# Exhibit 4:
# Deposition Excerpts of Eure

Transcript of the Testimony of
# Loretta Eure

**Date:**
August 29, 2013

**Case:**
Loretta I. Eure v. The SAGE Corporation

Kim Tindall and Associates, LLC
Phone: 210-697-3400
Fax: 210-697-3408
Email: ktindall@ktanda.com
Internet: www.kimtindallandassociates.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LORETTA I. EURE                )
                               )
vs.                            ) CASE NO. 5:12-C-01119
                               )
THE SAGE CORPORATION           )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION

LORETTA I. EURE

August 29, 2013

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION OF LORETTA I. EURE,

produced as a witness at the instance of the Defendant

and duly sworn, was taken in the above-styled and

numbered cause on the 29th day of August, 2013, from

1:34 p.m. to 3:29 p.m., before Tammy Pozzi, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine at the

offices of Naman, Howell, Smith & Lee, PLLC, Union

Square II, 10001 Reunion Place, Suite 600, San Antonio,

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

hereto.

```
1                          APPEARANCES

2        FOR THE PLAINTIFF:

3            Mr. Glenn D. Levy
             Glenn D. Levy, Attorney at Law
4            906 West Basse Road, Suite 100
             San Antonio, Texas 78212
5            Telephone: (210) 822-5666
             E-mail: Glenn@GlennLevyLaw.com
6
         FOR THE DEFENDANT:
7
             Mr. Larry D. Warren
8            Naman, Howell, Smith & Lee, PLLC
             Union Square II
9            10001 Reunion Place
             San Antonio, Texas 78216
10           Telephone: (210) 731-6300
             E-mail: lwarren@namanhowell.com
11
             Mr. John T. Hawkins
12           Naman, Howell, Smith & Lee, PLLC
             400 Austin Avenue, Suite 800
13           P.O. Box 1470
             Waco, Texas 76703-1470
14           Telephone: (254) 755-4100
             E-mail: jhawkins@namanhowell.com
15
         ALSO PRESENT:
16
             Mr. Chris Thropp
17
             Ms. Carmella Campanian
18
             Mr. Patrick Knapick, Videographer
19

20

21

22

23

24

25
```

Electronically signed by Tammy Pozzi (001-241-268-3188)                    c569de6f-c35a-4a5f-801a-8fa76856dc36

1                           INDEX

2                                                    PAGE

3      Appearances................................     2

4      Loretta I. Eure
            Examination by Mr. Warren...............     4
5           Examination by Mr. Levy.................    78

6      Reporter's Certificate......................    80

7

8

9                          EXHIBITS

10     NO.  DESCRIPTION                              PAGE

11      1   Driver Qualification Checklist...........    10

12      2   Corporate Personnel Policy Manual excerpts   29

13      3   Corporate Policy Manual Acknowledgement..    29

14      4   4/1/11 E-mail to Gregg Aversa...........    55

15      5   4/1/11 E-mail to Loretta Eure...........    58

16      6   4/4/11 E-mail to Gregg Aversa...........    61

17      7   4/6/11 E-mail to Gregg Aversa...........    62

18      8   Charge of Discrimination................    67

19      9   Weekly Class Drive Schedule.............    74

20

21

22                       *-*-*-*-*-*

23

24

25

Electronically signed by Tammy Pozzi (001-241-268-3188)                     c569de6f-c35a-4a5f-801a-8fa76856dc36

.3:33:39  1          THE VIDEOGRAPHER:  Good afternoon.  Today

2      is the 29th day of August, 2013, and the time is

3      1:34 p.m.  We're on the record.

4                  We're located at the offices of Naman,

.3:33:51  5      Howell, Smith & Lee, PLLC, 10001 Reunion Place, Suite

6      600, San Antonio, Texas, 78216.  And we're here for the

7      Oral and Video Deposition of Loretta I. Eure in the

8      matter of Loretta I. Eure versus The SAGE Corporation,

9      Civil Action Number 5:12-CV-0119, to be heard in the

.3:34:23  10     United States District Court for the Western District of

11     Texas, San Antonio Division.

12                 My name is Patrick Knapick, and I'm the

13     legal videographer.  Our court reporter is Tammy Pozzi,

14     and we are both with Kim Tindall & Associates of

.3:34:38  15     San Antonio, Texas.

16                 Would counsel please introduce themselves

17     and whom they represent?

18                 MR. LEVY:  Glenn Levy for the plaintiffs.

19                 MR. WARREN:  Larry Warren and John Hawkins

.3:34:50  20     on behalf of The SAGE Corporation.

21                 THE VIDEOGRAPHER:  Also present today is?

22                 MR. THROPP:  Chris Thropp from The SAGE

23     Corporation.

24                 MR. WARREN:  And Carmella Campanian.

.3:34:58  25                 MS. CAMPANIAN:  Carmella Campanian, The

.3:34:59  1      SAGE Corporation me.

2                      THE VIDEOGRAPHER:  Madam Court Reporter,

3          would you please swear our witness?

4                          LORETTA I. EURE,

.3:35:03  5      having been first duly sworn, testified as follows:

6                          EXAMINATION

7          BY MR. WARREN:

8              Q     Loretta, would you state your full name for us,

9          please?

.3:35:17  10             A     Lorenzo Inez Eure.

11             Q     Okay.  I'm sorry.  I couldn't hear you.

12         Lorenzo?

13             A     Inez Eure.

14             Q     Have you had a name change?

.3:35:29  15             A     Yes, sir.

16             Q     When did you accomplish the name change?

17             A     I don't recall exactly the date.  A couple

18         months ago.

19             Q     All right.  Now, when the lawsuit was filed and

.3:35:38  20         as it's currently styled, it's filed under the name

21         Loretta.

22             A     Yes, sir.

23             Q     And so you would have changed your name from

24         Lor- -- Loretta I. Eure to Lorenzo?

.3:35:49  25             A     I. Eure.

Electronically signed by Tammy Pozzi (001-241-268-3188)          c569de6f-c35a-4a5f-801a-8fa76856dc36

.3:35:50  1      Q    I. Eure within the last two months?

          2      A    Approximately, yes.

          3      Q    Where did you file your official name change?

          4      A    Guadalupe County.

.3:36:12  5      Q    What you'd like you to do -- well, let's -- let

          6   me go through a few ground rules, okay?  From time to

          7   time, I may ask a question that you respond with a nod

          8   of a head, the shake of a head or an "uh-huh" and an

          9   "huh-uh".

.3:36:25 10      A    "Yes" or "no".

         11      Q    Those are hard to read on here.  Your lawyer

         12   may have explained that to you.

         13      A    Yes, sir.

         14      Q    Okay.  So if on occasion I look at you and say,

.3:36:32 15   "Was that a yes or a no," it's not meant to be rude.

         16   It's meant to have a clear record --

         17      A    I understand.

         18      Q    -- all right?  All right.  Also, you can take a

         19   break at any time that you would like.

.3:36:39 20      A    Thank you.

         21      Q    Now, because of the nature of this suit, there

         22   are certain questions that are going to be very personal

         23   that I'm going to have to ask.  Are you okay with that?

         24      A    Yes, sir.

.3:36:47 25      Q    Okay.  Now, would you state just -- I think you

Electronically signed by Tammy Pozzi (001-241-268-3188)                  c569de6f-c35a-4a5f-801a-8fa76856dc36

| | | | |
|---|---|---|---|
| .3:36:51 | 1 | | already stated your full name for the record.  Lorenzo |
| | 2 | | I. Eure, correct? |
| | 3 | A | Yes. |
| | 4 | Q | What is your date of birth? |
| .3:36:57 | 5 | A | 2/17/1959. |
| | 6 | Q | Where were you born? |
| | 7 | A | San Antonio, Texas. |
| | 8 | Q | And were you born under the -- and given the |
| | 9 | | name Loretta I. Eure? |
| .3:37:09 | 10 | A | Yes. |
| | 11 | Q | Did you grow up in San Antonio? |
| | 12 | A | No. |
| | 13 | Q | Where did you grow up? |
| | 14 | A | Overseas, pretty much. |
| .3:37:21 | 15 | Q | Was your family in the military? |
| | 16 | A | My father was in the military, yes. |
| | 17 | Q | Where did you go to high school? |
| | 18 | A | Seguin. |
| | 19 | Q | Did you graduate from Seguin High School? |
| .3:37:34 | 20 | A | Yes, sir. |
| | 21 | Q | What year? |
| | 22 | A | 1977. |
| | 23 | Q | Did you go to any type of school after |
| | 24 | | graduation from Seguin High School? |
| .3:37:45 | 25 | A | Yes, sir. |

.3:37:45  1        Q     Tell me about your education.

          2        A     Truck driving school, San Antonio College for

          3  EMT, San Antonio College for dialysis therapy, auto

          4  mechanics.

.3:38:05  5        Q     At SAC?

          6        A     No, at -- I can't recall the name of the

          7  college.  I think it was like "Esens" or something like

          8  that.  Way back.

          9        Q     What other formal education after high school?

.3:38:19 10        A     That's it.

         11        Q     Did you receive any type of associate's degree?

         12        A     No, sir.

         13        Q     Are you married?

         14        A     No.

.3:38:32 15        Q     Have you ever been married?

         16        A     No.

         17        Q     Do you have any children?

         18        A     No.

         19        Q     After graduating from high school, did you go

.3:38:49 20  into the workforce?

         21        A     Yes, sir.

         22        Q     Where did you work?  First -- start with your

         23  first job.

         24        A     My first job, I was 12.

.3:38:57 25        Q     Okay.

.3:38:58  1        A    I worked as a -- started off as a dishwasher in

2    a restaurant in Seguin.  Then I -- my second job was at

3    a textile plant in Seguin, graduation night, actually.

4    Then I've worked at the steel mill in Seguin.

.3:39:20  5        Q    Is that Triple S or --

6        A    Actually, it was SMI.

7        Q    SMI, okay.  How -- and was this after you got

8    out of high school?

9        A    School, yes, sir.

.3:39:28  10        Q    What did you do for SMI steel mill?

11        A    I was a crane operator.

12        Q    How long were you a crane operator for SMI?

13        A    I don't really remember.  A couple of years,

14    roughly.

.3:39:42  15        Q    How long did you work for SMI?

16        A    I don't really remember.

17        Q    Why did you leave SMI?

18        A    I wanted to change -- I got tired of operating

19    a crane.  Wanted something different.

.3:39:59  20        Q    Okay.  What -- what did you go into?

21        A    I believe that's when I went into trucking.

22        Q    Is that when you went to the truck driving

23    school?

24        A    Yes, sir, I think so.

.3:40:08  25        Q    And where was the truck driving school that you

Electronically signed by Tammy Pozzi (001-241-268-3188)                c569de6f-c35a-4a5f-801a-8fa76856dc36

| | | | |
|---|---|---|---|
| .3:40:10 | 1 | | attended? |
| | 2 | A | American Truck Driving School. |
| | 3 | Q | In San Antonio? |
| | 4 | A | No.  It was in Elmont, Texas. |
| .3:40:21 | 5 | Q | Do you know if that school still exists? |
| | 6 | A | I don't know. |
| | 7 | Q | Did you graduate from that school? |
| | 8 | A | Yes. |
| | 9 | Q | Did you go into truck driving after graduation? |
| .3:40:33 | 10 | A | Yes. |
| | 11 | Q | What was your first truck driving job? |
| | 12 | A | I don't really remember the name.  I think -- I |
| | 13 | | have to reflect back to my -- I can't remember the name. |
| | 14 | Q | Do you have a resume with you, by chance? |
| .3:41:03 | 15 | A | No, sir, I don't. |
| | 16 | Q | All right. |
| | 17 | | (Exhibit 1 marked.) |
| | 18 | Q | (BY MR. WARREN):  Let me show you what's marked |
| | 19 | | as Exhibit No. 1.  This is a Driver Qualification File |
| .3:41:14 | 20 | | for you from SAGE Corporation.  And -- |
| | 21 | A | This -- |
| | 22 | Q | -- we'll walk through this. |
| | 23 | A | Yeah.  This would be all the way back to -- I |
| | 24 | | don't even remember. |
| .3:41:32 | 25 | Q | All right.  Let's just go through Exhibit 1. |

.3:41:35  1        On the first page, that's just the qualification

          2    checklist that's initiated by SAGE so they can keep

          3    track of all the records that are obtained?

          4        A    Yes.

.3:41:43  5        Q    Page 2, do you recognize -- of Exhibit 1, do

          6    you recognize as this -- this as your application for

          7    employment with SAGE Corporation, December 8th, 2010?

          8        A    Yes, sir.

          9        Q    And you listed your name as Loretta Eure?

.3:41:56  10       A    Yes.

          11       Q    Texas driver's license -- and it was a

          12   commercial license -- 08136486, correct?

          13       A    Yes.

          14       Q    Is that still that -- your license today?

.3:42:08  15       A    Yes.

          16       Q    Address, 4823 Laura Lane, Kirby, Texas 78219.

          17   Is that still your address?

          18       A    Yes, sir.

          19       Q    And at that time, you had lived there for 10

.3:42:17  20   years, correct?

          21       A    Yes, sir.  Okay.  This only --

          22       Q    On page 2 -- or it's actually page 3 of the

          23   driver qualification file, it lists your employment

          24   roughly for the past 10 years.

.3:42:34  25       A    Correct.

Electronically signed by Tammy Pozzi (001-241-268-3188)                   c569de6f-c35a-4a5f-801a-8fa76856dc36

| .3:42:35 | 1 | MR. LEVY: Looks like there's two page -- |

.3:42:35  1    MR. LEVY: Looks like there's two page --

2    THE WITNESS: Yeah.

3    MR. LEVY: -- 3s.

4    MR. WARREN: There may be. That would be

.3:42:40  5  inadvertent. Actually, it's --

6    MR. LEVY: Well --

7    MR. WARREN: -- listed two page 3s but I

8  think it's to get enough employers.

9    THE WITNESS: Information.

.3:42:47 10    MR. LEVY: Oh, I got you.

11    Q    (BY MR. WARREN): Okay. So let's start in

12  chronological order with your past employers that were

13  submitted by your application to SAGE, and that would be

14  on the second page of the past employers. The first one

.3:43:01 15  listed is Cougar Tractor. Do you see that?

16    A    At the bottom, yes.

17    Q    All right. And is that a trucking company?

18    A    Yes.

19    Q    And it states that you worked for them from

.3:43:10 20  November of 2001 until about March of 2003.

21    A    Correct.

22    Q    Located in San Antonio. What was your job for

23  them?

24    A    Over-the-road driver.

.3:43:21 25    Q    It says you left because you quit.

.3:43:23  1        A    Yes.

          2        Q    Why did you quit?

          3        A    I had personal problems, and I needed to be

          4    home, not over the road.

.3:43:34  5        Q    Did those personal problems have anything to do

          6    with your employment with Cougar Tractor?

          7        A    No.   It didn't have anything to do with them.

          8    It had everything to do with my personal life.

          9        Q    Okay.   The next company that you worked for was

.3:43:49 10    the same month.   Started March of '03 to August of '03.

         11    That's Earth Transport.

         12        A    Mm-hmm.

         13        Q    Okay.   That's, again, where she'll need a "yes"

         14    or a "no".

.3:43:58 15        A    Yes.

         16        Q    And what type of company was that?

         17        A    A rock company.

         18        Q    Okay.

         19        A    Gravel hauler.

.3:44:07 20        Q    And it says you were driving a dump truck.

         21        A    Yes, sir.

         22        Q    And is that what allowed you to be closer to

         23    home than the --

         24        A    Yes, sir.

.3:44:13 25        Q    -- over-the-road driving?

.3:44:14  1       A    Yes, sir.

2       Q    All right.  And it also states that you quit

3   them.  Why did you quit Earth Transport?

4       A    Because they paid a percentage the money in

.3:44:22  5   that case.

6       Q    So you quit for more money?

7       A    Yes, sir.

8       Q    Then August of '03 for two months you worked

9   for SMT, and it looks like you went back to work for

.3:44:34  10  Cougar.

11      A    Actually, it was -- I went to work for Cougar,

12  leased on with SMT.

13      Q    All right.  So you were back with your original

14  employer that you left because there were personal

.3:44:44  15  problems at home?

16      A    Correct.

17      Q    Had the personal problems at home resolved?

18      A    Pretty much so.

19      Q    And it says that you worked for them only for

.3:44:52  20  two months and quit, correct?

21      A    Yes, sir.

22      Q    Why did you quit?

23      A    He actually -- Risk was closing the company.

24      Q    Cougar Tractor?

.3:45:05  25     A    Yes, sir.

Electronically signed by Tammy Pozzi (001-241-268-3188)        c569de6f-c35a-4a5f-801a-8fa76856dc36

.3:45:06   1        Q    Did you try to sign on for SMT?

           2        A    No.

           3        Q    Because SMT is still in business, isn't it?

           4        A    Yes.

.3:45:13   5        Q    Okay.  Next company that's listed here is Swift

           6   Transportation beginning in October of '03, going to

           7   November of '05.

           8        A    Yes, sir.

           9        Q    What type of job did you have for them?

.3:45:24  10        A    Back over the road.

          11        Q    And it says that you drove for them for two

          12   years, and why did you leave?

          13        A    Actually, I had gotten hurt at Swift, and I

          14   couldn't get them to -- the doctor to release me.  He

.3:45:47  15   kept dragging it on.  I was fine, so I quit because of

          16   that.

          17        Q    All right.  It says you quit and it was because

          18   you were hurt on the job and the doctor wouldn't release

          19   you to return to work.

.3:45:58  20        A    Yes.

          21        Q    Why wouldn't the doctor release you to return

          22   to work?

          23        A    I don't know why he wouldn't release me.  I was

          24   fine.  I can't -- I can't tell you why.

.3:46:08  25        Q    So you quit in November of 2005 and went to

.3:46:11  1     work for Leonel Marroquin --

        2          A    Marroquin.

        3          Q    -- Trucking.

        4          A    Yes.

.3:46:16  5          Q    Is it also known as Giovanni Trucking?

        6          A    Yes.

        7          Q    And they're in San Antonio?

        8          A    Mm-hmm.

        9          Q    Again, she'll need a "yes".

.3:46:23 10          A    Yes.

       11          Q    And that was about a year -- well, no, the same

       12     month that you quit Swift, you went straight over to

       13     Giovanni Trucking.

       14          A    Mm-hmm, yes, sir.

.3:46:31 15          Q    And worked for them until July of '06.

       16          A    Yes.

       17          Q    And what happened then?

       18          A    I -- and in that case, my mother was very sick.

       19     I needed to -- Marroquin's Trucking was

.3:46:50 20     around-the-clock, every day.  It wasn't over the road,

       21     but it was from San Antonio to Odessa and the truck

       22     never stopped.  It couldn't stop.  It was a team

       23     operation.  So I needed to dedicate my time to my

       24     mother, and that's why I left him.

.3:47:08 25          Q    Okay.  So you left him in July of '06 and went

.3:47:13  1    to work for Rulon Transportation?

2         A    Yes.

3         Q    And you worked for Rulon for four years?

4         A    Yes, sir.

.3:47:20  5    Q    Why did you leave Rulon?

6         A    I had an incident where they sent me to -- I

7    don't remember what part of North Dakota, to work during

8    the -- I -- I can't remember if it was in December or --

9    November, December.  And they asked me to go up there

.3:47:50 10   and work, and I agreed.  And one of the -- I had to pick

11   up another driver to go along with me.  I had never done

12   it, so I didn't have a clue.

13             The guy that went with me stated that I

14   was going to be angry when I came back.  And I said,

.3:48:10 15   "Why is that?"  He said, "Because they're not going to

16   pay you what they say."  I said, "They won't do it but

17   one time."  And it turns out, he knew what he was

18   talking about.

19             They didn't compensate us like we had --

.3:48:24 20   they had agreed.  They compensated us accurately up

21   until when we departed North Dakota.  The trip down,

22   they did not.  And that's why I quit.

23        Q    Did you file any type of fair labor --

24        A    No.

.3:48:41 25   Q    -- complaint?

Electronically signed by Tammy Pozzi (001-241-268-3188)                    c569de6f-c35a-4a5f-801a-8fa76856dc36

.3:48:42  1        A    No.

          2        Q    Who was your supervisor at Rulon?

          3        A    Ricardo Guzman.

          4        Q    Where was he based?

.3:48:50  5        A    San Antonio.

          6        Q    Is he still with Rulon?

          7        A    Yes.

          8        Q    In January 2010, you went to work for Pro Lab.

          9    What type of company is that?

.3:49:05  10       A    Medical.

          11       Q    It says that you are a phlebotomist.  Did you

          12   receive training to become a phlebotomist?

          13       A    Actually, no.

          14       Q    Okay.  But did that also kind of come -- or

.3:49:15  15   stem off of your EMT training that you --

          16       A    Yes.

          17       Q    -- had at San Antonio College?

          18       A    Yes.

          19       Q    Okay.  You worked for them for five months and

.3:49:23  20   quit.  Why did you quit?

          21       A    It was mobile.  I was going to -- it was more

          22   geriatric and utilizing my vehicle, and it was a lot of

          23   wear and tear on my car for the money.

          24       Q    Okay.  Then you left there and went to work for

.3:49:46  25   Raygar?

.3:49:47  1        A    That was the -- I went to work for an

2    owner-operator that was leased on with Raygar.

3        Q    Does Raygar stand for Raymond Garcia?

4        A    No.  I don't know what it stands for.

.3:49:57  5        Q    Okay.  And you worked for that company for only

6    about 30 days, right?

7        A    Yes.

8        Q    Why did you quit?

9        A    Because the owner-operator that I worked for

.3:50:08  10    expected me to drive a wrecked -- to be -- in other

11    words, the truck was not legal, mechanically sound, I

12    should say.

13        Q    Okay.  Any other reason that you quit Raygar?

14        A    No, that was it.

.3:50:29  15        Q    Then you left and went to Carter Express out of

16    Indiana?

17        A    Mm-hmm.

18        Q    Again, she'll need a "yes" or a "no".

19        A    Yes, sir -- yes, ma'am.

.3:50:37  20        Q    And you were there for approximately three to

21    four months?

22        A    Four months, yes, sir.

23        Q    Why did you quit Carter Express?

24        A    I -- I really don't know.  I -- I just didn't

.3:50:56  25    like the company, I guess I should say.

.3:51:01  1          Q    You left them in October of 2010, went to

         2     Trucks for You in 2010 out of Oklahoma, and worked the-

         3     -- with them up -- and I -- I guess until you were

         4     applying for this job in December of 2010, correct?

.3:51:16  5          A    No.   I only worked for -- I only went with them

         6     one trip.

         7          Q    Okay.   So it might have been from October 4th,

         8     2010 to October 18th, 2010?

         9          A    Correct.

.3:51:26 10          Q    Why did you quit Trucks for You?

        11          A    Because, again, I was going to buy a truck from

        12     them, and then the choices that I had were not good, so

        13     I declined.   I decided not to do that.

        14          Q    So in 2010, you -- between January of 2010 and

.3:51:52 15     October of 2010, you worked for four different trucking

        16     companies?

        17          A    Probably, yes, sir.

        18          Q    And quit all four of them?

        19          A    Yes, sir.

.3:52:11 20          Q    Have you ever filed any type of unemployment

        21     claim, other than the one in this case?

        22          A    I don't remember.   Probably, but I'm not for

        23     sure.

        24          Q    Which companies did you file unemployment

.3:52:37 25     claims with?

Electronically signed by Tammy Pozzi (001-241-268-3188)                    c569de6f-c35a-4a5f-801a-8fa76856dc36

.3:52:38  1        A    I couldn't tell you.  I can't remember.

       2        Q    Have you filed any other type of discrimination

       3   lawsuit other than the one you filed in this case?

       4        A    No, sir.

.3:52:57  5        Q    You applied to go to work for SAGE in December

       6   of 2010.  It's now -- let me get my dates right -- it's

       7   still August of 2013, three years later.  Have you --

       8   has your physical appearance changed to any degree

       9   between December 2010 and now?

.3:53:19 10        A    No.

      11        Q    Okay.  So it's fair to say that if we took a

      12   picture of you now, that that would be reflective of

      13   your appearance in the January 2011 to March 2011 time

      14   frame?

.3:53:34 15        A    I'm older, but I'm still ugly.  I'm still the

      16   same.

      17        Q    All right, thank you.  We are all older.  When

      18   you were applying for your -- well, let me go on down

      19   the -- keep on flipping through Exhibit No. 1 there.

.3:54:02 20        A    (Complies.)

      21        Q    Does it reflect your signature on what is

      22   titled as page 5 of 7, December 8th, 2010 --

      23        A    Yes, sir.

      24        Q    -- Applicant's Signature?  Okay.  And it looks

.3:54:12 25   to me perhaps -- is that Margie Brandon's signature in

.3:54:15  1    the middle, or do you know?

2         A    It appears to be, yes, sir.

3         Q    Did you know Margie Brandon at any time before

4    you went to work for SAGE?

.3:54:22  5    A    No, sir, I didn't.

6         Q    Did you know Maria Solis at any time before you

7    went to work for SAGE?

8         A    No, sir, I did not.

9         Q    All right.  On the next page of Exhibit 1, it

.3:54:32  10   has a Medical Examiner's Certificate.

11        A    Mm-hmm.

12        Q    Okay.  It's Loretta Eure, and gives you a

13   medical clearance to drive until November 9th of 2011.

14        A    Yes.

.3:54:44  15   Q    All right.  Below that is your driver's

16   license.  It's a little hard to read on this copy, but

17   from what you can tell, does that appear to be a front

18   and back copy of your license, the middle -- or the

19   second item --

.3:54:54  20   A    Yes.

21        Q    -- at the bottom?  And then I -- I'm assuming

22   that's a Social Security --

23        A    I'm --

24        Q    -- card that's kind of blacked out there.

.3:55:01  25   A    I'm assuming, yes, sir.

Electronically signed by Tammy Pozzi (001-241-268-3188)              c569de6f-c35a-4a5f-801a-8fa76856dc36

1          Q    Okay.  Then let's go to the next page.  Did you

2     have to give a -- well, basically did you have to pass a

3     drug alcohol test to go to work for SAGE?

4          A    Yes, sir.

.3:55:14 5          Q    And did you pass that test?

6          A    Yes.

7          Q    Did you also have to pass a DOT physical in

8     order to go to work for SAGE?

9          A    I can't remember if I did.

.3:55:30 10         Q    Okay.  We'll get into that in just a second.

11         A    (Reviews document.)

12         Q    The next document is -- it should at the top --

13    or about the third line down say Current Employer, CJC

14    Trucking, Trucks for You.

.3:55:51 15         A    Mm-hmm.

16         Q    And it shows somebody Castillon was VP.  Is

17    that who you worked for?

18         A    That was who I was trying to get a truck from,

19    yes.  Cris.

.3:56:09 20         Q    All right.  Let's go to the next page.  This is

21    with your -- when the company sends out a request for

22    information on you from Carter Express.  Did you

23    remember Sue Orr in safety at Carter Express?

24         A    No, never met her.

.3:56:26 25         Q    Okay.  The next page is information from Raygar

.3:56:31  1    International Trucking in Laredo.  And it gives reason

2    for leaving the employment is you had a conflict with

3    the owner of the truck.  Is that accurate?

4         A    Yes.

.3:56:41  5         Q    And do you remember Carlos Martinez?

6         A    No.

7         Q    Okay.  Let's go to the next page.  This is Pro

8    Lab.  This is when you were a phlebotomist.  You didn't

9    drive any type of company vehicle --

.3:56:58 10         A    No.

11         Q    -- for them?

12         A    No.

13         Q    This is your own personal car?

14         A    Right.

.3:57:01 15         Q    Okay.  The next page is from Rulon Transport

16    out of Des Moines Iowa.  Accident history is none,

17    signed by Jessica Hill.  Did you know Jessica Hill?

18         A    No.

19         Q    Next one is from Giovanni Trucking, or

.3:57:25 20    Marroquin, okay?  Let's go to the next one.  Now, this

21    is where you have to report to SAGE any violations,

22    traffic violations, and you reported that about six

23    months earlier, in June of twe- -- of 2010, you had a

24    speeding ticket in Sandusky, I- -- Ohio.

.3:57:43 25         A    Yes, sir.

.3:57:43   1          Q    All right.  Did you have to give a -- undergo a

           2    driver test, show them that you could actually drive a

           3    truck when you were applying with SAGE?

           4          A    Yes.

.3:57:57   5          Q    And you -- did you pass that test?

           6          A    Yes.

           7          Q    Okay.  SAGE then obtained a -- it's -- the next

           8    page, would be a background on your driving record, and

           9    it shows that just July -- June/July 2010 speeding

.3:58:09  10    ticket, correct?

          11          A    Yes.

          12          Q    The next page is Concentra Medical Centers.

          13    It's dated November 9th, 2011 for your -- well, excuse

          14    me.  That's the expiration of your medical card.  It

.3:58:25  15    says actual service date November 9th, 2009.

          16               Did you have to provide to SAGE proof of

          17    your having passed a medical exam in November of 2009?

          18          A    I would say so, since they have my long form

          19    (indicating).

.3:58:41  20          Q    All right.  And I understand the short form was

          21    that medical card?

          22          A    Yes, sir.

          23          Q    This is the long form --

          24          A    Yes, sir.

.3:58:46  25          Q    -- as evidenced by one is longer than the

| | |
|---|---|
| .3:58:48 | 1 |

.3:58:48  1    other, right?

          2         A    Mm-hmm.

          3         Q    Right.  Under "Comments," explain all yes

          4    answers.  And there was a "yes" under spine or other

.3:58:57  5    muscular -- muscular -- musculoskeletal, previous

          6    surgery, deformities, limitations of motion and

          7    tenderness.  And you're supposed to comment on that, and

          8    it's says number 1.  Can you read for me what is -- is

          9    that hypertension?

.3:59:13  10        A    No.

          11        Q    Okay.

          12        A    I don't have hypertension.  That's a

          13   hysterectomy.

          14        Q    Hysterectomy, okay.  What --

.3:59:20  15        A    Breast removal.

          16        Q    Breast removal, and the third?

          17        A    That I'd have to guess and -- I don't know what

          18   he wrote there.

          19        Q    Okay.

.3:59:30  20        A    Probably -- I'm -- and I'm --

          21        Q    Is it --

          22        A    -- the only other surgery that I had had was a

          23   tonsillectomy.

          24        Q    Okay.

.3:59:40  25        A    Unless he's putting --

Electronically signed by Tammy Pozzi (001-241-268-3188)              c569de6f-c35a-4a5f-801a-8fa76856dc36

.3:59:41  1        Q      Is it testosterone?

        2        A      The -- the hormonal therapy.

        3        Q      Okay.

        4        A      That -- it -- that was the other thing I was

.3:59:47  5   going to say.

        6        Q      All right.  So the surgeries were hysterectomy,

        7   breast removal, and then apparently taking of

        8   testosterone?

        9        A      Right.

.3:59:54 10        Q      All right.  And this would have been

       11   submitted -- this you medical card would have been

       12   submitted -- or long sheet was submitted to --

       13        A      SAGE.

       14        Q      -- SAGE for employment purposes; is that right?

.4:00:03 15        A      Obviously.

       16        Q      Okay.

       17        A      I don't remember having given to it them, but

       18   for them to have it, I had to have.

       19        Q      All right.  And the second page is continuation

.4:00:11 20   of that same long form.  It talks about your health

       21   history, which you listed no problems.

       22        A      Yes.

       23        Q      Your vision, which obviously passed the -- the

       24   muster, your hearing passed muster, and it appears your

.4:00:25 25   blood pressure all passed.

.4:00:26  1     A    Correct.

2     Q    Then the next item is actually -- the next page

3  is actually your driver's instructor road test exam. So

4  did the company give you a road test exam?

.4:00:36  5     A    Yes, sir.

6     Q    Okay. And the next, and I guess it's the last

7  page, what is that?

8     A    It is a Certificate of Qualification that was

9  issued by their safety administrator.

.4:00:55  10     Q    Okay. And after filling out all aspects of

11  Exhibit No. 1, the driver qualification file, and the

12  company doing all -- the background check, medical

13  verification, drug tests, et cetera, did SAGE

14  Corporation offer you a job in -- sometime December of

.4:01:12  15  2010 to January 2011?

16     A    Yes.

17     Q    And did you go to work for SAGE?

18     A    Yes.

19     Q    We'll need to leave that out here because she

.4:01:23  20  will take charge of all that.

21     A    Okay.

22     Q    What was your rate of pay when you were hired

23  and went to work for SAGE?

24     A    I'm not 100 percent. I'm -- I'm going to say I

.4:01:38  25  think it was $14 an hour.

| | | |
|---|---|---|
| .4:01:41 | 1 | Q    Okay. |
| | 2 | (Exhibit 2 marked.) |
| | 3 | Q    (BY MR. WARREN):  Let me hand to you what's now |
| | 4 | marked as Exhibit No. 2 and ask you to take a glance at |
| .4:01:56 | 5 | that.  And I'll represent to you that it's the cover |
| | 6 | sheet and various pages of the company's corporate |
| | 7 | Personnel Policy Manual. |
| | 8 | A    (Reviews document.) |
| | 9 | Q    And while we're looking at that, I'm going to |
| .4:02:23 | 10 | hand you Exhibit 3 and ask you to look through that and |
| | 11 | then I'll ask you some questions. |
| | 12 | (Exhibit 3 marked.) |
| | 13 | A    Okay. |
| | 14 | Q    (BY MR. WARREN):  Okay.  Exhibit No. 3, do you |
| .4:02:33 | 15 | recognize that as your having signed acknowledging that |
| | 16 | you received a copy of the corporate company policy |
| | 17 | manual? |
| | 18 | A    Yes, sir. |
| | 19 | Q    And Exhibit No. 2 is a -- is portions of the |
| .4:02:45 | 20 | company manual that you did, in fact, receive? |
| | 21 | A    Yes. |
| | 22 | Q    All right.  In Exhibit No. 2, if you can turn |
| | 23 | to the second page of that exhibit, it shows that |
| | 24 | there's a title of the Table of Contents, and then |
| .4:03:09 | 25 | the -- what's the first heading from the Table of |

.4:03:12   1      contex- -- Contents?

           2          A     Equal Employment Opportunity.

           3          Q     Okay.  And then it goes on to talk about equal

           4      employment opportunity on age discriminations, ethics,

.4:03:24   5      avoidance of conflict of interest, sexual harassment and

           6      fraternization.  And you were provided a copy of this

           7      and reviewed it and signed acknowledging it, correct?

           8          A     Yes.

           9          Q     And at the bottom, does it talk about a

.4:03:37  10      complaint procedure that you are to go through?

          11          A     That's what it says, yes.

          12          Q     Okay.  On the next page where it talks about --

          13      it's President's Welcome.  Do you see that page?

          14          A     Yes, sir.

.4:03:53  15          Q     Would you read for me the fourth paragraph of

          16      the President's Welcome?

          17          A     If there is ever any issue that you want to

          18      discuss with me personally, I ask that you call the

          19      corporate office at any time and speak with me.  This

.4:04:10  20      includes any time you see something you think is wrong

          21      or violates company policies.  I would prefer to hear

          22      from you about a problem than not know there is a

          23      problem.  I ask that you first try to address issues to

          24      your supervisor, but the bottom line is you should

.4:04:24  25      feel -- feel free to talk with me.  No employee or

.4:04:27   1        student should ever be told by a supervisor that they

           2        cannot call me or the corporate office.

           3            Q    At any time during or after your employment

           4        with SAGE, did you try to contact Gregg Aversa?

.4:04:38   5            A    Yes.

           6            Q    Okay.  Did that occur after the incidents upon

           7        which this lawsuit is based?

           8            A    It occurred right about that time, yes, sir.

           9            Q    All right.  Now, the dates in the petition --

.4:04:52  10        or the complaint say that the incidents about which

          11        you're complaining occurred on March 29th and March 30th

          12        of 2011, all right?

          13            A    Okay.

          14            Q    At any time between your hire date in

.4:05:04  15        December 2010 and March 28th, 2011, did you ever try to

          16        contact Gregg Aversa?

          17            A    No.

          18            Q    Let's go to the second -- the next page in the

          19        employee manual.

.4:05:19  20            A    (Complies.)

          21            Q    At the top of where it says Employment

          22        Issues -- I think you may have to back up one page.

          23            A    Okay.

          24            Q    The title is 3.A.1, Equal Employment

.4:05:34  25        Opportunity.  Read for us what is the purpose of that

.4:05:37  1     section.

          2          A    To ensure continued compliance with federal and

          3     state laws providing for legal opportunity of employment

          4     with respective age of applicants and employees.

.4:05:49  5          Q    Okay.

          6          A    Excuse me.

          7          Q    Let's see.  I -- may I see what you're looking

          8     at?  Because I may -- mine was reading slightly

          9     different.  I want to see where I make a mistake.

.4:06:01 10          A    Maybe I read the wrong one.

         11          Q    I don't know.  All right.  I was starting right

         12     up at the top, and maybe you did read that one.  It just

         13     sounded different form what I'm reading here.  Read

         14     along with me, and I'll read it.

.4:06:17 15               It's -- the purpose is to ensure continued

         16     compliance with the applicable federal and state equal

         17     opportunity laws and executive orders.

         18          A    Oh, I'm sorry.  I read 3.A.2.

         19          Q    Okay.

.4:06:29 20          A    Okay.

         21          Q    3.A.2, that's on -- that's in the area on age

         22     discrimination.

         23          A    Okay.

         24          Q    All right.  Back at 3.A.1, did I read it

.4:06:35 25     correctly to ensure continued compliance with a- --

.4:06:37   1        applicable federal and state equal opportunity laws and

           2        executive orders?

           3             A    Yes, sir.

           4             Q    And the scope is this policy and procedure

.4:06:43   5        applies to all locations and employees of The SAGE

           6        Corporation.

           7             A    Yes.

           8             Q    So that would have covered you, and it would

           9        have covered San Antonio?

.4:06:51  10             A    Yes, sir.

          11             Q    And then the policy, It is the continued policy

          12        of The SAGE Corporation to offer available employment to

          13        qualified job applic- -- applicants regardless of race,

          14        color, religion, age, sex, national origin, veteran

.4:07:07  15        status, except where age and sex are essential, bona

          16        fide occupational requirements.  Officers, managers and

          17        supervisors of all school locations are instructed to

          18        take action to ensure that recruiting, hiring, transfer,

          19        promotion, demotion, compensation, training, layoff,

.4:07:24  20        recall, employment benefits and all other actions

          21        concerning personnel shall be taken solely on the basis

          22        of merit and fitness.

          23                    Did I read that correctly?

          24             A    Yes.

.4:07:51  25             Q    Under 3.A.6, Sexual Harassment and

.4:07:55 1     Fraternization -- that would be on the next page -- re-

2     -- read what -- for us what is the purpose of that

3     policy.

4         A    To prohibit any form of sexual harassment of

.4:08:05 5     employees or students and to prohibit fraternization

6     with students by employees.  To foster a safe,

7     comfortable and non-threatening learning and working

8     environment.

9         Q    And read for us what is the scope of this

.4:08:17 10    policy.

11        A    This policy applies to all employees of the

12    company.  It is the responsibility of all employees to

13    implement this policy.

14        Q    So did that policy cover you?

.4:08:25 15        A    Yes.

16        Q    Did that policy cover the San Antonio office

17    for SAGE?

18        A    Yes.

19        Q    Read for us what -- under Procedure, what is

.4:08:32 20    the definition of sexual harassment.

21        A    Sexual harassment is defined as an unwelcome

22    and offensive behavior by an employee that is

23    sufficiently severe, persistent and pervasive that it

24    adversely affects the student's education or creates a

.4:08:48 25    hostile or abusive en- -- educational environment or

.4:08:51  1      adversely affects another employee's work or creates a

2      hostile or abusive employment environment.

3          Q    And read for us 3.1.1.

4          A    Sexual harassment can consist of sexually

.4:09:04  5      oriented kidding, physical contact or touching, demands

6      for sexual beha- -- be- -- behaviors, sexual favors tied

7      to promises of better treatments or threats concerning

8      employment for refusal, discriminating against an

9      employee for refusing to give in or granting favors to

.4:09:21 10      one who -- who submits.

11          Q    And 3.1.2 of the policy?

12          A    Other sexually harassing -- harassing conduct

13      includes offensive sexual flirtation, advances,

14      propositions, verbal abuse of a sexual nature, graphic

.4:09:36 15      verbal commentaries about the human body parts or

16      functions, sexual-degrading words used to describe an

17      individual and an offensive display in the workplace of

18      sexually suggestive objects or pictures.

19          Q    All right.  Under the next page, 3.3,

.4:09:57 20      Prohibition Against Sexual Harassment and

21      Fraternization.  What is the policy 3.3.1?

22          A    It is the policy of the company that sexual

23      harassment of students or employees and fraternization

24      by employees with students or other employees with whom

.4:10:11 25      there is a supervisory contact -- context is absolutely

Electronically signed by Tammy Pozzi (001-241-268-3188)          c569de6f-c35a-4a5f-801a-8fa76856dc36

.4:10:15  1    prohibited.

          2        Q    And under 3.4, read for us the Reporting

          3    Procedure.

          4        A    Employees who believe that this -- is that 3-

.4:10:25  5    -- do you want me to read --

          6        Q    Yes, sir.

          7        A    Employees who believe that this policy is being

          8    violated should notify the person engaging in such

          9    conduct that you find it offensive and that it is

.4:10:35 10    against company policy and that you expect them to stop

         11    it immediately.

         12        Q    Okay.  Under 3.4.3, what should one do if that

         13    warning does not cease the activity?

         14        A    If the conduct continues after warning,

.4:10:51 15    immediately report the violation to the school director

         16    and company's legal department in Camp Hill.  School

         17    directors that receive information on possible

         18    violations of this policy must contact the company's

         19    legal department immediately.

.4:11:09 20        Q    3.4.5, would you read for us that statement of

         21    the policy?

         22        A    Remember that the company cannot take action

         23    for sex- -- action for sexual harassment unless it has

         24    been notified of the contact -- conduct.  No employee

.4:11:20 25    will be disciplined or retaliated against for providing

.4:11:23   1      notice of harassment.

           2          Q    Do you agree with that statement, that a

           3      company can't act if it hasn't been notified of a

           4      problem?

.4:11:30   5          A    If it hasn't been notified, yes.

           6          Q    Okay.  On the next page, which is actually

           7      twenty- -- page 25 of the handbook, the policy manual,

           8      under Complaint Procedure, would you tell us what is the

           9      purpose of the complaint procedure?

.4:11:55  10          A    To establish a complaint procedure policy to

          11      main- -- maintain a good feeling among all employees of

          12      the company, to provide effective lines of communication

          13      within the company.

          14          Q    What is the scope of this complaint procedure?

.4:12:08  15          A    The policy applies to all employees of the SAGE

          16      Corporation.

          17          Q    And what is the policy?

          18          A    The SAGE Corporation encourages all employees

          19      to bring to the attention of their supervisor complaints

.4:12:21  20      about work-related situations.  Employees will be

          21      provided an opportunity to present complaints and

          22      appeals of decision to management through a formal

          23      complaint procedure.

          24          Q    And now walk me through the procedure.  What is

.4:12:35  25      item number 1 under the procedure?

| | | |
|---|---|---|
| .4:12:38 | 1 | A    Employees should discuss any work problems, |
| | 2 | suggestions or questions with their supervisor first. |
| | 3 | Q    Who -- |
| | 4 | A    Where -- |
| .4:12:43 | 5 | Q    First of all, who was your supervisor? |
| | 6 | A    Margie Brandon. |
| | 7 | Q    All right.  So the first step to issue a com- |
| | 8 | -- a complaint for any violation of company policy |
| | 9 | would -- you would go to Margie Brandon, correct? |
| .4:12:53 | 10 | A    Exactly, yes. |
| | 11 | Q    What is step 2? |
| | 12 | A    The resolution of the problem has not -- where |
| | 13 | the resolution of the problem has not been accomplished |
| | 14 | with the supervisor, the matter may then be discussed |
| .4:13:04 | 15 | with the appropriate department head.  The department |
| | 16 | head will attempt to give the employee his or her answer |
| | 17 | within two working days from the time he or she is |
| | 18 | informed.  Additionally, the president of SAGE is |
| | 19 | available to advise/counsel both employee and manager if |
| .4:13:18 | 20 | needed. |
| | 21 | Q    All right.  Who was your department head? |
| | 22 | A    Margie Brandon. |
| | 23 | Q    All right.  And then who was the president of |
| | 24 | SAGE, if you know? |
| .4:13:26 | 25 | A    I -- I -- the only other person that I knew was |

.4:13:30 1    Mr. Aversa.

2        Q    All right.  Did you bring any of the issues

3    about which you have -- have filed this complaint to the

4    attention of Margie Brandon?

.4:13:39 5        A    That day --

6        Q    All right.

7        A    -- just briefly.

8        Q    Did you bring any of the issues to the

9    attention of anyone else at SAGE?

.4:13:46 10       A    Mr. Aver- -- well, I tried, Mr. Aversa.

11       Q    But he wasn't available, correct?

12       A    But he wasn't available.

13       Q    Other than Margie Brandon and then your effort

14   with Mr. SAGE [sic], did you bring it to the attention

.4:13:56 15   to anyone else at SAGE?

16       A    No.

17       Q    Read for us the Open Door Policy and Counseling

18   paragraph, if --

19       A    Normally an employee will be expected to use

.4:14:22 20   the complaint procedure to resolve a problem.  However,

21   if the problem or complaint is a personal -- is of a

22   personal nature or involves an immediate supervisor, the

23   employee may meet first with the school director to

24   discuss it.  The school director will decide if it

.4:14:37 25   should be first discussed with the employee's

.4:14:38  1    supervisor.  If so, the employee will be directed to use

        2    the complaint procedure.  If the complaint, suggestion

        3    or question is -- is of such a nature that resolution of

        4    the problem would be hampered by the complaint

.4:14:50  5    procedure, the school director will take the appropriate

        6    action.  All employees are encouraged to contact the

        7    corporate office, including the President/CEO on the

        8    matter that is not resolved to their satisfaction at the

        9    local school level.

.4:15:02  10       Q    Okay.  It appears that you began to work for

       11    SAGE sometime late December of 2010 and worked for SAGE

       12    until March 30th or 31st, 2011; is that correct?

       13       A    Yes.

       14       Q    So right at a three-month period of time?

.4:15:17  15       A    (Moves head up and down.)

       16       Q    Am I right?

       17       A    Yes, sir.

       18       Q    Okay.  Between December 21st, 2010 and

       19    March 28th, 2010, did you enter -- encounter any

.4:15:32  20    problems with SAGE?

       21       A    No.

       22       Q    How would you describe the work environment at

       23    SAGE for the time frame December 21, 2010 to March 28th,

       24    2011?

.4:15:44  25       A    Well, hol- -- ju- -- just a minute.  Can you

.4:15:46  1    ask me that question you just asked me again?

       2        Q    Sure.  How would you describe the work

       3    environment at SAGE for --

       4        A    No, the -- one before that one.

.4:15:54  5        Q    Sure.  I asked you did you ha- -- encounter any

       6    problems at SAGE between December 21, 2010 and

       7    March 28th, 2011.

       8        A    The only problem that I encountered -- I'm

       9    going to retract my answer earlier -- was with the

.4:16:15 10    sarcasm and little innuendos that I had to receive from

      11    Mr. Noel Smith.  That was my only other problem.

      12        Q    Was Noel Smith your supervisor?

      13        A    No, he was another --

      14        Q    He was a coworker?

.4:16:36 15        A    Coworker, yes.

      16        Q    Co-driver trainer?

      17        A    Another instructor, yes.

      18        Q    All right.  Did you make any complaint to --

      19        A    Ms. --

.4:16:42 20        Q    -- SAGE Corporation regarding Noel Smith's

      21    sarcasm and innuendos?

      22        A    I did with Ms. Margie.

      23        Q    When did you make these complaints to Ms. --

      24    Ms. Margie?

.4:16:55 25        A    I -- again, I can't remember the dates, but I

| | | |
|---|---|---|
| .4:16:58 | 1 | know there were like two occasions that I mentioned it |
| | 2 | to her.  Then I believe she told me that she had had a |
| | 3 | talk with him.  And then it kind of subsided, you know, |
| | 4 | and things went back to okay, and then it started again. |
| .4:17:19 | 5 | And -- and -- I don't really remember what |
| | 6 | happened after that.  I just kind of -- I think she told |
| | 7 | me she had another talk with him and talked to her |
| | 8 | superiors, I believe, and -- yes, so just those two |
| | 9 | times. |
| .4:17:38 | 10 | Q    All right.  Did you make any complaint about |
| | 11 | Noel Smith's conduct to anyone other than Margie -- |
| | 12 | A    No. |
| | 13 | Q    -- Brandon?  Did you make any written complaint |
| | 14 | about Noel Smith's conduct? |
| .4:17:50 | 15 | A    I can't remember if I did or not. |
| | 16 | Q    Was it your belief that Margie Brandon was |
| | 17 | attempting to address the concerns you had about Noel |
| | 18 | Smith's sarcasm and innuendos? |
| | 19 | A    Yes. |
| .4:18:04 | 20 | Q    Describe for me specifically what were the |
| | 21 | sarcastic statements and innuendos. |
| | 22 | A    Well, it's like -- she would instruct or -- me |
| | 23 | to like shadow him in the classroom and him to -- and |
| | 24 | then -- and in -- in other words, to instruct me in the |
| .4:18:31 | 25 | classroom as to how it was -- things were done, and he |

.4:18:36  1    didn't like it at all.  He grumbled a lot, you know.

        2    Just it -- then he'd make little comments about he

        3    needed -- he should have been in her position and not

        4    instructing.  He should be running -- she didn't know

.4:18:59  5    what she was doing, little things like that and -- and,

        6    you know, it's like he just didn't want to teach me.

        7         Q    Okay.  What other specific comments, and/or

        8    innuendos did Noel Smith address to you, other than what

        9    you've already described for us?

.4:19:22 10         A    Pretty much that's it.

       11         Q    All right.  Aside from the sarcasm and

       12    innuendos that you've described regarding Noel Smith,

       13    how was the work environment for you at SAGE between --

       14    between December 21, 2010 and March 28th, 2011?

.4:19:41 15         A    It was good, aside from that.

       16         Q    What was your job that you were specifically

       17    hired to do?

       18         A    I was an instructor, classroom, train on the

       19    course, train on the road.

.4:20:00 20         Q    And at $14 per hour, how many hours per week

       21    were you working?

       22         A    Well, I don't really remember exactly.  It

       23    wasn't much.  When I came on board, Ms. Margie told me

       24    that it wouldn't be a lot of hours, it was going to be

.4:20:18 25    like part time, but that they had this project coming in

Electronically signed by Tammy Pozzi (001-241-268-3188)              c569de6f-c35a-4a5f-801a-8fa76856dc36

.4:20:22  1    and -- that was going to be with the -- the Sanjel

       2    project, and she needed instructors to help get that off

       3    the ground and that there would be more hours then.  And

       4    I agreed to come in at that rate of pay and minimal

.4:20:46  5    hours.

       6              I mean, it wasn't -- I think I was

       7    getting -- I -- like I said, I'm not ex- -- I can't be

       8    exact -- about 28, 26, something like that, a week.

       9    Sometimes a little bit more, but not that -- not much

.4:21:05 10    more.  It was not full-time hours -- hour-wise, it was

      11    not full time.

      12         Q    Since you've left SAGE Corporation, have you

      13    returned to work?

      14         A    Oh, yes.

.4:21:16 15         Q    And in what capacity have you returned to work?

      16         A    I don't understand the question.

      17         Q    What job --

      18         A    Am I --

      19         Q    -- do you --

.4:21:24 20         A    -- a driver?

      21         Q    -- have?

      22         A    I'm a driver.

      23         Q    For whom?

      24         A    Sunline Energy.

.4:21:28 25         Q    When did you begin with Sunline Energy?

.4:21:31  1        A    I just started in -- this month, August.

         2        Q    What is your rate of pay with Sunline?

         3        A    $22 an hour.

         4        Q    How many hours a week will you be working with

.4:21:46  5    Sunline?

         6        A    Seventy, approximately, the -- the DOT limit.

         7        Q    Before you were working for Sunline, where did

         8    you work?

         9        A    ARC.

.4:21:57 10        Q    ARC?

        11        A    Mm-hmm.

        12        Q    And how long --

        13        A    Driver.

        14        Q    Sure.  Okay.  When did you begin working for

.4:22:03 15    ARC?

        16        A    September of this past year.

        17        Q    September of 2012?

        18        A    2012, yes.

        19        Q    And what was your rate of pay with ARC?

.4:22:16 20        A    Seventeen.

        21        Q    $17 dollars per hour?

        22        A    Yes, sir.

        23        Q    And how many hours a week were you averaging?

        24        A    About 70 -- 69, 70.

.4:22:28 25        Q    And did you remain with ARC from September of

| | | |
|---|---|---|
| .4:22:31 | 1 | '12 until -- |
| | 2 | A    I -- |
| | 3 | Q    -- roughly July of '13? |
| | 4 | A    Actually, August. |
| .4:22:37 | 5 | Q    Okay.  August of -- |
| | 6 | A    That was -- |
| | 7 | Q    -- 2013? |
| | 8 | A    Yes. |
| | 9 | Q    Who did you work for before ARC? |
| .4:22:44 | 10 | A    Genesis. |
| | 11 | Q    And what type of work did you do for Genesis? |
| | 12 | A    Driver. |
| | 13 | Q    When did you start working for Genesis? |
| | 14 | A    September of 2012. |
| .4:23:00 | 15 | Q    All right.  Now that's when you said? |
| | 16 | A    Or -- or '11. |
| | 17 | Q    Okay.  September of '11?  And how long did you |
| | 18 | work for Genesis? |
| | 19 | A    Till September of '12. |
| .4:23:08 | 20 | Q    And what was your rate of pay with Genesis? |
| | 21 | A    There I was being paid by the load. |
| | 22 | Twenty-eight percent, I believe it was. |
| | 23 | Q    Did you end up earning more money when you went |
| | 24 | to ARC driving by the hour, or did you make more money |
| .4:23:33 | 25 | at Genesis? |

Electronically signed by Tammy Pozzi (001-241-268-3188)                c569de6f-c35a-4a5f-801a-8fa76856dc36

.4:23:34    1        A    Well -- depends, actually.  It depends on the

          2    loads as to how you pay.  So I mean -- I guess it was

          3    about the same or a little bit more hourly, yes.

          4        Q    Okay.  Who did you work for before Genesis?

.4:24:06    5        A    I want to say Quality Driveaway.

          6        Q    From when until when did you work for Quality?

          7        A    After I left SAGE, a couple of months.  I don't

          8    remember the exact date, but it was my first job after

          9    SAGE.

.4:24:27   10        Q    About May of 2011, then?

         11        A    Until September.

         12        Q    Okay.  And what -- you -- were you a driver for

         13    them?

         14        A    Yes.

.4:24:36   15        Q    And what was your rate of pay for Quality?

         16        A    Thirty-six cents a mile.

         17        Q    Long haul?

         18        A    Forty-two cents a mile, I'm sorry.  Yes, all

         19    over.

.4:24:48   20        Q    Were you fired from any of --

         21        A    No.

         22        Q    -- these companies afterwards?

         23        A    No, sir.

         24        Q    Okay.

.4:25:01   25              MR. LEVY:  Mr. -- let him -- make sure he

.4:25:04  1    finishes his question.

2                    THE WITNESS:  Oh.  I'm sorry.

3                    MR. LEVY:  No problem.

4         Q    (BY MR. WARREN):  Now, you filed a complaint in

.4:25:12  5    this case about some conduct that you say took place at

6    SAGE Corporation.

7         A    Yes, sir.

8         Q    Tell me about that.  When did you first

9    encounter any -- any item or activity that you felt was

.4:25:23  10   inappropriate at SAGE?

11        A    Again, I don't remember the date.  It was

12   when -- it was the day that Ms. Campanian arrived in

13   San Antonio --

14        Q    Okay.

.4:25:39  15       A    -- whatever date that was.

16        Q    All right.

17        A    I was scheduled to take a student out that

18   afternoon, around lunchtime or something like that.

19   Again, I don't really remember, but I know it was in the

.4:26:03  20   afternoon.  And the young man was there, I was there,

21   the office was closed.  Nobody else was there.

22                    I'm thinking we -- we pre-tripped the

23   truck and -- or we were -- something to that effect,

24   either we had already pre-tripped it or something to

.4:26:35  25   that effect that -- and it was raining.  And we were

.4:26:39  1    standing out, and I think I had tried to contact

2    Ms. Margie to find out where the keys were for the

3    vehicle.

4                And so then a little while later -- so

.4:26:51  5    we're kind of -- and it -- I believe it was a -- a truck

6    that had a -- a trailer that had a -- something on it to

7    where we were -- like a refur, and I don't really

8    remember.  But anyway, we were standing out in the rain

9    waiting for them to arrive.

.4:27:08 10                So they get there, and I go get the keys

11    because now we're on my student's time.  I go get the

12    keys and we start doing what -- and then I believe

13    that's when Ms. Campanian came out, introduced herself,

14    and I acknowledged her.  And then I think that was when

.4:27:36 15    she told me that I would not be taking -- if I'm not

16    mistaken, I think she's the one that told me that I

17    would not be taking that certain vehicle, that I would

18    be taking another one.

19                So we had to stop that and go get the keys

.4:27:53 20    to the another one, and we proceeded off to go do our

21    run.

22        Q    Let me ask you this:  Was there anything wrong

23    with the first truck that you were told you wouldn't be

24    taking?

.4:28:04 25        A    Not to my knowledge.

.4:28:05   1          Q    Did anybody tell you there was something that

           2    needed to be repaired on that first truck and that's why

           3    you weren't going to be --

           4          A    No.

.4:28:11   5          Q    -- taking -- okay.  All you can tell us is that

           6    you were told "you can't use this truck, you've got to

           7    use another one"?

           8          A    Right.

           9          Q    Have you told us everything about that

.4:28:18  10    discussion or encounter with Ms. Campanian?

          11          A    Yes.  To my recollection, yes.

          12          Q    All right.  And now you were telling us that

          13    you got in the truck and drove off.

          14          A    Mm-hmm.  We got in the -- did what we had to

.4:28:29  15    do, got in the truck, we drove off.  And then when we --

          16    when the young man's time finished and we headed back to

          17    the yard, we got there and we did you what we had to do,

          18    our post-trip.  And then I was getting ready -- doing my

          19    paperwork, getting ready to leave when Maria -- I

.4:28:48  20    believe it was Maria that came over and told me that

          21    Ms. Campanian wanted to meet with me.

          22               And I asked her about what, so she said,

          23    "I don't know.  She's over here."  So I said, "Okay."

          24    So I walked over there.  By the time I walked over --

.4:29:06  25    got my stuff together and walked over there, Maria was

.4:29:08  1    in her office, Ms. Margie was like over by the restroom

        2    and Ms. Campanian was in Ms. Margie's office.

        3              I stood there and I -- a- -- again, I

        4    don't remember if she was on the phone or what.  Then

.4:29:25  5    when she acknowledged me, I -- I said, "You wanted to

        6    speak to me."  So I went in -- she told me to come in, I

        7    went in and she said yes and then she said something to

        8    the effect of -- and I'm like -- so I'm -- you know,

        9    I'm -- I'm wondering what she wanted to speak to me

.4:29:51 10    about.

       11              And I said, "So you wanted to speak to

       12    me?"  And so she says, "Yes."  She said, "I've never had

       13    to deal with something like this."  And I said, "What do

       14    you mean?  Because I'm gay?"  And she said some- -- no

.4:30:28 15    sh- -- like she paused and then she said

       16    "insubordinate," that I was insubordinate.

       17              And I wondered how was I insubordinate

       18    because we had every bit of two seconds in the -- what

       19    do you call it -- the presentation, basically, or the

.4:30:51 20    introduction.

       21    Q    Okay.  Tell me anything else about that

       22    conversation -- everything about it.

       23    A    As far as I was concerned, that was it, I

       24    believe.  She got a phone call.  I don't recollect if I

.4:31:10 25    signed anything.  I -- I -- I -- I was dismissed.

.4:31:19   1      Q    Have you told me everything about your

2   encounter with Carmella Campanian on that occasion --

3      A    That I can --

4      Q    -- until you were dismissed when she got the

.4:31:31   5   phone call?

6      A    That I can recollect, yes, sir.

7      Q    When was your next encounter with anybody at

8   SAGE that you felt was inappropriate?

9      A    That was it.

.4:31:53  10      Q    What did you do in response to the conversation

11   where Carmella said because you were insubordinate?

12      A    I mean, you know, I just let her finish saying

13   what she had to say, and once I was dismissed, I was

14   dismissed.

.4:32:11  15      Q    When you say you were dismissed, were you

16   fired?

17      A    No, I mean like she had the phone call.

18      Q    Okay.

19      A    No, no.  I wasn't fired.

.4:32:23  20      Q    Did you complain to Margie, your supervisor,

21   about Carmella's comments?

22      A    Well, yes, but I didn't need to complain

23   because the room is very small.  But yes, I did.

24      Q    What do you mean the room was very small and

.4:32:41  25   didn't need to complain?

Electronically signed by Tammy Pozzi (001-241-268-3188)    c569de6f-c35a-4a5f-801a-8fa76856dc36

.4:32:42  1        A     Well, I mean, Ms. Margie's room -- her desk was

2        like there where the rug stops (indicating) and -- maybe

3        there's this much space to the door.  Maria's desk is

4        right here on the other side of this wall.  The door was

.4:32:59  5        open.  Ms. Margie was standing there.  I mean, you know,

6        it's -- it's just like this gentleman at the end of the

7        table.

8        Q     Okay.

9        A     (Indicating.)

.4:33:08  10       Q     Did you have any other discussions with anybody

11       at SAGE that you felt was inappropriate, other than this

12       one occasion where you've described Carmella saying that

13       she had never had to deal with anything like this?

14       A     No.

.4:33:26  15       Q     In addition to complaining to Margie and not

16       really having to because she -- the room was open, did

17       you complain to anybody else at SAGE about what

18       Carmella's comments were?

19       A     I -- I felt, yes, that I needed to -- that's

.4:33:43  20       when I tried to speak with Mr. Aversa.

21       Q     What day was that?

22       A     I actually -- if I'm not mistaken, that same

23       night, because it bothered me so bad that I ended up

24       calling Ms. Margie again.  After all of that, after I

.4:34:08  25       left, I ended up calling Ms. Margie, and I told her that

.4:34:11  1    I was really bothered by the tone and the -- the -- the

2    attitude, you know.  I hadn't done anything to this

3    lady, and I didn't appreciate it.

4                And then -- that was when I said I didn't

.4:34:29  5    have Mr. Aversa's information, you know.  So then I

6    Googled it, and I ended up getting the wrong Aversa,

7    initially.  So by the time this gentleman sends it back

8    to me, it was, I don't know, a couple of days later or

9    something like that that.  But then I redirected it to

.4:34:53  10   the correct Mr. Aversa.

11        Q    Did you ever return to work for SAGE after

12   that?

13        A    No.

14                MR. LEVY:  Whenever you can get to a

.4:35:02  15   point, I just need to --

16                MR. WARREN:  We can stop right now.

17                MR. LEVY:  Okay.  Take a little break.

18                THE VIDEOGRAPHER:  We're off the record at

19   2:35 p.m.

.4:35:11  20                (Recess taken.)

21                (Exhibit 4 marked.)

22                THE VIDEOGRAPHER:  We're on the record

23   with Eure tape 2 at 2:41 p.m.

24        Q    (BY MR. WARREN):  Okay.  We've had a short

.4:40:49  25   break.  Are you ready to proceed?

.4:40:50   1        A     Yes, sir.

       2        Q     All right.  You had made the comment that -- on

       3   the day when this event occurred with Ms. Campanian that

       4   you went to Margie and talked to Margie about it and

.4:41:04   5   that you tried to call Mr. Aversa but he was

       6   unavailable, correct?

       7        A     Yes, sir.

       8        Q     All right.  I'm going to hand you what's marked

       9   as Exhibit No. 4 and have you take a look at that.

.4:41:22  10        A     (Reviews document.)

      11        Q     And just starting at the top, it -- you can

      12   tell that this is an e-mail from Loretta Eure, you,

      13   directed to Chris Thropp on April the 1st, 2011, at

      14   12:19 at -- a little after midnight on April 19th,

.4:41:38  15   correct?

      16        A     I didn't send it to him.  I sent it to Gregg

      17   Aversa.

      18        Q     Okay.  Well, let's step down because it's a

      19   forwarded message.  As it says on the lower part, it

.4:41:48  20   says from Loretta.  That's you, correct?

      21        A     Mm-hmm.

      22        Q     She- -- she'll need a verbal res- --

      23        A     Yes.

      24        Q     Okay.

.4:41:53  25        A     Yes.  I'm sorry.

.4:41:54  1        Q    To Gregg Aversa and you copied Barbara Blake.

         2    How do you -- how did you know Barbara Blake?

         3        A    I don't believe I copied Barbara Blake either.

         4        Q    All right.  Well, there's a copy here.  And

.4:42:06  5    this is where you lodge your complaint about what's

         6    going on in late March.

         7        A    Oh, you know what?  I -- I still don't remember

         8    doing that, but I knew of Ms. Blake.  I didn't know

         9    her -- of her having being Ms. Margie's supervisor, I

.4:42:24 10    believe.  Ms. Margie -- because when I -- I told her

        11    that I had tried to call Mr. Aversa after the fact, it

        12    was a discussion we had.

        13        Q    Right.

        14        A    And then she said I think she had tried to

.4:42:37 15    contact Ms. Blake or something like that.  But I

        16    don't -- I don't remember this, but okay.

        17        Q    All right.  In any event, is this your first

        18    written communication with Mr. Aversa, this e-mail

        19    that's dated March 31, 2011 at 9:48 p.m.?

.4:42:52 20        A    I'm -- yes, sir, I'm thinking so.

        21        Q    All right.  And so this is occurring within

        22    roughly 24 hours of your having had this encoun- -- 24

        23    to 48 hours of having this encounter with Ms. Camp- --

        24    Campanian, right?

.4:43:06 25        A    Yes, sir.

.4:43:07   1        Q    All right.  And at any time before you sent
           2    this e-mail on March 31st at about -- almost 10:00
           3    o'clock at night, had you received any communication
           4    back from anybody at SAGE about the event?
.4:43:28   5        A    I'm trying to -- I -- again, I don't remember,
           6    but I'm -- I'm -- I'm thinking that I received an
           7    e-mail -- or maybe it was a call, I can't remember which
           8    of the two -- from -- I don't know if it was this
           9    gentleman, Mr. Thropp, "Thropp" or -- I don't remember,
.4:43:53  10    but it was somehow, somebody, either e-mail or a phone
          11    call.
          12        Q    All right.  Let's go through that.  But before
          13    we go into those other e-mails, on Exhibit No. 4 at the
          14    bottom, what do you advise Mr. Aversa that's going to
.4:44:06  15    take place?
          16             MR. LEVY:  Objection.  The document speaks
          17    for itself.
          18        Q    (BY MR. WARREN):  You can read that document,
          19    that last line.
.4:44:18  20        A    (Reviews document.)  I am certain your
          21    corporation has legal representation and therefore my
          22    legal counsel will be contacting yours.
          23        Q    Okay.  So within 48 hours of the event, you're
          24    already advising that you're going to get legal counsel?
.4:44:33  25        A    Pretty much.

.4:44:34  1        Q    Okay.

          2                  (Exhibit 5 marked.)

          3        Q    (BY MR. WARREN):  Now let's look at the next

          4   exhibit, Exhibit No. 5.  And 5 is an e-mail from Barbara

.4:44:52  5   Blake to you, correct?

          6        A    Yes.

          7        Q    And it's dated April 1st at about 12:12 p.m.,

          8   so a little after noon?

          9        A    Noon.

.4:45:01 10        Q    And it says Loretta -- that's you, correct?

         11        A    Yes.  Well, that --

         12        Q    We are --

         13        A    -- yes.

         14        Q    We are in receipt of your e-mail dated

.4:45:08 15   March 31.  Mr. Aversa is traveling today and is

         16   unfortunately unavailable to discuss your concerns.

         17   However, Chris Thropp, Vice President and General

         18   Counsel, and myself would very much like to speak with

         19   you today.  Please contact Chris at the number at your

.4:45:23 20   earliest convenience.  He will conference me into the

         21   call.

         22                  Did you receive this e-mail of Exhibit 5?

         23        A    Now, I'm not going to -- I cannot say that I

         24   received it.

.4:45:32 25        Q    Okay.

.4:45:33   1          A    I know that I remember seeing something to this

           2     effect --

           3          Q    All right.

           4          A    -- but I can't say that I actually received it.

.4:45:39   5          Q    Your recollection is sometime on Friday,

           6     April 1st, SAGE was trying to reach out to you in some

           7     capacity; is that correct?

           8          A    Friday -- oh, April 1st?  That I was made aware

           9     that Mr. Aversa was traveling, yes.  By then -- yes.

.4:45:55  10          Q    And that SAGE was trying to contact you, reach

          11     out to you and hear what had taken place?

          12          A    Yeah.

          13          Q    Certainly, that's the tenor of this particular

          14     letter or e-mail, isn't it?

.4:46:11  15          A    That's what it appears.

          16          Q    Okay.

          17               (Exhibit 6 marked.)

          18          Q    (BY MR. WARREN):  Did you ever have that phone

          19     conversation with Barbara, Mr. Thropp, or Mr. Aversa?

.4:46:28  20          A    I had a conversation with Mr. Aversa.

          21          Q    When did that conversation take place?

          22          A    I couldn't tell you.

          23          Q    Okay.  What did -- what -- tell me what went on

          24     in that conversation.

.4:46:41  25          A    He was very apologetic for how I felt,

.4:46:53   1      obviously, or it appeared to me as -- so he apologized

2      for Ms. Carmella, her actions, or alleged actions.  And

3      he asked me would I consider returning back to work.

4           Q     And what was your response to Gregg Aversa's

.4:47:16   5      request that you return to work?

6           A     I -- my first answer was "What about

7      Ms. Margie," be- -- "What about Ms. Margie's position,"

8      because I couldn't see working under Noel Smith or under

9      Ms. Campanian because I didn't want to work for bigots.

.4:47:46  10           Q     And what was his response?

11           A     He said that -- if I would give him an

12      opportunity to investigate, blah, blah, blah, but he

13      never answered my question about Ms. Margie.

14           Q     But he was offering to investigate further to

.4:48:06  15      see if anything --

16           A     That's what he --

17           Q     -- needed to be done?

18           A     Again, that was -- that was what he said, yes.

19      And I think that he understood that I would not -- did

.4:48:25  20      not want to go work for that comp- -- it's like putting

21      a coyote back in a henhouse.

22           Q     Okay.  Let me show you Exhibit No. 6.  This is

23      an e-mail from you to Mr. Aversa dated April 4th, 2011.

24      So it's -- we've gone from Friday until Monday at 6:16,

.4:48:45  25      and it's your formal resignation letter, correct?

.4:48:55  1        A    Yes.

2        Q    In here, does it not say that Margie Brandon

3   made -- made you feel very much a part of The SAGE team

4   and you were looking forward to a long employment with

.4:49:03  5   the --

6        A    Yes.

7        Q    -- company?

8        A    Yes, sir.

9        Q    So up until this event with Carmella that you

.4:49:08  10  have described, were you enjoying your time with SAGE?

11       A    Yes, I was.

12       Q    Other than these alleged events with Carmella,

13  did you have any other evidence that the company's

14  management otherwise was racist or biased?

.4:49:29  15       A    No.

16       Q    The second paragraph of this e-mail of

17  April 4th says this has left you with no alternative to

18  -- but to seek legal recourse.  What legal recourse did

19  you seek?

.4:49:46  20       A    Well, I went to the -- EEOC was my first stop.

21       Q    Okay.

22       A    Equal Employment Opportunity Commission.  Then

23  after that, I went to Mr. Levy.

24       Q    That's fine.  Okay.  Let me mark what's now

.4:50:18  25  marked as Exhibit No. 7.  It does not want to come up.

.4:50:26  1                    (Exhibit 7 marked.)

2          Q    (BY MR. WARREN):  This is the follow-up e-mail.

3     It appears to be from Loretta Eure to Gregg Aversa on

4     April 6 at 10:04 p.m. that evening.  Do you see that?

.4:50:45  5          A    Mm-hmm, yes.

6          Q    All right.  Now, this is an e-mail that you

7     sent to Gregg in response to the lower e-mail that he

8     replied to you on Tuesday, April 5th, correct?  Look at

9     the bottom half of that page.

.4:51:04  10         A    Where he's sending it to me, correct?

11         Q    Yes.  It says, Loretta, I'm sorry.  I had been

.12    out of --

13         A    Mm-hmm.

14         Q    -- my office from last Thursday evening until

.4:51:10  15    late yesterday afternoon and did not get your me- --

16    e-mail until this afternoon.

17         A    Okay.

18         Q    Did you receive that e-mail?

19         A    Yes, I did see it.

.4:51:17  20        Q    Hang on a second.  E-mails are always so much

21    fun.  All right.  You can see that this is a

22    continuation of your earlier e-mail, the first e-mail

23    that we already talked about, which was Exhibit No. 4.

24              MR. LEVY:  We're on 7, right?

.4:51:59  25             MR. WARREN:  Yes, sir.  I believe it's 7.

Electronically signed by Tammy Pozzi (001-241-268-3188)          c569de6f-c35a-4a5f-801a-8fa76856dc36

.4:52:00  1              THE WITNESS:  Mm-hmm.

       2              MR. WARREN:  Yeah.

       3         Q    (BY MR. WARREN):  If look at page 2, do you see

       4    that you have your earlier e-mail of March 31 to Gregg

.4:52:06  5    Aversa.  Then you follow up.  Said, Sorry, sir, I had

       6    sent this e-mail to an incorrect address.  And then

       7    Mr. Aversa responds to you on Tuesday, April 5th and

       8    says very sorry to have -- about the occurrence of late

       9    last week, correct?

.4:52:25 10         A    Mm-hmm.

      11         Q    Doesn't Mr. Aversa advise you that he's

      12    saddened for losing a valued instructor such as you?

      13         A    Yes.

      14         Q    Okay.  And was this during the same time frame

.4:52:43 15    that Mr. Aversa was asking if you would return to work

      16    for the company?

      17         A    I don't know if this was prior to or after the

      18    actual phone conversation, but yes, right -- right

      19    around that time frame.

.4:52:53 20         Q    Okay.  At the -- on Gregg Aversa's e-mail to

      21    you, the -- towards the bottom of the second paragraph,

      22    I'm going to read for you.  It says, The reports from

      23    Margie on your teaching skills and your overall

      24    performance were very positive and -- and encouraging to

.4:53:18 25    Barb Blake and me.

.4:53:21  1            Does it appear that Ms. Margie Brandon was

2      giving good reports on you?

3            A    Yes.

4            Q    Did you receive any negative reports from any

.4:53:28  5      manager or official at SAGE?

6            A    No.

7            Q    The last paragraph under Gregg Aversa's e-mail

8      says, Please accept my heartfelt apologies for all that

9      has transpired and please know any -- please know any

.4:53:55  10     consideration for your return would be greatly

11     appreciated by everyone.

12            Does that indicate that Mr. Aversa was

13     trying to get you to come back?

14            A    Yes.

.4:54:04  15           Q    Okay.

16            A    Yes, he tried.

17            Q    And your response to him above was, "Thanks but

18     no thanks.   I'm not coming back"?

19            A    That's right.

.4:54:37  20           Q    Okay.   Did you have any relationship or

21     knowledge or acquaintance with Maria Solis before going

22     to work at SAGE?

23            A    I've already answered that question.

24            Q    It's been a long day.   I spent a long -- a lot

.4:54:48  25     of hours asking Ms. Barbara questions, and so I can't

.4:54:52   1   remember what I may have --

           2       A    Ms. Margie.

           3       Q    -- I -- Margie Brandon questions that I can't

           4   remember what I may have asked her that I asked you.

.4:54:59   5       A    I -- I -- I didn't know either one of them

           6   prior to SAGE.

           7       Q    Okay.  Who had -- well, let me ask you.  Who

           8   were the driver instructors at SAGE in the spring of

           9   2011 while you were there?

.4:55:21  10       A    Was I there in the spring?

          11       Q    Well, you were there from December 2010 to

          12   March 2011, so --

          13       A    I --

          14       Q    -- winter/spring?

.4:55:30  15       A    Okay.

          16       Q    The three months that you were there.

          17       A    Kelly, myself, Noel and Wayne.  Don't ask

          18   nobody else's last names because I don't know them.

          19       Q    That's fine.

.4:55:49  20       A    And they had a new guy that had just come on

          21   board.  "Isi" is all I know him by.

          22       Q    Isidore?

          23       A    Yes.

          24       Q    Okay.  Who had the most years of driving

.4:56:04  25   experience of those five?

.4:56:06  1        A    I don't know.  I didn't see their records.

          2        Q    Did any of them have more years of driving

          3    experience than you did?

          4        A    Again, I don't know.

.4:56:14  5        Q    Who had the most years of experience

          6    instructing at a truck driving school of those five?

          7        A    I don't know.

          8        Q    Who had the most experience in vehicle

          9    maintenance of those five?

.4:56:35 10        A    I don't know.

         11        Q    Tell me about the Sanjel project.  What do you

         12    know about it?

         13        A    The only thing that I knew was that it was the

         14    oilfield industry that was coming in and that they were

.4:56:54 15    obtaining our services to help instruct their employees

         16    in driving, I guess, to be able to utilize them for the

         17    labor and actual driving of the equipment.  That's all I

         18    knew.

         19        Q    Okay.  Do you know the years of experience the

.4:57:11 20    drivers were going to have that were coming in from

         21    Sanjel?

         22        A    I know that the couple that I dealt with had

         23    none.

         24        Q    Okay.  Overall, do you have -- other than the

.4:57:21 25    ones that you actually dealt with, do you have any

.4:57:23  1    knowledge about the average years of experience any

        2    Sanjel driver was going to have?

        3        A    No, sir.

        4            (Exhibit 8 marked.)

.4:57:46  5            MR. LEVY:  You've got some goodies in

        6    there.  I'm just kidding.

        7            MR. WARREN:  Always.

        8        Q    (BY MR. WARREN):  Let me hand what's Exhibit 8.

        9    Do you recogni- -- recognize that document as the Charge

.4:58:01 10    of Discrimination that you prepare- -- or you signed?

       11        A    Yes.

       12        Q    And what is the date that this is signed by

       13    you?

       14        A    The 4th of April, 2011.

.4:58:13 15        Q    And read for us the particulars of the charge

       16    that you have presented.

       17        A    I believe I have been discriminated against

       18    because of my sex -- female -- and in all -- in that

       19    although I am female and have a female name.  I present

.4:58:27 20    and appear as a male.  My employer has not allowed me to

       21    return to work because I am a female who does not meet

       22    the stereotypical view of how a female should look and

       23    act in the violation of Title 7 of the Civil Rights Act.

       24        Q    Now, your employer was not prohibiting you from

.4:58:46 25    returning to work, were they?

.4:58:49   1        A     Well, I obviously did not read it because I

           2    just picked that up, too.  I signed it, yes.

           3        Q     And it -- doesn't it say above your signature

           4    you declare under penalty of perjury that the above is

.4:59:04   5    true and correct?

           6        A     Yes, it does.

           7        Q     And that is an inaccuracy in your charge.  The

           8    company did not prohibit you from returning.  You

           9    personally chose not to return.

.4:59:14  10        A     Yes.

          11        Q     Have you sought any type of medical care

          12    because of what took place at SAGE?

          13        A     I've seen -- I was so stressed out, yes.  I've

          14    seen a couple of doctors -- well, my main doctor, I

.5:00:11  15    guess I should say, because I -- I was so stressed out

          16    that I started breaking out in hives.  But I'm -- I

          17    mean, I call them -- I say they're hives, but they're

          18    like wheps, huge wheps and --

          19        Q     You mean like whelps, like red raised bumps on

.5:00:31  20    your body?

          21        A     Yeah, like 3-D -- yeah, whelps.

          22        Q     Okay.

          23        A     And --

          24        Q     Who is the doctor that you first saw after --

.5:00:41  25        A     Leos.

| .5:00:41 | 1 | Q | Spell that name for me, please. |

.5:00:41  1      Q    Spell that name for me, please.

2      A    L-E-O-S.

3      Q    Is that Dina or "Dina" Goytia --

4      A    "Goytia".

.5:00:48  5      Q    "Goytia"?

6      A    Goytia-Leos.

7      Q    Okay.  When did you first see Dr. Goytia Leos?

8      A    I don't know.  I didn't -- I don't remember

9  exactly when.  It was like -- right about that time, the

.5:01:12 10  last of March or early April --

11      Q    Okay.

12      A    -- I'm thinking.

13      Q    And you complained of hives?

14      A    Yeah, that --

.5:01:20 15      Q    Any other complaint?

16      A    Stomach, you know, like I was always -- like

17  had a nervous stomach.  Couldn't sleep.  Migraines.

18      Q    Did you she give you any recommendation or

19  prescription?

.5:01:38 20      A    Well, she was telling me to take like the

21  Benadryl for the bumps, the -- the whelps and -- I can't

22  remember what else.  I think she prescribed something

23  for the headaches, but hell, I couldn't afford it.  I

24  didn't have the insurance.  So I started taking BC

.5:02:06 25  Powders and it started helping, and then just regular

| | | |
|---|---|---|
| .5:02:11 | 1 | stuff for your stomach. |
| | 2 | Q   How many times did you see Dr. Leos because of |
| | 3 | complaints as a result of the event in this lawsuit? |
| | 4 | A   I want to say a couple of times. |
| .5:02:26 | 5 | Q   When was the last time you saw Dr. Leos? |
| | 6 | A   It's -- I -- it's been a while.  I just don't |
| | 7 | remember when. |
| | 8 | Q   Did SAGE have healthcare insurance? |
| | 9 | A   Yes. |
| .5:02:50 | 10 | Q   Medical insurance? |
| | 11 | A   I think so. |
| | 12 | Q   Do any of the companies you work with now have |
| | 13 | medical insurance? |
| | 14 | A   Yes. |
| .5:02:56 | 15 | Q   Which ones?  Or which ones of the companies |
| | 16 | you've worked with since SAGE had medical insurance? |
| | 17 | A   All of my companies have had it. |
| | 18 | Q   Did SAGE provide workers' compensation coverage |
| | 19 | for its employees? |
| .5:03:17 | 20 | A   I think they did.  I -- I mean, I don't know. |
| | 21 | I'm not positive. |
| | 22 | Q   In your answers to interrogatories, you stated |
| | 23 | that when you were working for ARC, you were paid |
| | 24 | $27,000 a quarter, which would translate to |
| .5:03:49 | 25 | approximately $104,000 a year (indicating).  Does that |

.5:03:56  1       sound accurate?

       2          A     Where?  Let me see.

       3          Q     Yeah.  These are interrogatories that were sent

       4       to Loretta Eure from the defendants, and they are sworn

.5:04:11  5       to you on April 19th, '13 -- 2013, sworn and answered by

       6       you.

       7                 And the answer about employment says

       8       that -- ARC Data Pressure, from September 2012 to

       9       present, salary based on percentage of -- making

.5:04:24 10       approximately $27,000 quarterly.

      11          A     Okay.

      12          Q     So that's an accurate statement that you swore

      13       to in answering the discovery?

      14          A     Yeah.  It would have to be.

.5:04:44 15          Q     Okay.

      16                 MR. WARREN:  Do you have his disclosures

      17       of witnesses?

      18                 (Witness and counsel confer.)

      19                 THE WITNESS:  And -- and I know how this

.5:05:55 20       got tripped up, too.

      21                 MR. WARREN:  Okay.  Let's take a short

      22       break.  I may be very close to being through.

      23                 MR. LEVY:  Okay.

      24                 THE WITNESS:  Okay.

.5:06:01 25                 THE VIDEOGRAPHER:  We're off the record at

.5:06:02  1        3:06 p.m.

        2                        (Recess taken.)

        3                THE VIDEOGRAPHER:  We're back on the

        4        record.  The time right now is 3:20 p.m.

.5:20:00  5        Q    (BY MR. WARREN):  Loretta, this is Larry Warren

        6        again.  Are you ready to procee- -- or Lorenzo, are you

        7        ready to proceed?

        8        A    Yes, I am, sir.

        9        Q    All right.  Now, in today's testimony, have you

.5:20:10  10       already told us now all the ways in which you feel that

        11       SAGE retaliated or discriminated against you?

        12       A    Yes.

        13       Q    And are those based upon your belief that it

        14       was sexual gender or sex orientation discrimination?

.5:20:35  15       A    It was -- I said it wrong initially when I --

        16       it's more of the -- the fact that I am how I am, that

        17       I'm a female that looks like the male and a lot of

        18       people, they don't accept it, can't accept it.

        19       Q    All right.  And the basis, then, would be on

.5:21:21  20       your sex or what you appear to look like as a male when

        21       you're a female.  That's the basis of your complaint

        22       that you've been discriminated against or retaliated

        23       against?

        24       A    Yes.

.5:21:48  25                MR. WARREN:  Glenn, I think these were --

.5:21:49  1    you objected earlier on this not being produced under

        2    23, but they were attached to your disclosure, so I'm

        3    not sure exactly --

        4                    MR. LEVY:  It didn't look like something

.5:21:57  5    I'd seen.

        6                    MR. WARREN:  Oh, that's fine.

        7                    (Exhibit 9 marked.)

        8         Q    (BY MR. WARREN):  All right.  Let me show you

        9    what's marked as Exhibit No. 9 -- actually, I think

.5:22:03 10    there may be multiple copies here -- and ask you if

       11    you're fami- --

       12                    MR. LEVY:  I see -- I see a lot of

       13    documents.

       14                    MR. WARREN:  Yeah, I think they were all

.5:22:12 15    together.

       16         Q    (BY MR. WARREN):  All right.  Ask you if you're

       17    familiar with that particular document.

       18                    MR. LEVY:  Oh, is that the one you marked?

       19                    MR. WARREN:  I had marked one earlier for

.5:22:23 20    Margie's --

       21                    MR. LEVY:  Another one.

       22                    MR. WARREN:  -- deposition, I think.

       23                    MR. LEVY:  Sorry.  I --

       24         A    (Reviews document.)

.5:22:43 25         Q    (BY MR. WARREN):  Now, that was added to your

.5:22:45  1    responses to your request for production and what is the

          2    significance of Exhibit No. 9 to you, if any?

          3         A    I don't understand.  What do you mean "what is

          4    the significance"?

.5:22:59  5         Q    Sure.  Does Exhibit No. 9 prove anything in

          6    this case for you or help you prove anything in this

          7    case?

          8                   MR. LEVY:  If you know?

          9         A    These are schedules, so what it would mean to

.5:23:27 10    me is where my name fell in -- initially, these were

         11    prior to -- like in other words, this one here

         12    (indicating) would have been given to us prior to this

         13    Monday, the 28th.  And of course, I believe that's the

         14    date that -- isn't that the date that everything

.5:23:49 15    happened?

         16         Q    (BY MR. WARREN):  I believe it was March 29th

         17    and March 30th, Tuesday --

         18         A    Okay.

         19         Q    -- and Wednesday.

.5:23:55 20         A    So -- yeah.  Like you know when I was scheduled

         21    to work and like this one here --

         22                   MR. LEVY:  When you --

         23         A    -- that's when the Sanjel project was supposed

         24    to be starting, I was supposed to be -- according to

.5:24:18 25    what we had discussed with us at orientation, I was

.5:24:23  1    supposed to be here.

        2            MR. LEVY:  When you say "here" --

        3    Q    (BY MR. WARREN):  "Here" being where?

        4            MR. LEVY:  -- identify --

.5:24:29  5            THE WITNESS:  Oh.

        6            MR. LEVY:  -- what date and whatever

        7    you're looking at so that the court reporter can type it

        8    up.

        9            THE WITNESS:  Oh, I'm sorry.  Oh, that's

.5:24:35 10    because he's looking at it and I -- okay.

       11            MR. LEVY:  Like if you're pointing to

       12    that, like identify what you're pointing at so that

       13    they'll know.  You know what I mean?

       14            THE WITNESS:  Yeah.

.5:24:44 15    A    That --

       16    Q    (BY MR. WARREN):  For instance, under the

       17    column Tuesday, March 29th, 2011, if we follow that

       18    column downward, we see your name appearing at the 1:00

       19    to 5:15 time frame as being with the truck training,

.5:24:59 20    right, driving?

       21    A    Right.  That -- that -- right.

       22    Q    Okay.  And -- and that would have reflected

       23    your driving that afternoon when you picked up the truck

       24    and you had to move to a different truck, correct?

.5:25:11 25    A    Correct.

.5:25:12   1          Q    Okay.  And then if you go over to Wednesday, I

           2    don't see -- March 30th, I don't see your name on the

           3    list.  But on March 31st, it does have your name down

           4    under "Rental Truck" from 5:30 p.m. to 9:45 p.m.  But it

.5:25:28   5    says "Loretta or Kelly," correct?

           6          A    Yes.

           7          Q    And your name was drawn through -- or is it

           8    drawn through?

           9               MR. LEVY:   (Indicating.)

.5:25:36  10          A    It seems like it, yes --

          11          Q    (BY MR. WARREN):  Okay.

          12          A    -- on here.

          13          Q    But that basically would tell us what is the

          14    schedule for drivers, correct?

.5:25:42  15          A    Correct.

          16          Q    Okay.  Anything else that this tells us other

          17    than the schedule for drivers?

          18          A    No.

          19          Q    Okay.  In your answers to initial disclosures,

.5:26:00  20    which is the document that's filed with the Court, there

          21    was a name of Paul Strickland listed.  Do you know

          22    anything about Paul Strickland?

          23          A    Oops.  He's a student, but I can't really

          24    recall.  I'm seeing here that he's a student -- he was a

.5:26:42  25    student at SAGE, but I cannot remember this gentleman

.5:26:50 1  now.

2      Q    Okay.  Let me ask it this way:  Other than

3  yourself, Carmella, perhaps Margie and perhaps Maria,

4  can you tell me anyone else who witnessed the events of

.5:27:04 5  about whi- -- about which you are complaining today with

6  SAGE?

7      A    No, nobody else --

8      Q    Okay.

9      A    -- that witnessed that --

.5:27:12 10          MR. LEVY:  Don't worry about the

11  paperclip.

12          THE WITNESS:  Oh.

13          MR. WARREN:  Yeah.  Don't worry about

14  that.  I just want to look at that real quickly.

.5:27:25 15          Do you have anything else?  Yeah, I think

16  that's all we have.  Thank you.  Appreciate your time.

17          THE WITNESS:  Thank you.

18          MR. LEVY:  I just have a real quick

19  question for you.

.5:27:30 20                   EXAMINATION

21  BY MR. LEVY:

22      Q    Earlier when you talked about Deposition

23  Exhibit No. --

24          THE VIDEOGRAPHER:  Can you put on your

.5:27:39 25  microphone?

.5:27:41  1              MR. WARREN:  We don't need to hear what

        2   Glenn has to say.

        3       Q    (BY MR. LEVY):  -- Deposition No. 8, can -- is

        4   this the EEOC charge that you filed?  Is that the one

.5:27:54  5   you signed?

        6       A    This is the one I signed.

        7       Q    Did you prepare it?

        8       A    No.

        9       Q    Who prepared it?

.5:27:59 10       A    This was some lady there at EEOC.

       11       Q    Okay.  And did she come up with the language in

       12   there?

       13       A    Yes.

       14       Q    Okay.  And did she -- did -- did -- did she

.5:28:11 15   tell you what that language was supposed to mean?

       16       A    Well, sh- -- what I said and what she write --

       17   wrote down or typed down -- typed, I said -- because

       18   I -- I remembered, you know, the employer, but I had

       19   told her what Ms. Campanian had said her position was --

.5:28:36 20       Q    Right.

       21       A    -- who she was.  So she said it means the same

       22   thing.

       23       Q    Okay.

       24       A    So that's why I just wanted to correct that --

.5:28:43 25   I mean -- or interject that --

Electronically signed by Tammy Pozzi (001-241-268-3188)                    c569de6f-c35a-4a5f-801a-8fa76856dc36

.5:28:46   1      Q    Okay.

          2      A    -- because SAGE is my em- -- was the employer.

          3    But because she said that she --

          4      Q    Gotcha.

.5:28:54   5           MR. LEVY:  I pass the witness.

          6           MR. WARREN:  No further questions.  Thank

          7    you.

          8           THE WITNESS:  Thank you.

          9           THE VIDEOGRAPHER:  That concludes the

.5:28:59  10    deposition.  The time is 3:29 p.m.

       11           (Proceedings concluded.)

       12           (Pursuant to FRCP 30(e)(1), request to
                                 review the transcript was not made by
       13           either deponent or party before the
                                 deposition was completed.)

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

Electronically signed by Tammy Pozzi (001-241-268-3188)         c569de6f-c35a-4a5f-801a-8fa76856dc36

.2:57:11  1          IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
        2               SAN ANTONIO DIVISION

        3    LORETTA I. EURE              )
                                         )
        4    vs.                         ) CASE NO. 5:12-CV-01119
                                         )
.2:57:11  5    THE SAGE CORPORATION        )

        6    ****************************************************

        7              REPORTER'S CERTIFICATE

        8    ORAL VIDEOTAPED DEPOSITION OF LORETTA I. EURE

        9                 August 29, 2013

.2:57:11 10    ****************************************************

       11          I, TAMMY POZZI, Certified Shorthand Reporter in and

       12    for the State of Texas, hereby certify to the following:

       13          That the witness, LORETTA I. EURE, was duly sworn by

       14    the officer and that the transcript of the oral

.2:57:11 15    deposition is a true record of the testimony given by

       16    the Witness.

       17          I further certify that pursuant to FRCP Rule

       18    30(e)(1) that the signature of the Deponent was not

       19    requested by the Deponent or a party before the

.2:57:11 20    completion of the deposition.

       21          That the amount of time used by each party at the

       22    deposition is as follows:

       23          Mr. Larry Warren ( 1 hour 34 minutes)

       24          Mr. Glenn D. Levy (2 minutes)

.2:57:11 25          I further certify that I am neither attorney, nor

2:57:11   1    counsel for, related to, nor employed by any of the

          2    parties to the action in which this testimony is taken.

          3    Further, I am not a relative or employee of any attorney

          4    of record in this cause, nor do I have a financial

2:57:11   5    interest in the action.

          6         SUBSCRIBED AND SWORN TO on this the _____ day of

          7    _____, 2013.

          8

          9                    _____
                               Tammy Pozzi, CSR, RPR, TCRR
2:57:11  10                    Texas CSR 5629
                               Expiration: 12/31/14
         11                    Kim Tindall & Associates, LLC
                               Firm No. 631
         12                    645 Lockhill Selma, Suite 200
                               San Antonio, Texas 78216
         13                    (210) 697-3400

         14

2:57:11  15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

| A | | | | |
|---|---|---|---|---|
| **able** 66:16 | **afford** 69:23 | 3:3 | **attached** 1:22 73:2 | **based** 18:4 31:7 |
| **abovestyled** 1:14 | **afternoon** 4:1 | **appeared** 60:1 | **attempt** 38:16 | 71:9 72:13 |
| **absolutely** 35:25 | 48:18,20 62:15,16 | **appearing** 75:18 | **attempting** 42:17 | **basically** 23:2 |
| **abuse** 35:14 | 75:23 | **appears** 22:2 27:24 | **attended** 10:1 | 51:19 76:13 |
| **abusive** 34:25 35:2 | **age** 30:4 32:4,21 | 40:10 59:15 62:3 | **attention** 37:19 | **basis** 33:21 72:19 |
| **accept** 64:8 72:18 | 33:14,15 | **applic** 33:13 | 39:4,9,14 | 72:21 |
| 72:18 | **ago** 5:18 | **applicable** 32:16 | **attitude** 54:2 | **basse** 2:4 |
| **accident** 24:16 | **agree** 37:2 | 33:1 | **attorney** 2:3 80:25 | **bc** 69:24 |
| **accomplish** 5:16 | **agreed** 17:10,20 | **applicants** 21:24 | 81:3 | **began** 40:10 |
| **accomplished** | 44:4 | 32:4 33:13 | **august** 1:10,15 4:2 | **beginning** 15:6 |
| 38:13 | **alcohol** 23:3 | **application** 11:6 | 13:10 14:8 21:7 | **beha** 35:6 |
| **accurate** 24:3 71:1 | **alleged** 60:2 61:12 | 12:13 | 45:1 46:4,5 80:9 | **behalf** 4:20 |
| 71:12 | **allowed** 13:22 | **applied** 21:5 | **austin** 2:12 | **behavior** 34:22 |
| **accurately** 17:20 | 67:20 | **applies** 33:5 34:11 | **auto** 8:3 | **behaviors** 35:6 |
| **acknowledged** | **alternative** 61:17 | 37:15 | **available** 33:12 | **belief** 42:16 72:13 |
| 49:14 51:5 | **american** 10:2 | **applying** 20:4 | 38:19 39:11,12 | **believe** 9:21 36:4,7 |
| **acknowledgement** | **amount** 80:21 | 21:18 25:3 | **avenue** 2:12 | 42:2,8 46:22 49:5 |
| 3:13 | **angry** 17:14 | **appreciate** 54:3 | **aver** 39:10 | 49:12 50:20 51:24 |
| **acknowledging** | **answer** 38:16 41:9 | 77:16 | **average** 67:1 | 56:3,10 62:25 |
| 29:15 30:7 | 60:6 71:7 | **appreciated** 64:11 | **averaging** 45:23 | 67:17 74:13,16 |
| **acquaintance** | **answered** 60:13 | **appropriate** 38:15 | **aversa** 3:14,16,17 | **benadryl** 69:21 |
| 64:21 | 64:23 71:5 | 40:5 | 31:4,16 39:1,10 | **benefits** 33:20 |
| **act** 37:3 67:23,23 | **answering** 71:13 | **approximately** 6:2 | 53:20 54:6,10 | **better** 35:7 |
| **action** 4:9 33:18 | **answers** 26:4 70:22 | 19:20 45:6 70:25 | 55:5,17 56:1,11 | **biased** 61:14 |
| 36:22,23 40:6 | 76:19 | 71:10 | 56:18 57:14 58:15 | **bigots** 60:9 |
| 81:2,5 | **antonio** 1:2,20 2:4 | **april** 55:13,14 58:7 | 59:9,19,20 60:23 | **birth** 7:4 |
| **actions** 33:20 60:2 | 2:9 4:6,11,15 7:7 | 59:6,8 60:23 | 62:3 63:5,7,11,15 | **bit** 44:9 47:3 51:18 |
| 60:2 | 7:11 8:2,3 10:3 | 61:17 62:4,8 63:7 | 64:12 | **blacked** 22:24 |
| **activity** 36:13 48:9 | 12:22 16:7,21 | 67:14 69:10 71:5 | **aversas** 54:5 60:4 | **blah** 60:12,12,12 |
| **actual** 25:15 63:18 | 18:5,17 33:9 | **arc** 45:9,10,15,19 | 63:20 64:7 | **blake** 56:1,2,3,8,15 |
| 66:17 | 34:16 48:13 80:2 | 45:25 46:9,24 | **avoidance** 30:5 | 58:5 63:25 |
| **added** 73:25 | 81:12 | 70:23 71:8 | **aware** 59:8 | **blood** 27:25 |
| **addition** 53:15 | **anybody** 50:1 52:7 | **area** 32:21 | | **board** 43:23 65:21 |
| **additionally** 38:18 | 53:10,17 57:4 | **aroundtheclock** | B | **body** 35:15 68:20 |
| **address** 11:16,17 | **anyway** 49:8 | 16:20 | **back** 8:8 10:13,23 | **bona** 33:15 |
| 30:23 42:17 43:8 | **apologetic** 59:25 | **arrive** 49:9 | 14:9,13 15:10 | **born** 7:6,8 |
| 63:6 | **apologies** 64:8 | **arrived** 48:12 | 17:14 22:18 31:22 | **bothered** 53:23 |
| **administrator** 28:9 | **apologized** 60:1 | **aside** 43:11,15 | 32:24 42:4 50:16 | 54:1 |
| **advances** 35:13 | **apparently** 27:7 | **asked** 17:9 41:1,5 | 54:7 57:4 60:3,21 | **bottom** 12:16 22:21 |
| **adversely** 34:24 | **appeals** 37:22 | 50:22 60:3 65:4,4 | 64:13,18 72:3 | 30:9,24 57:14 |
| 35:1 | **appear** 22:17 64:1 | **asking** 63:15 64:25 | **background** 25:8 | 62:9 63:21 |
| **advise** 38:19 57:14 | 67:20 72:20 | **aspects** 28:10 | 28:12 | **box** 2:13 |
| 63:11 | **appearance** 21:8 | **associates** 4:14 | **bad** 53:23 | **brandon** 22:3 38:6 |
| **advising** 57:24 | 21:13 | 8:11 81:11 | **barb** 63:25 | 38:9,22 39:4,13 |
| | **appearances** 2:1 | **assuming** 22:21,25 | **barbara** 56:1,2,3 | 42:13,16 61:2 |
| | | | 58:4 59:19 64:25 | |

64:1 65:3
**brandons** 21:25
**break** 6:19 54:17
  54:25 71:22
**breaking** 68:16
**breast** 26:15,16
  27:7
**briefly** 39:7
**bring** 37:19 39:2,8
  39:14
**bumps** 68:19 69:21
**business** 15:3
**buy** 20:11

**C**

**call** 30:18 31:2
  51:19,24 52:5,17
  55:5 56:11 57:7
  57:11 58:21 68:17
**calling** 53:24,25
**camp** 36:16 56:23
**campanian** 2:17
  4:24,25,25 48:12
  49:13 50:10,21
  51:2 52:2 55:3
  56:24 60:9 78:19
**cant** 8:6 10:13
  15:24,24 17:8
  21:1 23:9 37:3
  41:25 42:15 44:7
  50:6 57:7 59:4
  64:25 65:3 69:21
  72:18 76:23
**capacity** 44:15 59:7
**car** 18:23 24:13
**card** 22:24 25:14
  25:21 27:11
**care** 68:11
**carlos** 24:5
**carmella** 2:17 4:24
  4:25 52:2,11
  53:12 60:2 61:9
  61:12 77:3
**carmellas** 52:21
  53:18
**carter** 19:15,23

23:22,23
**case** 1:4 14:5 16:18
  20:21 21:3 48:5
  74:6,7 80:4
**castillon** 23:16
**cause** 1:15 81:4
**cease** 36:13
**centers** 25:12
**cents** 47:16,18
**ceo** 40:7
**certain** 6:22 49:17
  57:20
**certainly** 59:13
**certificate** 3:6
  22:10 28:8 80:7
**certified** 1:16 80:11
**certify** 80:12,17,25
**cetera** 28:13
**chance** 10:14
**change** 5:14,16 6:3
  9:18
**changed** 5:23 21:8
**charge** 3:18 28:20
  67:9,15 68:7 78:4
**check** 28:12
**checklist** 3:11 11:2
**children** 8:17
**choices** 20:12
**chose** 68:9
**chris** 2:16 4:22
  55:13 58:17,19
**chronological**
  12:12
**civil** 1:21 4:9 67:23
**cjc** 23:13
**claim** 20:21
**claims** 20:25
**class** 3:19
**classroom** 42:23,25
  43:18
**clear** 6:16
**clearance** 22:13
**close** 71:22
**closed** 48:21
**closer** 13:22

**closing** 14:23
**clue** 17:12
**codriver** 41:16
**college** 8:2,3,7
  18:17
**color** 33:14
**column** 75:17,18
**com** 2:5,10,14 38:7
**come** 18:14 44:4
  51:6 61:25 64:13
  65:20 78:11
**comfortable** 34:7
**coming** 43:25 64:18
  66:14,20
**comment** 26:7 55:2
**commentaries**
  35:15
**comments** 26:3
  43:2,7 52:21
  53:18
**commercial** 11:12
**commission** 61:22
**communication**
  37:12 56:18 57:3
**comp** 60:20
**companies** 20:16
  20:24 47:22 70:12
  70:15,17
**company** 12:17
  13:9,16,17 14:23
  15:5 18:19 19:5,25
  23:21 24:9 28:4
  28:12 29:16,20
  30:21 34:12 35:22
  36:10,22 37:3,12
  37:13 38:8 61:7
  63:16 68:8
**companys** 29:6
  36:16,18 61:13
**compensate** 17:19
**compensated** 17:20
**compensation**
  33:19 70:18
**complain** 52:20,22
  52:25 53:17

**complained** 69:13
**complaining** 31:11
  53:15 77:5
**complaint** 17:25
  30:10 31:10 37:8
  37:9,10,14,23
  38:8 39:3,20,21
  40:2,2,4 41:18
  42:10,13 48:4
  56:5 69:15 72:21
**complaints** 37:19
  37:21 41:23 70:3
**completed** 79:13
**completion** 80:20
**compliance** 32:2,16
  32:25
**complies** 21:20
  31:20
**computerized** 1:18
**concentra** 25:12
**concerned** 51:23
**concerning** 33:21
  35:7
**concerns** 42:17
  58:16
**concluded** 79:11
**concludes** 79:9
**conduct** 35:12 36:9
  36:14,24 42:11,14
  48:5
**confer** 71:18
**conference** 58:20
**conflict** 24:2 30:5
**consider** 60:3
**consideration**
  64:10
**consist** 35:4
**contact** 31:4,16
  35:5,25 36:18,24
  40:6 49:1 56:15
  58:19 59:10
**contacting** 57:22
**contents** 29:24 30:1
**contex** 30:1
**context** 35:25

**continuation** 27:19
  62:22
**continued** 32:2,15
  32:25 33:11
**continues** 36:14
**convenience** 58:20
**conversation** 51:22
  52:10 59:19,20,21
  59:24 63:18
**copied** 56:1,3
**copies** 73:10
**copy** 22:16,18
  29:16 30:6 56:4
**corporate** 3:12,13
  29:6,16 30:19
  31:2 40:7
**corporation** 1:5 4:8
  4:20,23 5:1 10:20
  11:7 28:14 33:6
  33:12 37:16,18
  41:20 44:12 48:6
  57:21 80:5
**correct** 7:2 11:12
  11:20,25 12:21
  14:16,20 20:4,9
  25:10 28:1 30:7
  38:9 39:11 40:12
  54:10 55:6,15,20
  58:5,10 59:7
  60:25 62:8,10
  63:9 68:5 75:24
  75:25 76:5,14,15
  78:24
**correctly** 32:25
  33:23
**cougar** 12:15 13:6
  14:10,11,24
**couldnt** 5:11 15:14
  16:22 21:1 59:22
  60:8 69:17,23
**counsel** 4:16 38:19
  57:22,24 58:18
  71:18 81:1
**counseling** 39:17
**county** 6:4

**couple** 5:17 9:13
47:7 54:8 66:22
68:14 70:4
**course** 43:19 74:13
**court** 1:1 4:10,13
5:2 75:7 76:20
80:1
**cover** 29:5 34:14,16
**coverage** 70:18
**covered** 33:8,9
**coworker** 41:14,15
**coyote** 60:21
**crane** 9:11,12,19
**creates** 34:24 35:1
**cris** 23:19
**csr** 81:9,10
**current** 23:13
**currently** 5:20

**D**

**dakota** 17:7,21
**data** 71:8
**date** 5:17 7:4 25:15
31:14 47:8 48:11
48:15 67:12 74:14
74:14 75:6
**dated** 25:13 56:19
58:7,14 60:23
**dates** 21:6 31:9
41:25
**day** 1:15 4:2 16:20
39:5 48:12 53:21
55:3 64:24 81:6
**days** 19:6 38:17
54:8
**deal** 51:13 53:13
**dealt** 66:22,25
**december** 11:7
17:8,9 20:4 21:5,9
21:22 28:14 31:15
40:11,18,23 41:6
43:14 65:11
**decide** 39:24
**decided** 20:13
**decision** 37:22
**declare** 68:4

**declined** 20:13
**dedicate** 16:23
**defendant** 1:13 2:6
**defendants** 71:4
**defined** 34:21
**definition** 34:20
**deformities** 26:6
**degree** 8:11 21:8
**demands** 35:5
**demotion** 33:19
**departed** 17:21
**department** 36:16
36:19 38:15,15,21
**depends** 47:1,1
**deponent** 79:13
80:18,19
**deposition** 1:8,12
4:7 73:22 77:22
78:3 79:10,13
80:8,15,20,22
**des** 24:16
**describe** 35:16
40:22 41:2 42:20
**described** 43:9,12
53:12 61:10
**description** 3:10
**desk** 53:1,3
**dialysis** 8:3
**didnt** 13:7 17:12,19
19:24 22:5 24:8
43:1,4,6 52:22,25
54:3,4 55:16 56:8
60:9 65:5 66:1
69:8,24 73:4
**different** 9:19
20:15 32:9,13
75:24
**dina** 69:3,3
**directed** 40:1 55:13
**director** 36:15
39:23,24 40:5
**directors** 36:17
**disciplined** 36:25
**disclosure** 73:2
**disclosures** 71:16

76:19
**discovery** 71:13
**discriminated**
67:17 72:11,22
**discriminating**
35:8
**discrimination**
3:18 21:2 32:22
67:10 72:14
**discriminations**
30:4
**discuss** 30:18 38:1
39:24 58:16
**discussed** 38:14
39:25 74:25
**discussion** 50:10
56:12
**discussions** 53:10
**dishwasher** 9:1
**dismissed** 51:25
52:4,13,14,15
**display** 35:17
**district** 1:1,1 4:10
4:10 80:1,1
**division** 1:2 4:11
80:2
**doctor** 15:14,18,21
68:14,24
**doctors** 68:14
**document** 23:11,12
29:8 55:10 57:16
57:18,20 67:9
73:17,24 76:20
**documents** 73:13
**doesnt** 63:11 68:3
**doing** 28:12 43:5
49:12 50:18 56:8
**dollars** 45:21
**dont** 5:17 9:13,16
10:6,12,15,24
15:23 17:7 19:4
19:24 20:22 26:12
26:17 27:17 32:11
42:5 43:22 44:16
47:7 48:11,19

49:7 50:23 51:4
51:24 54:8 56:3,7
56:16,16 57:5,8,9
63:17 65:17,18
66:1,4,7,10 69:8,8
70:6,20 72:18
74:3 76:2,2 77:10
77:13 78:1
**door** 39:17 53:3,4
**dot** 23:7 45:6
**downward** 75:18
**dr** 69:7 70:2,5
**dragging** 15:15
**drawn** 76:7,8
**drive** 3:19 19:10
22:13 24:9 25:2
**driveaway** 47:5
**driver** 3:11 10:19
11:23 12:24 17:11
25:2 28:11 44:20
44:22 45:13 46:12
47:12 65:8 67:2
**drivers** 11:11 22:15
28:3 66:20 76:14
76:17
**driving** 8:2 9:22,25
10:2,9,11 13:20
13:25 25:8 46:24
65:24 66:2,6,16
66:17 75:20,23
**drove** 15:11 50:13
50:15
**drug** 23:3 28:13
**duly** 1:14 5:5 80:13
**dump** 13:20

**E**

**earlier** 24:23 41:9
62:22 63:4 73:1
73:19 77:22
**earliest** 58:20
**early** 69:10
**earning** 46:23
**earth** 13:11 14:3
**education** 8:1,9
34:24

**educational** 34:25
**eeoc** 61:20 78:4,10
**effect** 48:23,25 51:8
59:2
**effective** 37:12
**effort** 39:13
**either** 48:24 56:3
57:10 65:5 79:13
**elmont** 10:4
**elses** 65:18
**em** 79:2
**email** 2:5,10,14
3:14,15,16,17
55:12 56:18 57:2
57:7,10 58:4,14
58:22 59:14 60:23
61:16 62:2,6,7,16
62:18,22,22 63:4
63:6,20 64:7
**emails** 57:13 62:20
**employed** 81:1
**employee** 30:25
31:19 34:22 35:9
36:24 38:16,19
39:19,23 40:1
81:3
**employees** 32:4
33:5 34:5,6,11,12
35:1,23,24,24
36:4,7 37:11,15
37:18,20 38:1
39:25 40:6 66:15
70:19
**employer** 14:14
23:13 67:20,24
78:18 79:2
**employers** 12:8,12
12:14
**employment** 11:7
11:23 13:6 24:2
27:14 30:2,4 31:3
31:21,24 32:3
33:12,20 35:2,8
61:4,22 71:7
**emt** 8:3 18:15

en 34:25
encoun 56:22
encounter 40:19
    41:5 48:9 50:10
    52:2,7 56:23
encountered 41:8
encouraged 40:6
encourages 37:18
encouraging 63:24
ended 53:23,25
    54:6
energy 44:24,25
engaging 36:8
enjoying 61:10
ensure 32:2,15,25
    33:18
enter 40:19
environment 34:8
    34:25 35:2 40:22
    41:3 43:13
equal 30:2,3 31:24
    32:16 33:1 61:22
equipment 66:17
esens 8:7
essential 33:15
establish 37:10
et 28:13
ethics 30:4
eure 1:3,9,12 3:4
    3:15 4:7,8 5:4,10
    5:13,24,25 6:1 7:2
    7:9 11:9 22:12
    54:23 55:12 62:3
    71:4 80:3,8,13
evening 62:4,14
event 55:3 56:17
    57:4,23 61:9 70:3
events 61:12 77:4
evidence 61:13
evidenced 25:25
ex 44:7
exact 44:8 47:8
exactly 5:17 38:10
    43:22 69:9 73:3
exam 25:17 28:3,4

examination 3:4,5
    5:6 77:20
examiners 22:10
excerpts 3:12
excuse 25:13 32:6
executive 32:17
    33:2
exhibit 10:17,19,25
    11:5 21:19 22:9
    28:11 29:2,4,10
    29:12,14,19,22,23
    54:21 55:9 57:13
    58:2,4,4,22 59:17
    60:22 61:25 62:1
    62:23 67:4,8 73:7
    73:9 74:2,5 77:23
exhibits 3:9
exists 10:5
expect 36:10
expected 19:10
    39:19
experience 65:25
    66:3,5,8,19 67:1
expiration 25:14
    81:10
explain 26:3
explained 6:12
express 19:15,23
    23:22,23

_____ F _____
fact 29:20 56:11
    72:16
fair 17:23 21:11
fami 73:11
familiar 73:17
family 7:15
far 51:23
father 7:16
favors 35:6,9
federal 1:21 32:2
    32:16 33:1
feel 30:25,25 61:3
    72:10
feeling 37:11
fell 74:10

felt 48:9 52:8 53:11
    53:19 59:25
female 67:18,19,19
    67:21,22 72:17,21
fide 33:16
file 6:3 10:19 11:23
    17:23 20:24 28:11
filed 5:19,20 20:20
    21:2,3 39:3 48:4
    76:20 78:4
filling 28:10
financial 81:4
find 36:9 49:2
fine 15:15,24 61:24
    65:19 73:6
finish 52:12
finished 50:16
finishes 48:1
fired 47:20 52:16
    52:19
firm 81:11
first 5:5 8:22,23,24
    10:11 11:1 12:14
    29:25 30:23 38:2
    38:5,7 39:23,25
    47:8 48:8 49:23
    50:2 56:17 60:6
    61:20 62:22 68:24
    69:7
fitness 33:22
five 18:19 65:25
    66:6,9
flipping 21:19
flirtation 35:13
follow 63:5 75:17
following 80:12
follows 5:5 80:22
followup 62:2
form 25:18,20,23
    27:20 32:13 34:4
formal 8:9 37:22
    60:25
fortytwo 47:18
forward 61:4
forwarded 55:19

foster 34:6
four 17:3 19:21,22
    20:15,18
fourth 30:15
frame 21:14 40:23
    63:14,19 75:19
fraternization 30:6
    34:1,5 35:21,23
frcp 79:12 80:17
free 30:25
friday 59:5,8 60:24
front 22:17
full 5:8 7:1 44:11
fulltime 44:10
fun 62:21
functions 35:16
further 60:14 79:6
    80:17,25 81:3

_____ G _____
garcia 19:3
gay 51:14
gender 72:14
general 58:17
genesis 46:10,11,13
    46:18,20,25 47:4
gentleman 53:6
    54:7 57:9 76:25
geriatric 18:22
getting 44:7 50:18
    50:19 54:6
giovanni 16:5,13
    24:19
give 23:2 25:1 28:4
    35:9 38:16 60:11
    69:18
given 7:8 27:17
    74:12 80:15
gives 22:12 24:1
giving 64:2
glance 29:4
glenn 2:3,3,5 4:18
    72:25 78:2 80:24
glennlevylaw 2:17
go 6:6 7:17,23 8:19
    9:20 10:9,25 17:9

17:11 21:5,18
    23:1,3,8,20 24:7
    24:20 28:17 30:10
    31:18 38:9 49:10
    49:11,19,20 57:12
    57:13 60:20 76:1
goes 30:3
going 6:22,23 15:6
    17:14,15 18:21
    20:11 27:5 28:24
    29:9 41:9 43:24
    44:1 50:3 55:8
    56:6 57:14,24
    58:23 63:22 64:21
    66:20 67:2
good 4:1 20:12
    37:11 43:15 64:2
goodies 67:5
googled 54:6
gotcha 79:4
gotten 15:13
goytia 69:3,4,5,7
goytialeos 69:6
graduate 7:19 10:7
graduating 8:19
graduation 7:24
    9:3 10:9
granting 35:9
graphic 35:14
gravel 13:19
greatly 64:10
gregg 3:14,16,17
    31:4,16 55:16
    56:1 60:4 62:3,7
    63:4,20 64:7
ground 6:6 44:3
grow 7:11,13
grumbled 43:1
guadalupe 6:4
guess 19:25 20:3
    26:17 28:6 47:2
    66:16 68:15
guy 17:13 65:20
guzman 18:3

_____ H _____

**ha** 41:5
**hadnt** 54:2
**half** 62:9
**hampered** 40:4
**hand** 29:3,10 55:8
  67:8
**handbook** 37:7
**hang** 62:20
**happened** 16:17
  42:6 74:15
**harassing** 35:12,12
**harassment** 30:5
  33:25 34:4,20,21
  35:4,20,23 36:23
  37:1
**hard** 6:11 22:16
**hasnt** 37:3,5
**haul** 47:17
**hauler** 13:19
**hawkins** 2:11 4:19
**head** 6:8,8 38:15,16
  38:21 40:15
**headaches** 69:23
**headed** 50:16
**heading** 29:25
**health** 27:20
**healthcare** 70:8
**hear** 5:11 30:21
  59:11 78:1
**heard** 4:9
**hearing** 27:24
**heartfelt** 64:8
**hed** 43:2
**hell** 69:23
**help** 44:2 66:15
  74:6
**helping** 69:25
**henhouse** 60:21
**hereto** 1:23
**hes** 26:25 62:10
  63:11 75:10 76:23
  76:24
**high** 7:17,19,24 8:9
  8:19 9:8
**hill** 24:17,17 36:16

**hire** 31:14
**hired** 28:22 43:17
**hiring** 33:18
**history** 24:16 27:21
**hives** 68:16,17
  69:13
**hol** 40:25
**home** 13:4,23 14:15
  14:17
**hormonal** 27:2
**hostile** 34:25 35:2
**hour** 28:25 43:20
  45:3,21 46:24
  80:23
**hourly** 47:3
**hours** 43:20,24
  44:3,5,10 45:4,23
  56:22,23 57:23
  64:25
**hourwise** 44:10
**howell** 1:19 2:8,12
  4:5
**huge** 68:18
**huhuh** 6:9
**human** 35:15
**hurt** 15:13,18
**hypertension** 26:9
  26:12
**hysterectomy**
  26:13,14 27:6

_____ I _____

**id** 26:17 73:5
**identify** 75:4,12
**ii** 1:20 2:8
**ill** 29:5,11 32:14
**im** 4:12 5:11 6:23
  20:22 21:15,15,15
  22:21,23,25 26:20
  26:20 28:24,24,24
  29:9 32:13,18
  41:8 44:7,22
  47:18 48:2,22
  49:15 51:8,8,9,9
  51:14 53:22 55:8
  55:25 56:20,20

57:5,6,6,6 58:23
  62:11 63:22 64:18
  67:6 68:16 69:12
  70:21 72:17 73:2
  75:9 76:24
**immediate** 39:22
**immediately** 36:11
  36:15,19
**implement** 34:13
**inaccuracy** 68:7
**inadvertent** 12:5
**inappropriate**
  48:10 52:8 53:11
**incident** 17:6
**incidents** 31:6,10
**includes** 30:20
  35:13
**including** 40:7
**incorrect** 63:6
**index** 3:1
**indiana** 19:16
**indicate** 64:12
**indicating** 25:19
  53:2,9 70:25
  74:12 76:9
**individual** 35:17
**industry** 66:14
**inez** 5:10,13
**information** 12:9
  23:22,25 36:17
  54:5
**informed** 38:18
**initial** 76:19
**initially** 54:7 72:15
  74:10
**initiated** 11:2
**innuendos** 41:10
  41:21 42:18,21
  43:8,12
**instance** 1:13 75:16
**instruct** 42:22,24
  66:15
**instructed** 33:17
**instructing** 43:4
  66:6

**instructor** 28:3
  41:17 43:18 63:12
**instructors** 44:2
  65:8
**insubordinate**
  51:16,16,17 52:11
**insurance** 69:24
  70:8,10,13,16
**interest** 30:5 81:5
**interject** 78:25
**international** 24:1
**interrogatories**
  70:22 71:3
**introduce** 4:16
**introduced** 49:13
**introduction** 51:20
**investigate** 60:12
  60:14
**involves** 39:22
**iowa** 24:16
**isi** 65:21
**isidore** 65:22
**isnt** 15:3 59:14
  74:14
**issue** 30:17 38:7
**issued** 28:9
**issues** 30:23 31:22
  39:2,8
**item** 22:19 28:2
  37:25 48:9
**ive** 9:4 51:12 64:23
  68:13,13

_____ J _____

**january** 18:8 20:14
  21:13 28:15
**jessica** 24:17,17
**jhawkins** 2:14
**job** 8:23,24 9:2
  10:11 12:22 15:9
  15:18 20:4 28:14
  33:13 43:16 44:17
  47:8
**john** 2:11 4:19
**ju** 40:25
**july** 16:15,25 25:9

25:9 46:3
**june** 24:23 25:9

_____ K _____

**keep** 11:2 21:19
**kelly** 65:17 76:5
**kept** 15:15
**keys** 49:2,10,12,19
**kidding** 35:5 67:6
**kim** 4:14 81:11
**kind** 18:14 22:24
  42:3,6 49:5
**kirby** 11:16
**knapick** 2:18 4:12
**knew** 17:17 38:25
  56:8 66:13,18
**know** 10:5,6 15:23
  19:4,24 22:1,3,6
  24:17 26:17 30:22
  32:11 38:24 42:1
  42:3 43:1,4,6
  48:19 50:23 51:8
  52:12 53:5 54:2,5
  54:8 56:2,7,8 57:8
  59:1 63:17 64:9,9
  65:5,18,21 66:1,4
  66:7,10,12,19,22
  69:8,16 70:20
  71:19 74:8,20
  75:13,13 76:21
  78:18
**knowledge** 49:25
  64:21 67:1
**known** 16:5

_____ L _____

**lab** 18:8 24:8
**labor** 17:23 66:17
**lady** 54:3 78:10
**lane** 11:16
**language** 78:11,15
**laredo** 24:1
**larry** 2:7 4:19 72:5
  80:23
**late** 40:11 56:6
  62:15 63:8

laura 11:16
law 2:3
laws 32:3,17 33:1
lawsuit 5:19 21:3
  31:7 70:3
lawyer 6:11
layoff 33:19
learning 34:7
leased 14:12 19:2
leave 9:17 15:12
  17:5 28:19 50:19
leaving 24:2
lee 1:19 2:8,12 4:5
left 12:25 14:14
  16:24,25 18:24
  19:15 20:1 44:12
  47:7 53:25 61:17
legal 4:13 19:11
  32:3 36:16,19
  57:21,22,24 61:18
  61:18
leonel 16:1
leos 68:25 69:2,7
  70:2,5
letter 59:14 60:25
level 40:9
levy 2:3,3 3:5 4:18
  4:18 12:1,3,6,10
  47:25 48:3 54:14
  54:17 57:16 61:23
  62:24 67:5 71:23
  73:4,12,18,21,23
  74:8,22 75:2,4,6
  75:11 76:9 77:10
  77:18,21 78:3
  79:5 80:24
license 11:11,12,14
  22:16,18
life 13:8
limit 45:6
limitations 26:6
line 23:13 30:24
  57:19
lines 37:12
list 76:3

listed 11:9 12:7,15
  15:5 27:21 76:21
lists 11:23
little 22:16 41:10
  43:2,5 44:9 47:3
  49:4 54:17 55:14
  58:8
lived 11:19
llc 81:11
load 46:21
loads 47:2
local 40:9
located 4:4 12:22
locations 33:5,17
lockhill 81:12
lodge 56:5
long 9:12,15 25:18
  25:23 27:12,20
  45:12 46:17 47:17
  61:4 64:24,24
longer 25:25
look 6:14 29:10
  55:9 58:3 62:8
  63:3 67:22 72:20
  73:4 77:14
looking 29:9 32:7
  61:4 75:7,10
looks 12:1 14:9
  21:24 72:17
lor 5:24
lorenzo 5:10,12,24
  7:1 72:6
loretta 1:3,9,12 3:4
  3:15 4:7,8 5:4,8
  5:21,24 7:9 11:9
  22:12 55:12,20
  58:10 62:3,11
  71:4 72:5 76:5
  80:3,8,13
losing 63:12
lot 18:22 43:1,24
  64:24 72:17 73:12
lower 55:19 62:7
lunchtime 48:18
lwarren 2:10

**M**
maam 19:19
machine 1:18
madam 5:2
main 37:11 68:14
maintain 37:11
maintenance 66:9
making 71:9
male 67:20 72:17
  72:20
man 48:20
management 37:22
  61:14
manager 38:19
  64:5
managers 33:16
mans 50:16
manual 3:12,13
  29:7,17,20 31:19
  37:7
march 12:20 13:10
  21:13 31:11,11,15
  40:12,19,23 41:7
  43:14 56:6,19
  57:2 58:15 63:4
  65:12 69:10 74:16
  74:17 75:17 76:2
  76:3
margie 21:25 22:3
  38:6,9,22 39:4,13
  41:22,24 42:11,16
  43:23 49:2 51:1
  52:20 53:5,15,24
  53:25 55:4,4
  56:10 60:7,13
  61:2 63:23 64:1
  65:2,3 77:3
margies 51:2 53:1
  56:9 60:7 73:20
maria 22:6 50:19
  50:20,25 64:21
  77:3
marias 53:3
mark 61:24
marked 10:17,18

29:2,4,12 54:21
  55:8 58:2 59:17
  61:25 62:1 67:4
  73:7,9,18,19
married 8:13,15
marroquin 16:1,2
  24:20
marroquins 16:19
martinez 24:5
matter 4:8 38:14
  40:8
mean 44:6 47:2
  51:14 52:12,17,24
  53:1,5 68:17,19
  70:20 74:3,9
  75:13 78:15,25
means 78:21
meant 6:15,16
mechanically 19:11
mechanics 8:4
medical 18:10
  22:10,13 25:12,14
  25:17,21 27:11
  28:12 68:11 70:10
  70:13,16
meet 39:23 50:21
  67:21
mentioned 42:1
merit 33:22
message 55:19
met 23:24
microphone 77:25
middle 22:1,18
midnight 55:14
migraines 69:17
mile 47:16,18
military 7:15,16
mill 9:4,10
mine 32:8
minimal 44:4
minute 40:25
minutes 80:23,24
mistake 32:9
mistaken 49:16
  53:22

mmhmm 13:12
  16:8,14 19:17
  22:11 23:15 26:2
  45:11 50:14 55:21
  62:5,13 63:1,10
mobile 18:21
moines 24:16
monday 60:24
  74:13
money 14:4,6 18:23
  46:23,24
month 13:10 16:12
  45:1
months 5:18 6:1
  14:8,20 18:19
  19:21,22 24:23
  47:7 65:16
mother 16:18,24
motion 26:6
move 75:24
moves 40:15
multiple 73:10
muscular 26:5,5
musculoskeletal
  26:5
muster 27:24,24

**N**
naman 1:19 2:8,12
  4:4
namanhowell 2:10
  2:14
name 4:12 5:8,14
  5:16,20,23 6:3 7:1
  7:9 8:6 10:12,13
  11:9 67:19 69:1
  74:10 75:18 76:2
  76:3,7,21
names 65:18
national 33:14
nature 6:21 35:14
  39:22 40:3
need 13:13 16:9
  19:18 28:19 52:22
  52:25 54:15 55:22
  78:1

needed 13:3 16:19
16:23 38:20 43:3
44:2 50:2 53:19
60:17
negative 64:4
neither 80:25
nervous 69:17
never 16:22 17:11
23:24 51:12 53:13
60:13
new 65:20
night 9:3 53:23
57:3
nod 6:7
noel 41:11,12,20
42:11,14,17 43:8
43:12 60:8 65:17
nonthreatening
34:7
noon 58:8,9
normally 39:19
north 17:7,21
notice 37:1
notified 36:24 37:3
37:5
notify 36:8
november 12:20
15:7,25 17:9
22:13 25:13,15,17
number 4:9 26:8
37:25 58:19
numbered 1:15

O

objected 73:1
objection 57:16
objects 35:18
obtained 11:3 25:7
obtaining 66:15
obviously 27:15,23
60:1 68:1
occasion 6:14 52:2
53:12
occasions 42:1
occupational 33:16
occur 31:6

occurred 31:8,11
55:3
occurrence 63:8
occurring 56:21
oclock 57:3
october 15:6 20:1,7
20:8,15
odessa 16:21
offensive 34:22
35:13,17 36:9
offer 28:14 33:12
offering 60:14
office 30:19 31:2
34:16 40:7 48:21
51:1,2 62:14
officer 80:14
officers 33:16
offices 1:19 4:4
official 6:3 64:5
oh 12:10 32:18
44:14 48:2 56:7
59:8 73:6,18 75:5
75:9,9 77:12
ohio 24:24
oilfield 66:14
okay 5:11 6:6,14,23
6:25 8:25 9:7,20
11:21 12:11 13:9
13:13,18 15:5
16:25 18:14,19,24
19:5,13 20:7
21:11,24 22:12
23:1,10,25 24:7
24:15,20 25:7
26:11,14,19,24
27:3,16 28:6,10
28:21 29:1,13,14
30:3,12 31:6,13
31:23 32:5,19,20
32:23 36:12 37:6
40:10,18 42:4
43:7 45:14 46:5
46:17 47:4,12,24
48:14 50:5,23
51:21 52:18 53:8

54:17,24 55:18,24
56:16 57:23 58:1
58:25 59:16,23
60:22 61:21,24
62:17 63:14,20
64:15,20 65:7,15
65:24 66:19,24
68:22 69:7,11
71:11,15,21,23,24
74:18 75:10,22
76:1,11,16,19
77:2,8 78:11,14
78:23 79:1
oklahoma 20:2
older 21:15,17
once 52:13
ones 66:25 70:15
70:15
oops 76:23
open 39:17 53:5,16
operating 9:18
operation 16:23
operator 9:11,12
opportunity 30:2,4
31:25 32:3,17
33:1 37:21 60:12
61:22
oral 1:8,12 4:7 80:8
80:14
order 12:12 23:8
orders 32:17 33:2
orientation 72:14
74:25
oriented 35:5
origin 33:14
original 14:13
orr 23:23
overall 63:23 66:24
overseas 7:14
overtheroad 12:24
13:25
owner 24:3
owneroperator
19:2,9

P

page 3:2,10 11:1,5
11:22,22 12:1,7
12:14 21:22 22:9
23:1,20,25 24:7
24:15 25:8,12
27:19 28:2,7
29:23 30:12,13
31:18,22 34:1
35:19 37:6,7 62:9
63:3
pages 29:6
paid 14:4 46:21
70:23
paperclip 77:11
paperwork 50:19
paragraph 30:15
39:18 61:16 63:21
64:7
part 17:7 43:25
55:19 61:3
particular 59:13
73:17
particulars 67:15
parties 81:2
parts 35:15
party 79:13 80:19
80:21
pass 23:2,5,7 25:5
79:5
passed 25:17 27:23
27:24,25
patrick 2:18 4:12
paul 76:21,22
paused 51:15
pay 17:16 28:22
44:4 45:2,19
46:20 47:2,15
penalty 68:4
people 72:18
percent 28:24
46:22
percentage 14:4
71:9
performance 63:24
period 40:14

perjury 68:4
persistent 34:23
person 36:8 38:25
personal 6:22 13:3
13:5,8 14:14,17
24:13 39:21,22
personally 30:18
68:9
personnel 3:12
29:7 33:21
pervasive 34:23
petition 31:9
phlebotomist 18:11
18:12 24:8
phone 51:4,24 52:5
52:17 57:10 59:18
63:18
physical 21:8 23:7
35:5
pick 17:10
picked 68:2 75:23
picture 21:12
pictures 35:18
place 1:20 2:9 4:5
48:5 57:15 59:11
59:21 68:12
plaintiff 2:2
plaintiffs 4:18
plant 9:3
please 4:16 5:3,9
58:19 64:8,9,9
69:1
pllc 1:19 2:8,12 4:5
point 54:15
pointing 75:11,12
policies 30:21
policy 3:12,13 29:7
29:16 33:4,11,11
34:3,10,11,13,14
34:16 35:11,21,22
36:7,10,18,21
37:7,10,15,17
38:8 39:17
portions 29:19
position 43:3 60:7

78:19
**positive** 63:24
    70:21
**possible** 36:17
**posttrip** 50:18
**powders** 69:25
**pozzi** 1:16 4:13
    80:11 81:9
**prefer** 30:21
**prepare** 67:10 78:7
**prepared** 78:9
**prescribed** 69:22
**prescription** 69:19
**present** 2:15 4:21
    37:21 67:19 71:9
**presentation** 51:19
**presented** 67:16
**president** 38:18,23
    40:7 58:17
**presidents** 30:13,16
**pressure** 27:25
    71:8
**pretripped** 48:22
    48:24
**pretty** 7:14 14:18
    43:10 57:25
**previous** 26:5
**prior** 63:17 65:6
    74:11,12
**pro** 18:8 24:7
**probably** 20:17,22
    26:20
**problem** 30:22,23
    37:4 38:12,13
    39:20,21 40:4
    41:8,11 48:3
**problems** 13:3,5
    14:15,17 27:21
    38:1 40:20 41:6
**procedure** 1:21
    30:10 33:4 34:19
    36:3 37:8,9,10,14
    37:23,24,25 39:20
    40:2,5
**procee** 72:6

**proceed** 54:25 72:7
**proceeded** 49:20
**proceedings** 79:11
**produced** 1:13 73:1
**production** 74:1
**prohibit** 34:4,5
    68:8
**prohibited** 36:1
**prohibiting** 67:24
**prohibition** 35:20
**project** 43:25 44:2
    66:11 74:23
**promises** 35:7
**promotion** 33:19
**proof** 25:16
**propositions** 35:14
**prove** 74:5,6
**provide** 25:16
    37:12 70:18
**provided** 30:6
    37:21
**providing** 32:3
    36:25
**provisions** 1:22
**purpose** 31:25
    32:15 34:2 37:9
**purposes** 27:14
**pursuant** 1:21
    79:12 80:17
**put** 77:24
**putting** 26:25 60:20

**Q**

**qualification** 3:11
    10:19 11:1,23
    28:8,11
**qualified** 33:13
**quality** 47:5,6,15
**quarter** 70:24
**quarterly** 71:10
**question** 6:7 40:3
    41:1 44:16 48:1
    60:13 64:23 77:19
**questions** 6:22
    29:11 38:2 64:25
    65:3 79:6

**quick** 77:18
**quickly** 77:14
**quit** 12:25 13:2
    14:2,3,6,20,22
    15:15,17,25 16:12
    17:22 18:20,20
    19:8,13,23 20:10
    20:18

**R**

**race** 33:13
**racist** 61:14
**rain** 49:8
**raining** 48:25
**raised** 68:19
**rate** 28:22 44:4
    45:2,19 46:20
    47:15
**raygar** 18:25 19:2
    19:3,13 23:25
**raymond** 19:3
**reach** 59:6,10
**read** 6:11 22:16
    26:8 30:15 31:25
    32:10,12,13,14,18
    32:24 33:23 34:2
    34:9,19 35:3 36:2
    36:5,20 39:17
    57:18 63:22 67:15
    68:1
**reading** 32:8,13
**ready** 50:18,19
    54:25 72:6,7
**real** 77:14,18
**really** 9:13,16
    10:12 19:24 42:5
    43:22 48:19 49:7
    53:16 54:1 76:23
**reason** 19:13 24:1
**recall** 5:17 8:6
    33:20 76:24
**receipt** 58:14
**receive** 8:11 18:12
    29:20 36:17 41:10
    58:22 62:18 64:4
**received** 29:16 57:3

57:6 58:24 59:4
**recess** 54:20 72:2
**recogni** 67:9
**recognize** 11:5,6
    29:15 67:9
**recollect** 51:24 52:6
**recollection** 50:11
    59:5
**recommendation**
    69:18
**record** 1:22 4:3
    6:16 7:1 25:8
    54:18,22 71:25
    72:4 80:15 81:4
**records** 11:3 66:1
**recourse** 61:18,18
**recruiting** 33:18
**red** 68:19
**redirected** 54:9
**reflect** 10:13 21:21
**reflected** 75:22
**reflective** 21:12
**refur** 49:7
**refusal** 35:8
**refusing** 35:9
**regarding** 41:20
    43:12
**regardless** 33:13
**regular** 69:25
**related** 81:1
**relationship** 64:20
**relative** 81:3
**release** 15:14,18,21
    15:23
**religion** 33:14
**remain** 45:25
**remember** 9:13,16
    10:12,13,24 17:7
    17:8 20:22 21:1
    23:9,23 24:5
    27:17 36:22 41:25
    42:5,15 43:22
    47:8 48:11,19
    49:8 51:4 56:7,16
    57:5,7,9 59:1 65:1

65:4 69:8,22 70:7
    76:25
**remembered** 78:18
**removal** 26:15,16
    27:7
**rental** 76:4
**repaired** 50:2
**replied** 62:8
**report** 24:21 36:15
**reported** 1:18
    24:22
**reporter** 1:17 4:13
    5:2 75:7 80:11
**reporters** 3:6 80:7
**reporting** 36:2
**reports** 63:22 64:2
    64:4
**represent** 4:17 29:5
**representation**
    57:21
**request** 23:21 60:5
    74:1 79:12
**requested** 80:19
**requirements**
    33:16
**res** 55:22
**resignation** 60:25
**resolution** 38:12,13
    40:3
**resolve** 39:20
**resolved** 14:17 40:8
**respective** 32:4
**respond** 6:7
**responds** 63:7
**response** 52:10
    60:4,10 62:7
    64:17
**responses** 74:1
**responsibility**
    34:12
**restaurant** 9:2
**restroom** 51:1
**result** 70:3
**resume** 10:14
**retaliated** 36:25

72:11,22
retract 41:9
return 15:19,21
  54:11 60:5 63:15
  64:10 67:21 68:9
returned 44:13,15
returning 60:3
  67:25 68:8
reunion 1:20 2:9
  4:5
review 79:12
reviewed 30:7
reviews 23:11 29:8
  55:10 57:20 73:24
ricardo 18:3
right 5:19 6:18,18
  10:16,25 12:17
  14:2,13 15:17
  19:6 21:6,17 22:9
  22:15 23:20 24:14
  25:1,20 26:1,3
  27:6,9,10,14,19
  29:22 31:8,9,12
  32:11,11,24 35:19
  38:7,21,23 39:2,6
  40:14,16 41:18
  42:10 43:11 46:15
  48:16 50:8,12
  53:4 54:16 55:2,8
  56:4,13,17,21,24
  57:1,12 59:3 62:6
  64:19 69:9 72:4,9
  72:19 73:8,16
  75:20,21,21 78:20
rights 67:23
risk 14:23
road 2:4 13:4 15:10
  16:20 28:3,4
  43:19
rock 13:17
room 52:23,24 53:1
  53:16
roughly 9:14 11:24
  46:3 56:22

rpr 81:9
rude 6:15
rug 53:2
rule 80:17
rules 1:21 6:6
rulon 17:1,3,5 18:2
  18:6 24:15
run 49:21
running 43:4

—— S ——
sac 8:5
saddened 63:12
safe 34:6
safety 23:23 28:9
sage 1:5 4:8,20,22
  5:1 10:20 11:2,7
  12:13 21:5 22:4,7
  23:3,8 24:21 25:3
  25:7,16 27:13,14
  28:13,17,23 31:4
  33:5,12 34:17
  37:15,18 38:18,24
  39:9,14,15 40:11
  40:11,20,23 41:3
  41:6,20 43:13
  44:12 47:7,9 48:6
  48:10 52:8 53:11
  53:17 54:11 57:4
  59:6,10 61:3,10
  64:5,22 65:6,8
  68:12 70:8,16,18
  72:11 76:25 77:6
  79:2 80:5
salary 71:9
san 1:2,20 2:4,9 4:6
  4:11,15 7:7,11 8:2
  8:3 10:3 12:22
  16:7,21 18:5,17
  33:9 34:16 48:13
  80:2 81:12
sandusky 24:24
sanjel 44:1 66:11
  66:21 67:2 74:23
sarcasm 41:10,21
  42:18 43:11

sarcastic 42:21
satisfaction 40:8
saw 68:24 70:5
saying 52:12 53:12
says 12:25 13:20
  14:19 15:11,17
  18:11 25:15 26:8
  30:11 31:21 51:12
  55:19,20 58:10
  61:17 62:11 63:8
  63:22 64:8 71:7
  76:5
schedule 3:19
  76:14,17
scheduled 48:17
  74:20
schedules 74:9
school 7:17,19,23
  7:24 8:2,9,19 9:8
  9:9,23,25 10:2,5,7
  33:17 36:15,16
  39:23,24 40:5,9
  66:6
scope 33:4 34:9
  37:14
second 9:2 12:14
  22:19 23:10 27:19
  29:23 31:18 61:16
  62:20 63:21
seconds 51:18
section 32:1
security 22:22
see 12:15 30:13,20
  32:7,7,9 60:8,15
  62:4,19,21 63:3
  66:1 69:7 70:2
  71:2 73:12,12
  75:18 76:2,2
seeing 59:1 76:24
seek 61:18,19
seen 68:13,14 73:5
seguin 7:18,19,24
  9:2,3,4
selma 81:12
send 55:16

sending 62:10
sends 23:21 54:7
sent 17:6 55:16
  57:1 62:7 63:6
  71:3
september 45:16
  45:17,25 46:14,17
  46:19 47:11 71:8
service 25:15
services 66:15
seventeen 45:20
seventy 45:6
severe 34:23
sex 33:14,15 36:23
  67:18 72:14,20
sexual 30:5 33:25
  34:4,20,21 35:4,6
  35:6,13,14,20,22
  36:23 72:14
sexualdegrading
  35:16
sexually 35:4,12,18
sh 51:15 78:16
shadow 42:23
shake 6:8
sheet 27:12 29:6
shell 13:13 16:9
  19:18 55:22
shes 49:16 50:23
short 25:20 54:24
  71:21
shorthand 1:17
  80:11
show 10:18 25:2
  60:22 73:8
shows 23:16 25:9
  29:23
sic 39:14
sick 16:18
side 53:4
sign 15:1
signature 21:21,24
  21:25 68:3 80:18
signed 24:17 29:15
  30:7 51:25 67:10

67:12 68:2 78:5,6
significance 74:2,4
sir 5:15,22 6:13,24
  7:20,25 8:12,21
  9:9,24 10:15 11:8
  11:18,21 13:21,24
  14:1,7,21,25 15:8
  16:14 17:4 19:19
  19:22 20:17,19
  21:4,23 22:2,5,8
  22:25 23:4 24:25
  25:22,24 28:5
  29:18 30:14 31:8
  33:3,10 36:6
  40:17 45:22 47:23
  48:7 52:6 55:1,7
  56:20,25 61:8
  62:25 63:5 67:3
  72:8
situations 37:20
six 24:22
skills 63:23
sleep 69:17
slightly 32:8
small 52:23,24
smi 9:6,7,10,12,15
  9:17
smith 1:19 2:8,12
  4:5 41:11,12 43:8
  43:12 60:8
smiths 41:20 42:11
  42:14,18
smt 14:9,12 15:1,3
social 22:22
solely 33:21
solis 22:6 64:21
somebody 23:16
  57:10
sorry 5:11 32:18
  47:18 48:2 55:25
  62:11 63:5,8
  73:23 75:9
sought 68:11
sound 19:11 71:1
sounded 32:13

space 53:3
speak 30:19 51:6,9
    51:11 53:20 58:18
speaks 57:16
specific 43:7
specifically 42:20
    43:16
speeding 24:24
    25:9
spell 69:1
spent 64:24
spine 26:4
spring 65:8,10,14
square 1:20 2:8
stand 19:3
standing 49:1,8
    53:5
stands 19:4
start 8:22 12:11
    46:13 49:12
started 9:1 13:10
    42:4 45:1 68:16
    69:24,25
starting 32:11
    55:11 74:24
state 1:17 5:8 6:25
    32:3,16 33:1
    80:12
stated 1:22 7:1
    17:13 70:22
statement 36:20
    37:2 71:12
statements 42:21
states 1:1 4:10
    12:19 14:2 80:1
status 33:15
steel 9:4,10
stem 18:15
stenotype 1:18
step 38:7,11 55:18
stereotypical 67:22
stomach 69:16,17
    70:1
stood 51:3
stop 16:22 36:10

49:19 54:16 61:20
stopped 16:22
stops 53:2
straight 16:12
stressed 68:13,15
strickland 76:21,22
student 31:1 48:17
    76:23,24,25
students 34:5,6,24
    35:23,24 49:11
stuff 50:25 70:1
styled 5:20
submits 35:10
submitted 12:13
    27:11,12,12
subscribed 81:6
subsided 42:3
sue 23:23
sufficiently 34:23
suggestion 40:2
suggestions 38:2
suggestive 35:18
suit 6:21
suite 1:20 2:4,12
    4:5 81:12
sunline 44:24,25
    45:2,5,7
superiors 42:8
supervisor 18:2
    30:24 31:1 37:19
    38:2,5,14 39:22
    40:1 41:12 52:20
    56:9
supervisors 33:17
supervisory 35:25
supposed 26:7
    74:23,24 75:1
    78:15
sure 20:23 41:2,5
    45:14 47:25 73:3
    74:5
surgeries 27:6
surgery 26:6,22
swear 5:3
swift 15:5,13 16:12

swore 71:12
sworn 1:14 5:5
    71:4,5 80:13 81:6

_____ T _____
table 29:24,25 53:7
take 6:18 28:20
    29:4 33:18 36:22
    40:5 48:17 54:17
    55:9 57:15 59:21
    69:20 71:21
taken 1:14 33:21
    54:20 59:11 72:2
    81:2
talk 30:3,9,25 42:3
    42:7
talked 42:7 55:4
    62:23 77:22
talking 17:18
talks 27:20 30:12
tammy 1:16 4:13
    80:11 81:9
tape 54:23
terr 81:9
teach 43:6
teaching 63:23
team 16:22 61:3
tear 18:23
telephone 2:5,10,14
tell 8:1 15:24 21:1
    22:17 37:8 48:8
    50:1,5 51:21
    55:12 59:22,23
    66:11 76:13 77:4
    78:15
telling 50:12 69:20
tells 76:16
tenderness 26:7
tenor 59:13
test 23:3,5 25:2,5
    28:3,4
testified 5:5
testimony 72:9
    80:15 81:2
testosterone 27:1,8
tests 28:13

texas 1:1,17,21 2:4
    2:9,13 4:6,11,15
    7:7 10:4 11:11,16
    80:1,12 81:10,12
textile 9:3
thank 6:20 21:17
    77:16,17 79:6,8
thanks 64:17,18
thats 8:10 9:21
    11:1,2 13:11,13
    15:5 16:24 17:22
    22:22,24 25:14
    26:12 30:11 32:21
    32:21 43:10 46:15
    49:13 50:2 53:19
    55:20 56:19 57:14
    58:10 59:13,15
    60:16 61:24 64:19
    65:19 66:17 71:12
    72:21 73:6 74:13
    74:23 75:9 76:20
    77:16 78:24
therapy 8:3 27:2
theres 12:1 29:24
    53:3 56:4
theyll 75:13
theyre 16:7 17:15
    68:17,17
thing 27:4 66:13
    78:22
things 42:4,25 43:5
think 6:25 8:7 9:24
    10:12 12:8 28:25
    30:20 31:22 42:6
    44:6 49:1,14,16
    56:14 60:19 69:22
    70:11,20 72:25
    73:9,14,22 77:15
thinking 48:22
    56:20 57:6 69:12
third 23:13 26:16
thirtysix 47:16
threats 35:7
three 19:20 21:7
    65:16

threemonth 40:14
thropp 2:16 4:22
    4:22 55:13 57:9,9
    58:17 59:19
thursday 62:14
ticket 24:24 25:10
tied 35:6
till 46:19
time 4:2 6:6,7,19
    11:19 16:23 17:17
    21:13 22:3,6
    30:19,20 31:3,8
    31:14 38:17 40:14
    40:23 43:25 44:11
    49:11 50:16,24
    54:7 57:1 61:10
    63:14,19 69:9
    70:5 72:4 75:19
    77:16 79:10 80:21
times 42:9 70:2,4
tindall 4:14 81:11
tired 9:18
title 29:24 31:24
    67:23
titled 21:22
today 4:1,21 11:14
    58:15,19 77:5
todays 72:9
told 31:1 42:2,6
    43:23 49:15,16,23
    50:6,9,20 51:6
    52:1 53:25 56:10
    72:10 78:19
tone 54:1
tonsillectomy 26:23
top 23:12 31:21
    32:12 55:11
touching 35:5
track 11:3
tractor 12:15 13:6
    14:24
traffic 24:22
trailer 49:6
train 43:18,19
trainer 41:16

| | | | | |
|---|---|---|---|---|
| **training** 18:12,15 33:19 75:19 | **two** 6:1 12:1,7 14:8 14:20 15:11 38:17 | 54:18,22 71:25 72:3 77:24 79:9 | **wayne** 65:17 | 22:4,7 23:3,8 28:17,23 35:1 |
| **transcript** 79:12 80:14 | 42:1,8 51:18 57:8 **type** 7:23 8:11 | **videotaped** 1:8,12 80:8 | **ways** 72:10 **wear** 18:23 | 38:1 40:10,22 41:2 43:13 44:13 |
| **transfer** 33:18 | 13:16 15:9 17:23 | **view** 67:22 | **wednesday** 74:19 | 44:15 45:8 46:9 |
| **translate** 70:24 | 18:9 20:20 21:2 | **violated** 36:8 | 76:1 | 46:11,18 47:4,6 |
| **transpired** 64:9 | 24:9 46:11 68:11 | **violates** 30:21 | **week** 43:20 44:8 | 54:11 60:3,5,9,20 |
| **transport** 13:11 | 75:7 | **violation** 36:15 | 45:4,23 63:9 | 63:15 64:22 67:21 |
| 14:3 24:15 | **typed** 78:17,17 | 38:8 67:23 | **weekly** 3:19 | 67:25 70:12 74:21 |
| **transportation** | | **violations** 24:21,22 | **welcome** 30:13,16 | **worked** 9:1,4 12:19 |
| 15:6 17:1 | **U** | 36:18 | **went** 9:21,22 14:9 | 13:9 14:8,19 |
| **traveling** 58:15 | **ugly** 21:15 | **vision** 27:23 | 14:11 15:25 16:12 | 16:15 17:3 18:19 |
| 59:9 | **uhhuh** 6:8 | **vp** 23:16 | 16:25 17:13 18:8 | 19:5,9 20:2,5,15 |
| **treatments** 35:7 | **unavailable** 55:6 | **vs** 1:4 80:4 | 18:24 19:1,15 | 23:17 40:11 70:16 |
| **tried** 39:10 49:1 | 58:16 | | 20:1,5 22:4,7 | **workers** 70:18 |
| 53:20 55:5 56:11 | **undergo** 25:1 | **W** | 28:23 42:4 46:23 | **workforce** 8:20 |
| 56:14 64:16 | **understand** 6:17 | **waco** 2:13 | 51:6,7 55:4 59:23 | **working** 34:7 38:17 |
| **trip** 17:21 20:6 | 25:20 44:16 74:3 | **waiting** 49:9 | 61:20,23 | 43:21 45:4,7,14 |
| **triple** 9:5 | **understood** 60:19 | **walk** 10:22 37:24 | **west** 2:4 | 46:13 60:8 70:23 |
| **tripped** 71:20 | **unemployment** | **walked** 50:24,24,25 | **western** 1:1 4:10 | **workplace** 35:17 |
| **truck** 8:2 9:22,25 | 20:20,24 | **wall** 53:4 | 80:1 | **workrelated** 37:20 |
| 10:2,9,11 13:20 | **unfortunately** | **want** 30:17 32:9 | **weve** 54:24 60:24 | **worry** 77:10,13 |
| 16:21 19:11 20:11 | 58:16 | 36:5 43:6 47:5 | **whats** 10:18 29:3 | **wouldnt** 15:18,21 |
| 23:18 24:3 25:3 | **union** 1:19 2:8 | 60:9,20 61:25 | 29:25 55:8 56:5 | 15:23 43:24 49:23 |
| 48:23 49:5,23 | **united** 1:1 4:10 | 70:4 77:14 | 61:24 67:8 73:9 | **wrecked** 19:10 |
| 50:2,6,13,15 66:6 | 80:1 | **wanted** 9:18,19 | **whelps** 68:19,21 | **write** 78:16 |
| 75:19,23,24 76:4 | **unwelcome** 34:21 | 50:21 51:5,9,11 | 69:21 | **written** 42:13 56:18 |
| **trucking** 9:21 | **use** 39:19 40:1 50:6 | 78:24 | **wheps** 68:18,18 | **wrong** 30:20 32:10 |
| 12:17 16:3,5,13 | 50:7 | **warning** 36:13,14 | **whi** 77:5 | 49:22 54:6 72:15 |
| 16:19 20:15 23:14 | **utilize** 66:16 | **warren** 2:7 3:4 | **winter** 65:14 | **wrote** 26:18 78:17 |
| 24:1,19 | **utilizing** 18:22 | 4:19,19,24 5:7 | **witness** 1:13 5:3 | |
| **trucks** 20:2,10 | | 10:18 12:4,7,11 | 12:2,9 48:2 63:1 | **X** |
| 23:14 | **V** | 29:3,14 48:4 | 71:18,19,24 75:5 | |
| **true** 68:5 80:15 | **valued** 63:12 | 54:16,24 57:18 | 75:9,14 77:12,17 | **Y** |
| **try** 15:1 30:23 31:4 | **various** 29:6 | 58:3 59:18 62:2 | 79:5,8 80:13,16 | **yard** 50:17 |
| 31:15 | **vehicle** 18:22 24:9 | 62:25 63:2,3 67:7 | **witnessed** 77:4,9 | **yeah** 10:23 12:2 |
| **trying** 23:18 57:5 | 49:3,17 66:8 | 67:8 71:16,21 | **witnesses** 71:17 | 59:12 63:2 68:21 |
| 59:6,10 64:13 | **verbal** 35:14,15 | 72:5,5,25 73:6,8 | **wondered** 51:17 | 68:21 69:14 71:3 |
| **tuesday** 62:8 63:7 | 55:22 | 73:14,16,19,22,25 | **wondering** 51:9 | 71:14 73:14 74:20 |
| 74:17 75:17 | **verification** 28:13 | 74:16 75:3,16 | **wont** 17:16 | 75:14 77:13,15 |
| **turn** 29:22 | **versus** 4:8 | 76:11 77:13 78:1 | **words** 19:11 35:16 | **year** 7:21 16:11 |
| **turns** 17:17 | **veteran** 33:14 | 79:6 80:23 | 42:24 74:11 | 45:16 70:25 |
| **twe** 24:23 | **vice** 58:17 | **wasnt** 16:20 39:11 | **work** 8:22 9:15 | **years** 9:13 11:20,24 |
| **twenty** 37:7 | **video** 4:7 | 39:12 43:23 44:6 | 14:9,11 15:19,22 | 15:12 17:3 21:7 |
| **twentyeight** 46:22 | **videographer** 2:18 | 52:19 | 16:1 17:1,7,10 | 65:24 66:2,5,19 |
| | 4:1,13,21 5:2 | **way** 8:8 10:23 77:2 | 18:8,24 19:1 21:5 | 67:1 |

**yesterday** 62:15
**youd** 6:5
**young** 48:20 50:16
**youre** 26:7 31:11
  32:7 57:23,24
  72:21 73:11,16
  75:7,11,12
**youve** 43:9,12
  44:12 50:6 53:12
  67:5 70:16 72:22

---
**Z**
---

---
**0**
---
**00** 57:2 75:18
**000** 70:24,25 71:10
**03** 13:10,10 14:8
  15:6
**04** 62:4
**05** 15:7
**06** 16:15,25 72:1
**08136486** 11:12

---
**1**
---
**1** 1:16 3:11,14,15
  4:3 10:17,19,25
  11:5 21:19 22:9
  26:8 28:11 31:24
  32:24 35:3,3,11
  35:21 37:25 75:18
  79:12 80:18,23
**10** 3:11 11:19,24
  57:2 62:4
**100** 2:4 28:24
**10001** 1:20 2:9 4:5
**104** 70:25
**11** 3:14,15,16,17
  46:16,17
**12** 8:24 46:1,19
  55:14 58:7,7
  81:10
**12c01119** 1:4
**12cv01119** 80:4
**12cv0119** 4:9
**13** 46:3 71:5
**14** 28:25 43:20

  81:10
**1470** 2:13
**15** 75:19
**16** 60:24
**17** 7:5 45:21
**18th** 20:8
**19** 55:14
**1959** 7:5
**1977** 7:22
**19th** 55:14 71:5
**1st** 55:13 58:7 59:6
  59:8

---
**2**
---
**2** 3:3,12 7:5 11:5,22
  29:2,4,19,22
  32:18,21 35:11
  38:11 54:19,23,23
  63:3 80:24
**20** 72:4
**200** 81:12
**2001** 12:20
**2003** 12:20
**2005** 15:25
**2009** 25:15,17
**2010** 11:7 18:8 20:1
  20:2,4,8,8,14,14
  20:15 21:6,9,22
  24:23 25:9 28:15
  31:15 40:11,18,19
  40:23 41:6 43:14
  65:11
**2011** 21:13,13
  22:13 25:13 28:15
  31:12,15 40:12,24
  41:7 43:14 47:10
  55:13 56:19 60:23
  65:9,12 67:14
  75:17
**2012** 45:17,18
  46:14 71:8
**2013** 1:10,15 4:2
  21:7 46:7 71:5
  80:9 81:7
**21** 40:23 41:6 43:14
**210** 2:5,10 81:13

**21st** 40:18
**22** 45:3
**23** 73:2
**24** 56:22,22
**25** 37:7
**254** 2:14
**26** 44:8
**27** 70:24 71:10
**28** 44:8
**28th** 31:15 40:19
  40:23 41:7 43:14
  74:13
**29** 1:10,16 3:12,13
  79:10 80:9
**29th** 1:15 4:2 31:11
  74:16 75:17

---
**3**
---
**3** 1:16 3:13 11:22
  29:10,12,14 31:24
  32:18,21,24 33:25
  35:3,11,19,19,21
  35:21 36:2,4,12
  36:12,20 72:1,4
  79:10
**30** 19:6 76:4 79:12
  80:18
**30th** 31:11 40:12
  74:17 76:2
**31** 56:19 58:15 63:4
  81:10
**31st** 40:12 57:2
  76:3
**34** 1:16 4:3 80:23
**35** 54:19
**3d** 68:21
**3s** 12:3,7

---
**4**
---
**4** 3:4,14,14,15,16
  3:16,17 36:2,12
  36:20 54:21 55:9
  57:13 62:23
**400** 2:12
**41** 54:23
**45** 76:4

**48** 56:19,23 57:23
**4823** 11:16
**4th** 20:7 60:23
  61:17 67:14

---
**5**
---
**5** 1:4 3:15 4:9 21:22
  36:20 58:2,4,4,22
  75:19 76:4 80:4
**55** 3:14
**5629** 81:10
**58** 3:15
**5th** 62:8 63:7

---
**6**
---
**6** 3:16,17 33:25
  59:17 60:22,24
  62:4
**600** 1:20 4:6
**61** 3:16
**62** 3:17
**631** 81:11
**645** 81:12
**67** 3:18
**69** 45:24
**6973400** 81:13

---
**7**
---
**7** 3:17 21:22 61:25
  62:1,24,25 67:23
**70** 45:24,24
**7316300** 2:10
**74** 3:19
**7554100** 2:14
**767031470** 2:13
**78** 3:5
**78212** 2:4
**78216** 2:9 4:6 81:12
**78219** 11:16

---
**8**
---
**8** 3:18 67:4,8 78:3
**80** 3:6
**800** 2:12
**8225666** 2:5
**8th** 11:7 21:22

---
**9**
---
**9** 3:19 56:19 73:7,9
  74:2,5 76:4
**906** 2:4
**9th** 22:13 25:13,15

EXHIBIT

1

PENGAD 800-631-6989

*The* **SAGE** *Corporation*
 **SAGE** *Technical Services*

# DRIVER QUALIFICATION CHECKLIST

DRIVER: _Loretta I Eure_          SCHOOL CODE: _30_

SSN: _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_          HIRE DATE: _12-21-10_

DL#/ST: _08136486   Tx_          L.O.A. DATE: _____

PHONE #: _210-617-0270_          TERM DATE: _____

☑ Driver's application for employment  _12-8-10_

☑ Copy of CDL and SSC

☑ Requests for information from previous employers

☑ Requests for information regarding drugs and alcohol  _12/15_

☑ Violation and Review Record  _12-21-10_

☑ Motor Vehicle Record  _12-10-10_

☑ DOT Physical Long Form & Medical Card  _11-9-09_

☑ Record of Road Test and Certification  _12|13|10_

☐ SAGE Certificate of Qualification

☐ Notice of Termination

☑ UA Results received and filed  _12-14-10_

DRIVER QUALIFICATION FILE

**CLEARED**

By: _____
On: _12-21-10_

*The* SAGE *Corporation*

## RENEWAL RECORD

| YEAR | ANNUAL MVR | PHYSICAL EXP | CDL EXP |
|------|-----------|--------------|---------|
| 2009 |  |  |  |
| 2010 | 12-10-10 |  |  |
| 2011 |  | 11-9-11 |  |
| 2012 |  |  |  |
| 2013 |  |  | 2-17-13 |
| 2014 |  |  |  |
| 2015 |  |  |  |
| 2016 |  |  |  |

# The SAGE Corporation
## DRIVER-INSTRUCTOR APPLICATION FOR EMPLOYMENT
### Answer all questions – please print clearly

School Name __36__ City __San Antonio__ Date of Application __12/8/10__

In compliance with Federal and State equal opportunity laws, qualified applicants are considered for all positions without regard to race, color, religion, sex, national origin, age, marital status, or non-job related disability.

Name __Eure__ __Loretta__ __I.__ Social Security No. __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__
　　　Last　　　　First　　　Middle

CDL State __Tx__ CDL # __0813648%__ CDL Expiration __02/17/13__ DOT Physical Expiration __11/9/11__

Phone __(210) 617-0270__ Cell Phone _____ Email __Eurel08@yahoo.com__

List your addresses of residency for the past 3 years.

Current Address __4823 Laura Lane__ __Kirby Tx 78219__ __10 yrs__
　　　　　　　　Street　　　　　City　　　State & Zip Code　　How Long?

Previous Addresses _____ _____ _____ How Long? _____
　　　　　　　　Street　　　　　City　　　State & Zip Code

_____ _____ _____ How Long? _____
Street　　　　　City　　　State & Zip Code

Do you have the legal right to work in the US? Yes ☑ No ☐ Date of Birth __02-17-59__
(proof may be required)　　　　　　　　　　　　　　　　　　　　　　(Required by FMCSR)

Are you now employed? __No__ If not, how long since leaving last employment? _____

My total time on-duty (include ANY compensated work) during the preceding seven (7) days was __O__ hours [§ 395.8(j)(2)]

Who referred you? _____ Rate of pay expected __14.00__

JOB DESCRIPTION SUMMARY: Driver-Instructors are responsible for providing commercial driver training and testing in a classroom, training lab and driving environment. All instructors must have and maintain, at their own expense, a current/valid CDL with all endorsements, DOT physical and acceptable driving record. Instruction requires ongoing substantial review of the curriculum and preparation for training, which must occur prior to reporting to work. Driver skill training is a physically demanding job that requires constant, vigorous movement from truck to truck, bending, light lifting, movement in and out of the truck, long hours in the truck, work in the elements and at night, and potential interstate travel during training and to other Company schools. Instructors must take all reasonable precautions to ensure the safe operation of Company equipment. Driver-Instructors are subject to compliance with Sage's Instructor Qualification Standards.

Is there any reason you might be unable to perform the functions of the job for which you have applied as described above?

Yes ☐ No ☑ If yes, please explain: _____

## EDUCATION / MILITARY EXPERIENCE

CIRCLE HIGHEST GRADE COMPLETED: 1　2　3　4　5　6　7　8　　HIGH SCHOOL: 9　10　11　12　　COLLEGE: ①　2　3　4

LAST SCHOOL ATTENDED __San Antonio College__ __San Antonio Tx__
　　　　　　　　　　　　　(NAME)　　　　　　　　　　(CITY, STATE)

MILITARY BRANCH _____ FROM _____ TO _____ HIGHEST RANK _____

DISCHARGE DATE _____ SPECIALITY _____

## EMPLOYMENT AND SAFETY PERFORMANCE HISTORY

All driver instructor applicants to drive and instruct in interstate commerce must provide the following information on all employers during the preceding 10 years. List complete mailing address, street number, city, state and zip code. (Note: List employers in reverse order starting with the most recent. Add another sheet as necessary.) All time periods must be accounted for. Owner-Operator tax records may be provided to verify employment. Information provided herein will be used to contact previous employers for purposes of investigating the applicant's safety performance history as required by section 391.23 of the FMCSR. Sage will verify at least the prior 5 years of history and safety performance.

| EMPLOYER | | | | DATE | |
|---|---|---|---|---|---|
| NAME Trucks for You | | | | FROM MO. 10 YR 10 | TO MO 10 YR 10 |
| ADDRESS Box A14 | | | | Position Held O T R | |
| CITY Muskogee | STATE OK | | ZIP 74402 | Salary/Wage .30 cpm | |
| CONTACT PERSON Andrea | | PHONE NUMBER 918 348 7413 | | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | | | YES ✓ | NO |

| EMPLOYER | | | | DATE | |
|---|---|---|---|---|---|
| NAME Carter Express | | | | FROM MO. 6 YR 10 | TO MO 10 YR 10 |
| ADDRESS 4020 W. 73rd St | | | | Position Held | |
| CITY Anderson | STATE IN | | ZIP 46011 | Salary/Wage .34 cpm | |
| CONTACT PERSON Kelli | | PHONE NUMBER 765-778-6850 | | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | | | YES ✓ | NO |

| EMPLOYER | | | | DATE | |
|---|---|---|---|---|---|
| NAME Ragar | | | | FROM MO. 5 YR 10 | TO MO 6 YR 10 |
| ADDRESS 870 NaSta Blvd | | | | Position Held O T R | |
| CITY Laredo | STATE TX | | ZIP 78045 | Salary/Wage .29 cpm | |
| CONTACT PERSON Gi | | PHONE NUMBER 956-727-4602 | | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | | | YES ✓ | NO |

| EMPLOYER | | | | DATE | |
|---|---|---|---|---|---|
| NAME Prolab | | | | FROM MO. YR 10 | TO MO 5 YR 10 |
| ADDRESS 120547 Starcrest | | | | Position Held Phlebotomist | |
| CITY San Antonio | STATE TX | | ZIP 78223 | Salary/Wage 11.00 | |
| CONTACT PERSON Lynn | | PHONE NUMBER | | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | | | YES | NO ✓ |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | | | YES ✓ | NO |

| EMPLOYER | | | | DATE | |
|---|---|---|---|---|---|
| NAME Ruan Transportation | | | | FROM MO 7 YR 06 | TO MO. 1 YR 10 |
| ADDRESS 666 Grand Ave | | | | Position Held Transport Driver | |
| CITY Des Moines | STATE IA | | ZIP 50306 | Salary/Wage 106. per ld. | |
| CONTACT PERSON HR | | PHONE NUMBER 515-245-5417 | | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | | | YES ✓ | NO |

Pursuant to 49 CFR Part 391.23(i), you are hereby notified that you have certain rights regarding the investigative information that will be provided by your previous employers, including the right to review information provided by previous employers, have errors in information corrected, and rebut alleged erroneous information. A copy of the regulations that set forth these rights and the procedure authorized to review employer-provided investigative information is available for review upon request.

# EMPLOYMENT AND SAFETY PERFORMANCE HISTORY

All driver instructor applicants to drive and instruct in interstate commerce must provide the following information on all employers during the preceding 10 years. List complete mailing address, street number, city, state and zip code. (Note: List employers in reverse order starting with the most recent. Add another sheet as necessary.) All time periods must be accounted for. Owner-Operator tax records may be provided to verify employment. Information provided herein will be used to contact previous employers for purposes of investigating the applicant's safety performance history as required by section 391.23 of the FMCSR. Sage will verify at least the prior 5 years of history and safety performance.

| EMPLOYER | | DATE | |
|---|---|---|---|
| NAME Leonel G. Marroquin Trucking (Grovel Trucking) | | FROM MO.11 YR.05 | TO MO.7 YR.06 |
| ADDRESS 6610 Cromer | | Position Held Transport | |
| CITY San Antonio | STATE Tp ZIP 78223 | Salary/Wage 200. | |
| CONTACT PERSON Giovani | PHONE NUMBER (210) 849-1950 | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | YES ✓ | NO |

| EMPLOYER | | DATE | |
|---|---|---|---|
| NAME Swift Transp. | | FROM MO.10 YR.03 | TO MO.11 YR.05 |
| ADDRESS 1101 Carrier Dr. | | Position Held OTR | |
| CITY Laredo | STATE Tp ZIP 78045 | Salary/Wage .46cpm | |
| CONTACT PERSON J. Gonzales | PHONE NUMBER (800) 800-2200 | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | YES | NO |

| EMPLOYER | | DATE | |
|---|---|---|---|
| NAME SmT / Couger Tractor | | FROM MO. YR.03 | TO MO.1 OYR.0.3 |
| ADDRESS 4600 Goldfield | | Position Held OTR | |
| CITY San Antonio | STATE Tp ZIP 78218 | Salary/Wage 19cpm | |
| CONTACT PERSON Rick | PHONE NUMBER (210) 618-2888 | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | YES | NO |

| EMPLOYER | | DATE | |
|---|---|---|---|
| NAME Earth Transport | | FROM MO.03 YR.03 | TO MO.08 YR.03 |
| ADDRESS 8135 Bracken Creek | | Position Held Dump Trk Driver | |
| CITY San Antonio | STATE Tp ZIP 78218 | Salary/Wage 5.50/d | |
| CONTACT PERSON McDade | PHONE NUMBER (210) 651-6494 | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | YES ✓ | NO |

| EMPLOYER | | DATE | |
|---|---|---|---|
| NAME Cougar Tractor | | FROM MO.11 YR.01 | TO MO.03 YR.03 |
| ADDRESS 8715 E. Hwy 87 E | | Position Held OTR | |
| CITY S.A | STATE Tp ZIP 78220 | Salary/Wage .17cpm | |
| CONTACT PERSON Rick | PHONE NUMBER (210) 648-2888 | Reason for Leaving Quit | |
| Were you subject to the Federal Motor Carrier Safety Regulations (FMCSR) while employed with this employer? | | YES ✓ | NO |
| Were you employed in a "safety sensitive" function (example: driver) subject to alcohol/controlled substances testing? | | YES ✓ | NO |

Pursuant to 49 CFR Part 391.23(i), you are hereby notified that you have certain rights regarding the investigative information that will be provided by your previous employers, including the right to review information provided by previous employers, have errors in information corrected, and rebut alleged erroneous information. A copy of the regulations that set forth these rights and the procedure authorized to review employer-provided investigative information is available for review upon request.

# DRIVING EXPERIENCE AND QUALIFICATIONS

ACCIDENT RECORD FOR PAST 3 YEARS OR MORE (ATTACH SHEET IF MORE SPACE IS NEEDED). IF NONE, WRITE "NONE."

| DATES | NATURE OF ACCIDENT (HEAD-ON, REAR-END, UPSET, ETC.) | FATALITIES | INJURIES |
|---|---|---|---|
| LAST ACCIDENT | | | |
| NEXT PREVIOUS | None | | |
| NEXT PREVIOUS | | | |

TRAFFIC CONVICTIONS AND FORFEITURES FOR THE PAST 3 YEARS (OTHER THAN PARKING VIOLATIONS). IF NONE, WRITE "NONE."

| LOCATION | DATE | CHARGE | PENALTY |
|---|---|---|---|
| Sandusky OH | 7/29/00 | Speeding +10 mph | 125.00 fine |
| | | | |
| | | | |

(ATTACH SHEET IF MORE SPACE IS NEEDED)

LIST ALL DRIVER'S LICENSES EVER HELD

| STATE | LICENSE NO. | TYPE | EXPIRATION DATE |
|---|---|---|---|
| TX | 05136484 | Am-CDL | 2-17-2013 |
| | | | |
| | | | |

A. Have you ever been denied a license, permit or privilege to operate a motor vehicle? Yes ☐ No ☑
B. Has any license, permit or privilege ever been suspended or revoked? Yes ☐ No ☑
C. Have you ever been stopped/arrested/convicted for driving under the influence of drugs or alcohol or have a current charge pending? Yes ☐ No ☑
D. Have you ever been arrested/convicted for possession, sale or use of a narcotic drug, amphetamine or other derivative thereof or have a current charge pending? Yes ☐ No ☑
E. Have you ever been convicted of a crime or have a current charge pending? Yes ☑ No ☐
F. Have you ever been convicted of an offense involving the use of drugs or alcohol? Yes ☐ No ☑
G. Have you ever tested positive on any drug test, tested at a breath alcohol concentration level of 0.02% or greater on a breath alcohol test, or refused to take a drug or alcohol test when you were required to do so in accordance with any federal regulation or a previous/current employer's company policy? Yes ☐ No ☑
H. Have you ever committed any other violations of DOT drug and alcohol testing regulations? Yes ☐ No ☑

IF THE ANSWER TO ANY QUESTION (A-H) IS "YES," ATTACH STATEMENT GIVING DETAILS.

1984 Aggr. Assault

DRIVING EXPERIENCE (IF NONE, WRITE NONE)

| CLASS OF EQUIPMENT | TYPE OF EQUIPMENT (VAN, TANK, FLAT, ETC.) | DATES | | APPROX. NO. OF MILES (TOTAL) |
|---|---|---|---|---|
| | | FROM | TO | |
| STRAIGHT TRUCK | | | | |
| TRACTOR AND SEMI-TRAILER | Van, Tank, FB | 2000 | Present | 500,000+ |
| TRACTOR- TWO TRAILERS | | | | |
| MOTORCOACH – SCHOOL BUS | | | | |
| OTHER: | | | | |

LIST STATES OPERATED IN FOR LAST FIVE YEARS   48

SHOW SPECIAL COURSES OR TRAINING AWARDS, TECHNICAL EXPERTISE OR EXPERIENCE THAT WILL HELP YOU AS AN INSTRUCTOR

Road Masters Truck Driving School

## TO BE READ AND SIGNED BY APPLICANT

I hereby certify that I have not knowingly withheld any information that might adversely affect my chances for employment and that the answers given by me are true and correct to the best of my knowledge. I further certify that I, the undersigned applicant, have personally completed this application. I understand that any omission or misstatement of any material fact on this application or on any document used to secure employment shall be grounds for rejection of this application or for immediate discharge if I am employed, regardless of the time elapsed before discovery.

I hereby authorize the Company to thoroughly investigate my references, work record, training, education and other matters related to my suitability for employment, and further authorize the references I have listed to disclose to the Company any and all letters, reports and other information related to my work records, without giving me prior notice to such disclosure. In addition, I hereby release the Company, my former employers and all other persons and organizations from any and all claims, demands, cost, damages, or liabilities arising out of or in any way related to such investigation or disclosure. It is understood that an investigative consumer report pursuant to the Fair Credit Reporting Act may be made whereby information is obtained through personal interviews with my neighbors, friends, or others with whom I am acquainted. This inquiry includes information as to my character, general reputation, personal characteristics, and mode of living. By signing this application, I hereby consent to the Company obtaining such a report. I hereby authorize any law enforcement agency or court of record to furnish information concerning Motor Vehicle Record or felony or misdemeanor convictions. I hereby authorize the Company to obtain any medical documentation or information concerning my past or present medical history after a job offer is made. I hereby release all such persons from any liability or damages.

I hereby agree to submit to binding arbitration all disputes and claims arising out of the submission of this application. I further agree, in the event that I am offered employment by the Company, as a condition of that employment, all disputes which might arise out of my employment with the Company, whether during or after that employment, that cannot be resolved by informal internal resolution, will be submitted to binding arbitration in lieu of any Federal or State investigative, administrative or legal proceeding. I agree that such arbitration shall be conducted under the rules of the American Arbitration Association. This application contains the entire agreement between the parties with regard to dispute resolution, and there are not other agreements as to dispute resolution, either oral or written.

I hereby agree to submit to an Alcohol and Controlled Substance Testing/Screening for pre-employment medical qualification (at my own cost), and thereafter as warranted by Company policy and federal regulations. I understand the Company may contract with a third party to assist in administration of drug and alcohol testing and agree to this party being involved with all information to which the Company is entitled and subject to the same confidentiality requirements as the Company. I further understand that any offers made to me will be contingent on the results of the tests. A positive reading from the test will automatically null and void any offers or consideration made to me.

Under the authority granted me by 49 CFR Parts 391.89, 40.37, 40.81(f), 382.405(h), and 382.409, I hereby authorize and require my previous and/or current employers specifically listed by me in this application, as well as any other person or company provided by me in writing or by interview, by whom I was employed or to whom I applied for employment preceding the date of this application, to release to the Company the date, type of test and result of all drug and alcohol tests taken by me, including the date and type of test for any refusals by me to take a drug or alcohol test. If I tested positive on any controlled substance test, had an alcohol test with a concentration of 0.02 or greater, refused to take any drug or alcohol test, I also authorize the release of all information concerning my referral to a Substance Abuse Professional (SAP) including all records pertaining to my evaluation and treatment (if required by SAP). I authorize this release by whatever means is most expedient and agree to hold harmless any past employer or any person or company I applied with, as well as their employees, agents, or representatives, from all liability or damage that may arise from the release of the information specifically authorized here.

I understand that the Company is an interstate motor carrier, and that I am being hired as an interstate driver-instructor. As such, I may be required to, and I agree to, drive or transport Company property for training or other purposes in interstate commerce in furtherance of the Company's business. I am subject to the Hours of Service requirements established by the Secretary of the Department of Transportation, and therefore I am exempt from time and one-half overtime pay requirements under Section 13(b)(1) of the Fair Labor Standards Act. I specifically acknowledge that such exemption has been considered in determining my rate of compensation, which would have been adjusted lower in the absence of this exemption. I understand that the Company's career training business is cyclical, and hours assigned to me will be based upon student enrollment, my qualifications, and the availability of other instructors and the needs of the school, among other factors. While the Company will make reasonable efforts to provide sufficient work assignments based upon my interest, I understand that all instruction is on a part-time, as needed basis, that there are no guarantees as to availability of work hours or employee seniority, and that training may occur 24 hours a day, 7 days a week. I agree to be reasonably available for such a schedule. If employed, I agree to comply with all Company rules and regulations. I consent that the Company has the right to search my personal property located on Company property, along with Company desks, lockers, vehicles, tool kits, etc. for the purpose of investigating possible violations of Company rules. I understand that my personal property, including my vehicle, is brought to any work site at my own risk, and I assume full responsibility for any lost, stolen or damaged property, and I hereby release the Company for any such loss or damage.

I understand that nothing contained in the application or conveyed during any interview that may be granted, is intended to create an employment contract between me and the Company. In addition, I understand and agree that if I am employed by the Company, my employment is "at will" and is for no definite or determinable period and may be terminated at any time, with or without prior notice, at the option of either myself or the Company. I further acknowledge that no specific promises relating to a condition of employment have been made to me. No promises or representations contrary to the specific provisions of this paragraph are binding on the Company unless made in writing and signed by me and the Company's designated representative. I have received and reviewed the Company Personnel Policy Manual, and I understand that none of the benefits or policies in this Manual or any handbook issued to me by the Company are intended by reason of its publication to confer any rights or privileges to any benefits or policies, or entitle me to remain employed by the Company, or to change my status as an "at will" employee. I understand that all statements and provision in the Manual are procedural or a guideline and that the Company has the right to change any policy, benefit, or procedure at any time without notice. I understand and hereby agree to comply with the above provisions.

| | | |
|---|---|---|
| 12/8/10 | | |
| Date | Witness | Applicant's Signature |



CONCENTRA Medical Center
# MEDICAL EXAMINER'S CERTIFICATE

I certify that I have examined _Lee Ann Ecker_ in accordance with FMCSR
49 CFR 391.41–391.49 and with knowledge of the driving duties, I find this person is qualified and, if applicable, only when:

☒ Wearing Corrective Lenses      ☐ Driving without an exempt intracity zone (49 CFR 391.62)

☐ Wearing Hearing Aid      ☐ Accompanied by a Skill Performance Evaluation Certificate

☐ Accompanied by a ___ waiver/exemption    ☐ Qualified by operation of 49 CFR 391.64

The information I have provided regarding this physical examination is true and complete. A complete examination form with any attachment embodies my findings completely and correctly, and is on file in my office.

| SIGNATURE OF MEDICAL EXAMINER | TELEPHONE NO. 210-228-7787 | DATE 11 09 09 |
|---|---|---|
| MEDICAL EXAMINER'S NAME CLIFFORD SHAW PA-C | | ☐ MD ☒ DO ☐ Chiropractor ☐ Advanced Practice Nurse ☒ Physician's Assistant |
| MEDICAL EXAMINER'S LICENSE OR CERTIFICATE NO. / ISSUING STATE  PA0012126 / TX | | |
| SIGNATURE OF DRIVER | DRIVING LICENSE NO. 08130486 | STATE TX |
| DRIVER'S ADDRESS (Street, City, State, Zip Code) 4823 ___ | | MED. CERT. EXPIRATION DATE 11 09 2011 |

NOTE: Driver must carry this certificate ... in accordance with 49 CFR 391.41 (a)



## The SAGE Corporation

### REQUEST FOR SAFETY PERFORMANCE AND DRUG/ALCOHOL TEST RESULTS FROM PREVIOUS EMPLOYER

*Employer: Fax to SAGE at* 2I0 826-7093 *or Call* (6I0) 826-7016

I, (print your name) Lon Ha Eua (print your SS#) 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 hereby authorize and request you to release and forward to The Sage Corporation the information requested below concerning safety performance history, employment and alcohol and controlled substances testing records for the purpose of investigation as required by Sections 391.23 and 382.413 of the Federal Motor Carrier Safety Regulations. You are hereby released from any and all liability that may result from furnishing such information.

Applicant's Signature: _____ Date: 12/18/10

Current/Former Employer: CJC Trucking / TRUCKS FoR YoU

Street: _____ Telephone: _____

City, State, Zip: S A T?___ Fax No.: _____

The above named applicant has applied for a position as Driving Instructor and states that you employed him/her. Please complete the form and return to Sage. We appreciate your time and consideration in completing this form.

1. Employed from 11-10-10 to 11-15-10 as a tractor-trailer driver or (specify) _____

2. Reason for leaving your employ: He did Fallow Company rules.

3. If company policy allowed, would you rehire? Yes ___ No X If so, why not? _____

4. Was applicant involved in any "accidents" (390.5) with in the previous 3 years? Yes ___ No X If yes, provide date, city/state of accident, injuries/fatalities, and whether hazmats were involved. List any other accident information retained by company policy at 390.15(b)(2).

5. Was applicant subject to Parts 40 or 382 testing require ments while employed? Yes ___ No X If "no", sign below and return.

6. Under Part 382 requirements has applicant in the last three (3) years ever (include information received from other previous employers):

| | | YES | NO |
|---|---|---|---|
| A. | Tested positive for a controlled substance? | | X |
| B. | Had an alcohol test with a Breath Alcohol Concentration 0.04 or greater? | | X |
| C. | Refused a required test for drugs or alcohol? | | X |
| D. | Committed any other violations of DOT drug/alcohol regulations under parts 40 or 382? | | X |
| E. | Completed or failed to undertake or complete a DOT return-to-duty process or SAP program? | | X |

If the answer to any item in question 6 was "YES" please provide full details _____

7. If the applicant completed a SAP program and remained in the employ of your company, did the applicant subsequently have an alcohol test with a result of 0.04 or higher, or have a verified positive drug test, or refuse to be tested (including verified adulterated or substituted drug test results)? Yes ___ No X If yes, provide details: _____

This form was completed by (Signature) Cristian Castellanos (Title) Vice President (Date) 12-20 10

(Name) CJC Trucking (Phone) 2I0 - 866-2388

---

### TO BE COMPLETED BY THE SAGE CORPORATION

This form was (check one) _____ Faxed to previous employer _____ Mailed          Date: _____

Information received from: _____          Date: _____

Recorded by: _____  Method: ____ Fax ____ Mail ____ Phone ____ Personal Interview

Applicants Complete top section of this form for all employers within past 3 years.

## The SAGE Corporation

### REQUEST FOR SAFETY PERFORMANCE AND DRUG/ALCOHOL TEST RESULTS FROM PREVIOUS EMPLOYER

*Employer: Fax to SAGE at* 210-826-7... *or Call* 210-826-7066

I, (print your name) **Lovetta Pure** (print your SSN) **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** hereby authorize and direct you to release and forward to The Sage Corporation the information requested below concerning safety performance history, employment and alcohol and controlled substance testing records for the purpose of investigation as required by Sections 391.23 and 382.413 of the Federal Motor Carrier Safety Regulation. You are hereby released from any and all liability that may result from furnishing such information.

Applicant's Signature: _____        Date: **12/8/10**

Current/Former Employer: **CARTER EXPRESS**

Street: **420 West 73rd St**        Telephone: **765-778-6961**

City, State, zip: **Anderson IN 46011**        Fax No.: **765-778-6967**

The above named applicant has applied for a position as Driving Instructor and states that you employed him/her. Please complete this form and return to Sage. We appreciate your time and consideration in completing this form.

1. Employee from **6/18/10** to **10/6/10** as a tractor-trailer driver or (specify) _____

2. Reason for leaving your employ: **RESIGNED**

3. If company policy allowed, would you rehire?  Yes ____  No ____  If so, why not? **UPON REVIEW**

4. Was applicant involved in any "accidents" (390.5) within the previous 3 years?  Yes ____  No **✓**  If yes, provide date, city/state of accident, injuries/fatalities, and whether hazmats were involved. List any other accident information retained by company policy of 390.15(b)(2).

5. Was applicant subject to Parts 40 or 382 testing requirements while employed? Yes **✓**  No ____  If "no", sign below and return.

6. Under a 382 requirements has applicant in the last three (3) years ever (include information received from other previous employers):

|  | YES | NO |
|---|---|---|
| A. tested positive for a controlled substance? |  | ✓ |
| B. Had an alcohol test with a Breath Alcohol Concentration 0.04 or greater? |  | ✓ |
| C. Refused a required test for drugs or alcohol? |  | ✓ |
| D. Committed any other violations of DOT drug/alcohol regulations under parts 40 or 382? |  | ✓ |
| E. Completed or failed to undertake or complete a DOT return-to-duty process or SAP program? |  |  |

If the answer to any item in question 6 was "YES" please provide full details: _____

7. If the applicant completed a SAP program and remained in the employ of your company, did the applicant subsequently have an alcohol test with a concentration .04 or higher, or have a verified positive drug test, or refuse to be tested (including verified adulterated or substituted drug test results)?  Yes ____  No ____  If yes, provide details: _____

This form was completed by (Signature) **Sue Orr** (Title) **Safety** (Date) **12/14/10**

(Name) **SUE ORR** (Phone) **765-778-6960**

---

### TO BE COMPLETED BY THE SAGE CORPORATION

This form was (check one) _____ Faxed to previous employer _____ Mailed        Date: _____

Information received from: _____        Date: _____

Recorded by: _____ Method: _____ Fax _____ Mail _____ Phone _____ Personal Interview

*The SAGE Corporation*

## REQUEST FOR SAFETY PERFORMANCE AND DRUG/ALCOHOL TEST RESULTS FROM PREVIOUS EMPLOYER

Applicant: Complete to section of this form for 3 employers with in past 5 years.

*Employer: Fax to SAGE at* 210-826-7093 *or Call* 210-826-7066

I, (or your name) Loretta Pine (print your SSN) 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 hereby authorize and direct you to release and forward to The Sage Corporation the information requested below concerning safety performance history, employment and alcohol and controlled substances testing records for the purpose of investigation as required by Sections 391.23 and 382.413 of the Federal Motor Carrier Safety Regulations. You are hereby released from any and all liability that may result from furnishing such information.

Applicant's Signature: _____  Date: 12/8/10

Current/Former Employer: Ragar International Trade

Street: 827 NoFTA                                    Telephone: 956-726-1127

City, State, Zip: Laredo, Tx 78045-                 Fax No.: 956-725-1571

The above named applicant has applied for a position as Driving Instructor and states that you employed him/her. Please complete this form and return to Sage. We appreciate your time and consideration in completing this form.

1. Employed from 5/22/10 to 6/21/10 as a tractor-trailer driver or (specify) OTR Driver

2. Reason for leaving your employ: Conflict with owner of truck

3. If company policy allowed, would you rehire?  Yes ✓  No ____  If no, why not? Upon review

4. Was applicant involved in any "accidents" (390.5) within the previous 3 years?  Yes ____  No ✓ If yes, provide date, city/state of accident, injuries, fatalities, and whether hazmats were involved. List any other accident information retained by company policy of 390.15(b)(2).

5. Was applicant subject to Parts 40 or 382 testing requirements while employed?  Yes ✓  No ____  If "no", sign below and return.

6. Under Part 382 requirements has applicant in the last three (3) years ever (include information received from other previous employers):

|   |   | YES | NO |
|---|---|---|---|
| A. | Tested positive for a controlled substance? |  | ✓ |
| B. | Had an alcohol test with a Breath Alcohol Concentration 0.04 or greater? |  | ✓ |
| C. | Refused a required test for drugs or alcohol? |  | ✓ |
| D. | Committed any other violations of DOT drug/alcohol regulations under parts 40 or 382? |  | ✓ |
| E. | Completed or failed to undertake or complete a DOT return-to-duty process or EAP program? |  |  |

If the answer to any item in question 6 was "YES" please provide full details: _____

7. If the applicant completed a SAP program and remained in the employ of your company, did the applicant subsequently have an alcohol test with an result of .04 or higher, or have a verified positive drug test, or refuse to be tested (including verified adulterated or substituted drug test result)?  Yes ____  No ____  If yes, provide details: _____

This form was completed by (Signature) Carlos MTZ (Title) Safety (Date) 12/13/10

(Name) Carlos Martinez (Phone) 956-727-4602

### TO BE COMPLETED BY THE SAGE CORPORATION

This form was (check one) ____ Faxed to previous employer ____ Mailed          Date: _____

Information received from: _____          Date: _____

Received by: _____  Method: ____ Fax ____ Mail ____ Phone ____ Personal Interview

Attn: Maria

# The SAGE Corporation

## REQUEST FOR SAFETY PERFORMANCE AND DRUG/ALCOHOL TEST RESULTS FROM PREVIOUS EMPLOYER

Applicants Complete top section of this form for all employers within past 5 years.

*Employer: Fax to SAGE at* 210-826-7073 *or Call* 210-826-7066

I, (print name) **Lauretha Pure** (print your SSN) **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** hereby authorize and direct you to release and forward to The Sage Corporation the information requested below concerning safety performance history, employment and alcohol and controlled substances testing records for the purpose of investigation as required by Sections 391.23 and 382.413 of the Federal Motor Carrier Safety Regulations. You are hereby released from any and all liability that may result from furnishing such information.

Applicant Signature: _____ Date: 12/8/10

Current/Former Employer: **Pro Lab**

Street: **120.547 Star Crest** Telephone: **866-776-5221**

City State Zip: **S.A. Tx 78223** Fax No.: **817-293-1246**

The above named applicant has applied for a position as Driving Instructor and states that you employed him/her. Please complete this form and return to Sage. We appreciate your time and consideration in completing this form.

1. Employed from 01/5/10 to 5/21/10 as a tractor-trailer driver or (specify) **Phlebotomist**

2. Reason for leaving your employ: **NA**

3. If company policy allowed, would you rehire? Yes _____ No _____ If no, why not? _____

4. Was applicant involved in any "accidents" (390.5) within the previous 3 years? Yes _____ No _____ If yes, provide date, city/state of accident, injuries or fatalities, and whether hazmats were involved. List any other accident information retained by company policy or 390.15(b)(2).

5. Was applicant subject to Parts 40 or 382 testing requirements while employed? Yes _____ No _____ If "no", sign below and return.

6. And, part 382 requirements has applicant in the last three (3) years ever (include information received from other previous employers):

| | | YES | NO |
|---|---|---|---|
| A. | Tested positive for a controlled substance? | | |
| B. | Had an alcohol test with a Breath Alcohol Concentration 0.04 or greater? | | |
| C. | Refused a required test for drugs or alcohol? | | |
| D. | Committed any other violations of DOT drug/alcohol regulations under parts 40 or 382? | | |
| E. | Completed or failed to undertake or complete a DOT return-to-duty process or SAP program? | | |

If the answer to any item in question 6 was "YES" please provide full details: _____

7. If the applicant completed a SAP program and remained in the employ of your company, did the applicant subsequently have an alcohol test with a result of .04 or higher, or have a verified positive drug test for refuse to be tested (including verified adulterated or substituted drug test results)? Yes _____ No _____ If yes, provide details.

This form was completed by (Signature) **Sharon Washington** (Title) **HR** (Date) 12/15/10

(Name) **Sharon Washington** (Phone) 210-[illegible]-5221

### TO BE COMPLETED BY THE SAGE CORPORATION

This form was (check one) _____ Faxed to previous employer _____ Mailed Date: _____

Information received from: _____ Date: _____

Received by: _____ Method: ____ Fax ____ Mail ____ Phone ____ Personal Interview

**Ruan Transport Corporation**
**666 Grand Avenue, 3100 Ruan Center**
**Des Moines, Iowa 50309**

12/09/2010

Loretta Bre
XXX-X-XX-3288

Dates of Employment: Start Date 07/06/2006 End Date 01/04/2010

Position: Driver

Type of Equip: Tractor-Trailer

Reason for leaving: Resigned

Eligible for rehire: Upon Review - Co. Policy
DOT Regulated: Trailer Length-48/53 feet; General Commodities; Drove 48 states

## DRUG AND ALCOHOL TEST HISTORY
Positive test for controlled substances? No

Failure or refusal to submit to controlled substance testing? No

Positive alcohol test of 0.04 or higher? No

## ACCIDENT HISTORY

| Date | DOT Rec? | Prev. | Inj. | Fat. | Tow | Location | Description |
|------|----------|-------|------|------|-----|----------|-------------|
| none |          |       |      |      |     |          |             |
|      |          |       |      |      |     |          |             |
|      |          |       |      |      |     |          |             |

Signature of person supplying above information    Title          Date

_Green Hill_          Driver Recruiter          12/9/10

Printed Name: _Jessica Hill_

NO ADDITIONAL INFORMATION WILL BE PROVIDED

## The SAGE Corporation

## REQUEST FOR SAFETY PERFORMANCE AND DRUG/ALCOHOL TEST
## RESULTS FROM PREVIOUS EMPLOYER

*Employer: Fax to SAGE at* 210-826-7073 *or Call* 210-826-7066

I, Loretta Pure (print your SSN) 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 hereby authorize and direct you to release and forward to The Sage Corporation the information requested below concerning safety performance history, employment and alcohol and controlled substances testing records for the purpose of investigation as required by Sections 391.23 and 382.413 of the Federal Motor Carrier Safety Regulations, I am hereby released from any and all liability that may result from furnishing such information.

Applicant's Signature: _____ Date: 12/8/10

Current or prior Employer: GIOVANI Trucking/LEONEL G. MARROQUIN

Street: 10 Cramer Telephone: 210-849-1950

City, State, Zip: S.A. TX Fax No.: Name

The above named applicant has applied for a position as Driving Instructor and states that you employed him/her. Please complete this form and return to Sage. We appreciate your time and consideration in completing this form.

1. I employed him from 11/05 to 07/06 as a tractor-trailer driver or (specify) _____

2. Reason for leaving your employ: Resigned _____

3. If company policy allowed, would you rehire? Yes ✓ No _____ If no, why not _____

4. Was applicant involved in any "accidents" (390.5) within the previous 3 years? Yes _____ No ✓ If yes, provide date, city/state of accident, injuries/fatalities, and whether hazmats were involved. List any other accident information retained by company policy or 390.15(b)(2).

5. Was applicant subject to Parts 40 or 382 testing requirements while employed? Yes ✓ No _____ If "no", sign below and return.

6. Under Part 382 requirements has applicant in the last three (3) years ever (include information received from other previous employers):

|  | YES | NO |
|---|---|---|
| A. Tested positive for a controlled substance? | | ✓ |
| B. Had an alcohol test with a Breath Alcohol Concentration 0.04 or greater? | | ✓ |
| C. Refused a required test for drugs or alcohol? | | ✓ |
| D. Committed any other violations of DOT drug/alcohol regulations under parts 40 or 382? | | ✓ |
| E. Committed or failed to undertake or complete a DOT return-to-duty process or SAP program? | | ✓ |

If the answer to any item in question 6 was "YES" please provide full details: _____

7. If the applicant completed a SAP program and remained in the employ of your company, did the applicant subsequently have an alcohol test with a result of 0.04 or higher, or have a verified positive drug test, or refuse to be tested (including verified adulterated or substituted drug test results)? Yes _____ No _____ If yes, provide details: _____

This form was completed by (Signature) _____ (Title) Owner (Date) 12/17/10

(Name) Giovani Marroquin (Phone) 210-849-1950

### TO BE COMPLETED BY THE SAGE CORPORATION

This form was (check one) _____ Faxed to previous employer _____ Mailed          Date: _____

Information received from: _____          Date: _____

Recorded by: _____ Method: _____ Fax _____ Mail _____ Phone _____ Personal Interview

# The SAGE *Corporation*

**DRIVER INSTRUCTOR MOTOR VEHICLE CERTIFICATION OF VIOLATIONS (391.27)**

I certify that the following is a true and complete list of traffic violations (other than parking violations) for which I have been convicted or forfeited bond or collateral during the past 12 months.

| Date of Conviction | Offense | Location | Type of Vehicle Operated |
|---|---|---|---|
| 6-29-10 | Speeding +10 MPH | Sandusky OH | Comm. |
| | | | |
| | | | |

If no violations are listed above, I certify that I have not been convicted or forfeited bond or collateral on account of any violation required to be listed during the past 12 months.

Eure Loretta
Driver's Name (Last, First, Middle Initial)

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
Social Security Number

_____
Date of Certification

_____
Driver's Signature

---

*Do Not Write Below this Line – SAGE Safety Dept. Use Only*

---

**DRIVER INSTRUCTOR ANNUAL REVIEW OF DRIVING RECORD (391.25)**

I have reviewed the Certification of Violations listed above and the motor vehicle record from each state in accordance with 391.25 of the Federal Motor Carrier Safety Regulations. I considered any evidence that the driver has violated applicable provisions of the Federal Motor Carrier Safety Regulations. I find that

( X ) the driver meets the minimum requirements for safe driving, or
( ) the driver does not adequately meet satisfactory safe driving performance, or
( ) the driver is disqualified to drive a motor vehicle pursuant to 391.15.

Include a current copy of the driver's motor vehicle record with this review.

Action taken with driver:_____

_____
Reviewed by: Signature

Safety
Title

12-21-10
Date of Review

## Fax to SAGE Safety Dept. in Billings, MT – (406) 652-3129
<span>11/18/2004</span>



# US MVR - Standard Delivery

Customer Name:      SAGE TECHNICAL SERVICES (44607)          136465762
Actor Name:         Lisa Reynolds ()
Customer Reference: 30
Customer Sub:       6PE
SSN:                467173288
=================================================================
                    .... M V R   R E P O R T ....
-----------------------------------------------------------------
STATE: TEXAS          D R I V E R   I N F O R M A T I O N
-----------------------------------------------------------------
EURE,LORETTA INEZ               REF: 30
4823 LAURA LN
KIRBY, TX 782180000
LICENSE: 08136486
-----------------------------------------------------------------
DOB:02/17/59 SOC/SEC:      SEX:  HGT:    WT:   EYES:    HAIR:

              D R I V E R   L I C E N S E   I N F O R M A T I O N
-----------------------------------------------------------------
CLASS           ISSUED  EXPIRES  STATUS              RESTRICTIONS
-----------------------------------------------------------------
CDL A, M                02/17/13 CLEAR

    M I S C E L L A N E O U S / S T A T E   S P E C I F I C   I N F O R M A T I O N
-----------------------------------------------------------------
   CLASS: CDL-A=COMB VEH>26,000 GVWR, TOWED UNIT>10,001 GVWR
   CLASS: M=MOTORCYCLE OR MOPED
   MISC: REQUESTED 3-YEAR RECORD
   MISC: ORIGINAL ISSUE DATE=07/02/1974
   MISC: THIS TYPE OF RECORD WILL NOT REFLECT COMPLETION OF A DRIVING SAFETY
   MISC: COURSE.
   MISC: THIS RECORD REFLECTS CONVICTIONS AND CRASH INVOLVEMENTS THAT ARE
   MISC: ALLOWED TO BE DISPLAYED BY LAW.

          D R I V I N G   R E C O R D   I N F O R M A T I O N
-----------------------------------------------------------------
TYPE V/S-DATE C/R-DATE DESCRIPTION                    V/C-CODE   PTS
-----------------------------------------------------------------
    06/29/10 07/26/10 SPEEDING
             CMV

-----------------------------------------------------------------
    RPT#:344-      ACCT#:10322-6PE    REF#:A2J6PEYD7L8PNONE   344    27
DMV DATE:12/10/10 DMV ACCT#:
=================================================================
V/S-DATE=Violation/Suspension Date    C/R-DATE=Conviction/Reinstatement Date

**Concentra Medical Centers**
3453 North IH 35 Ste 110 · San Antonio, TX 78219
Phone: (210) 226-7767    Fax: (210) 226-9656

Service Date:    11/09/2009
Patient Name:    Eure, Loretta I.
SSN:             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

**Medical Examination Report**
**FOR COMMERCIAL DRIVER FITNESS DETERMINATION**

## 6. LABORATORY AND OTHER TEST FINDINGS  Numerical reading must be recorded.

Urinalysis is required. Protein, blood or sugar in the urine may be an indication for further testing to rule out any underlying medical problem.

Other Testing  (Describe and record)

| URINE SPECIMEN | SP. GR | PROTEIN | BLOOD | SUGAR |
|---|---|---|---|---|
| | 010 | neg | neg | neg |

## 7. PHYSICAL EXAMINATION   Height 64 (in.)   Weight 208 (lbs)

The presence of a certain condition may not necessarily disqualify a driver, particularly if the condition is controlled adequately, is not likely to worsen or is readily amenable to treatment. Even if a condition does not disqualify a driver, the medical examiner may consider deferring the driver temporarily. Also, the driver should be advised to take the necessary steps to correct the condition as soon as possible/particularly if the condition, if neglected, could result in more serious illness that might affect driving.

Check YES if there are any abnormalities. Check NO if the body system is normal. Discuss any YES answers in detail in the space below, and indicate whether it would affect the driver's ability to operate a commercial motor vehicle safely. Enter applicable item number before each comment.  If organic disease is present, note that it has been compensated for.
See Instructions To The Medical Examiner for guidance.

| BODY SYSTEM | CHECK FOR: | YES | NO | BODY SYSTEM | CHECK FOR: | YES | NO |
|---|---|---|---|---|---|---|---|
| 1. General Appearance | Marked overweight, tremor, signs of alcoholism, problem drinking, or drug abuse. | | ✓ | 7. Abdomen and Viscera | Enlarged liver, enlarged spleen, masses, bruits, hernia, significant abdominal wall muscle weakness. | | ✓ |
| 2. Eyes | Pupillary equality, reaction to light, accommodation, ocular motility, ocular muscle imbalance, extraocular movement, nystagmus, exophthalmos. Ask about retinopathy, cataracts, aphakia, glaucoma, macular degeneration and refer to a specialist if appropriate. | | ✓ | 8. Vascular | Abnormal pulse and amplitude, carotid or arterial bruits, varicose veins. | | ✓ |
| | | | | 9. Genito-urinary | Hernias. | | ✓ |
| 3. Ears | Scarring of tympanic membrane, occlusion of external canal, perforated eardrums. | | | 10. Extremities - Limb impaired. Driver may be subject to SPE certificate if otherwise qualified. | Loss or impairment of leg, foot, toe, arm, hand, finger. Perceptible limp, deformities, atrophy, weakness, paralysis, clubbing, edema, hypotonia.  Insufficient grasp and prehension in upper limb to maintain steering wheel grip. Insufficient mobility and strength in lower limb to operate pedals properly. | | ✓ |
| 4. Mouth and Throat | Irremediable deformities likely to interfere with breathing or swallowing | | ✓ | | | | |
| 5. Heart | Murmurs, extra sounds, enlarged heart, pacemaker, implantable defibrillator. | | ✓ | 11. Spine, and other musculoskeletal | Previous surgery, deformities, limitation of motion, tenderness. | ✓ | |
| 6. Lungs and chest, not including breast examination | Abnormal chest wall expansion, abnormal respiratory rate, abnormal breath sounds including wheezes or alveolar rales, impaired respiratory function, dyspnea, cyanosis.  Abnormal findings on physical exam may require further testing such as pulmonary tests and/or xray of chest. | | ✓ | 12. Neurological | Impaired equilibrium, coordination or speech pattern; paresthesia, asymmetric deep tendon reflexes, sensory or positional abnormalities, abnormal patellar and Babinski's reflexes, ataxia. | | ✓ |

* COMMENTS: (explain all YES answers):

Note certification status here. See Instructions to the Medical Examiner for guidance.

- [✓] Meets standards in 49 CFR 391.41; qualifies for 2 year certificate
- [ ] Does not meet standards
- [ ] Meets standards, but periodic evaluation required.

  Due to _____ driver qualified only for:
  - [ ] 3 months   [ ] 6 months   [ ] 1 year
  - [ ] Other _____
- [ ] Temporarily disqualified due to (condition or medication): _____

  Return to medical examiner's office for follow up on _____

If meets standards, complete a Medical Examiner's Certificate according to 49 CFR 391.43(h). (Driver must carry certificate when operating a commercial vehicle.)

- [ ] Wearing corrective lenses
- [ ] Wearing hearing aid
- [ ] Accompanied by a _____ waiver/exemption. Driver must present exemption at time of certification.
- [ ] Skill Performance Evaluation (SPE) Certificate
- [ ] Driving within an exempt intracity zone. (See 49 CFR 391.62)
- [ ] Qualified by operation of 49 CFR 391.64

Medical Examiner's Signature _____
Medical Examiner's Name (print) **CLIFFORD SHAW PA-C**
Address  3453 North IH 35 Ste 110  San Antonio, TX 78219
Telephone Number  (210)226-7767

## MEDICAL EXAMINER'S CERTIFICATE

I certify that I have examined Eure, Loretta I.   In accordance with the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and with knowledge of the driving duties, I find this person is qualified; and, if applicable, only when:

- [✓] wearing corrective lenses
- [ ] wearing hearing aid
- [ ] accompanied by a _____ waiver/exemption
- [ ] driving within an exempt intracity zone (49 CFR 391.62)
- [ ] accompanied by a Skill Performance Evaluation Certificate (SPE)
- [ ] Qualified by operation of 49 CFR 391.64

The information I have provided regarding this physical examination is true and complete.  A complete examination form with any attachment embodies my findings completely and correctly, and is on file in my office.

| SIGNATURE OF MEDICAL EXAMINER | | TELEPHONE (210)226-7767 | DATE 11/09/2009 |
|---|---|---|---|
| MEDICAL EXAMINER'S NAME (PRINT) ____RD SHAW PA-C | | [ ] MD  [✓] DO  [ ] Physician Assistant | [ ] Chiropractor  [ ] Advance Practice Nurse |
| MEDICAL EXAMINER'S LICENSE OR CERTIFICATE NO. PA01212 | | ISSUING STATE | |
| SIGNATURE OF DRIVER | | DRIVER'S LICENSE NO. 081 36484 | STATE TX |
| ADDRESS OF DRIVER 4823 Laura Ln KIRBY, TX 78219 | | | |
| MEDICAL CERTIFICATE EXPIRATION DATE 11-9-2011 | | | |

Evaluation - DOT    Page 2 of 2       © 1996 - 2009  Concentra Health Services, Inc. All Rights Reserved.       Revision Date: 02/10/2004

**Concentra Medical Centers**
3450 North IH 35 Ste 110  San Antonio, TX 78219
Phone: (210) 226-7787    Fax: (210) 226-9658

Service Date: 11/09/2009
Patient Name: Eure, Loretta I.
SSN: 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

**Medical Examination Report**
**FOR COMMERCIAL DRIVER FITNESS DETERMINATION**

## 1. DRIVER'S INFORMATION — Driver completes this section

| Driver's Name (Last, First, Middle) | Social Security No. | Birth Date | Age | Sex | | Date of Exam |
|---|---|---|---|---|---|---|
| Eure, Loretta I. | 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 | 02/17/1959 | 50 | ☐ Male ☒ Female | ☐ New Certification ☒ Recertification ☐ Follow Up | 11/09/2009 |

| Address | City, State, ZIP Code | Work Tel: | Driver's License No. | License Class | State of Issue |
|---|---|---|---|---|---|
| 4823 Laura Ln | KIRBY, TX 78219 | Home Tel:(210) 617-0276 | 08136486 | ☒A ☐C ☐B ☐D ☐Other | TX |

## 2. HEALTH HISTORY — Driver completes this section, but medical examiner is encouraged to discuss with driver.

| Yes No | | Yes No | | Yes No | |
|---|---|---|---|---|---|
| ☐☐ | Any illness or injury in last 5 years? | ☐☐ | Shortness of breath | ☐☐ | Fainting, dizziness |
| ☐☐ | Head/Brain injuries, disorders or illnesses | ☐☐ | Lung disease, emphysema, asthma, chronic bronchitis | ☐☐ | Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring |
| ☐☐ | Seizures, epilepsy - if Yes, list medications: | ☐☐ | Kidney disease, dialysis | | |
| | | ☐☐ | Liver disease | ☐☐ | Stroke or paralysis |
| ☐☐ | Eye disorders or impaired vision (except corrective lenses) | ☐☐ | Digestive problems | ☐☐ | Missing or impaired hand, arm, foot, leg, finger, toe |
| ☐☐ | Ear disorders, loss of hearing or balance | ☐☐ | Diabetes or elevated blood sugar controlled by: | | |
| ☐☐ | Heart disease or heart attack; other cardiovascular condition | | ☐ diet ☐ pills ☐ insulin | ☐☐ | Spinal injury or disease |
| | if Yes, list medications: | ☐☐ | Nervous or psychiatric disorders, e.g., severe depression | ☐☐ | Chronic low back pain |
| | | | if Yes, list medications: | ☐☐ | Regular, frequent alcohol use |
| ☐☐ | Heart surgery (valve replacement/bypass, angioplasty, pacemaker) | | | ☐☐ | Narcotic or habit forming drug use |
| ☐☐ | High blood pressure - if Yes, list medications: | ☐☐ | Loss of, or altered consciousness | | |
| | | ☐☐ | Surgery | | |
| ☐☐ | Muscular disease | | | | |

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation. List all medications (including over-the-counter medications) used regularly or recently.

I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate. I authorize Concentra Health Services Inc., its subsidiaries, divisions and related entities (collectively "Concentra") to provide all or any of my medical records to my employer and release Concentra, its employees, physicians, nurses, technicians and other employee from any and all liabilities, claims, or causes of action that may result from this authorization.

_Driver's Signature_     Date  11/9/09

Medical Examiner's Comments on Health History (The medical examiner must review and discuss with the driver any 'yes' answers and potential hazards of medications, including over-the-counter medications, while driving. This discussion must be documented below.)

---

## Testing (Medical Examiner completes Section 3 through 7)

### 3. VISION
Standard: At least 20/40 acuity (Snellen) in each eye with or without correction. At least 70° peripheral in horizontal meridian measured in each eye. The use of corrective lenses should be noted on the Medical Examiner's Certificate.

INSTRUCTIONS: When other than the Snellen chart is used, give test results in Snellen-comparable values. In recording distance vision, use 20 feet as normal. Report visual acuity as a ratio with 20 as numerator and the smallest type read at 20 feet as denominator. If the applicant wears corrective lenses, these should be worn while visual acuity is being tested. If the driver habitually wears contact lenses, or intends to do so while driving, sufficient evidence of good tolerance and adaptation to their use must be obvious. Monocular drivers are not qualified. Numerical readings must be provided.

| ACUITY | UNCORRECTED | CORRECTED | HORIZONTAL FIELD OF VISION |
|---|---|---|---|
| Right Eye | 20/ | 20/ 30 | Right Eye 90° |
| Left Eye | 20/ | 20/ 20 | Left Eye 90° |
| Both Eyes | 20/ | 20/ 20 | |

Applicant can recognize and distinguish among traffic control signals and devices showing standard red, green, and amber colors?  ☒ Yes  ☐ No

Applicant meets visual acuity requirement only when wearing: ☒ Corrective Lenses

Monocular Vision: ☐ Yes ☒ No

Complete next line only if vision testing is done by an ophthalmologist or optometrist.

| Date of Examination | Name of Ophthalmologist or Optometrist (Print) | Tel No. | License No/State of Issue | Signature |
|---|---|---|---|---|
| | | | | |

### 4. HEARING
Standard: a) Must first perceive forced whispered voice >= 5 ft., with or without hearing aid, or b) average hearing loss in better ear <= 40 dB
☐ Check if hearing aid used for tests   ☐ Check if hearing aid required to meet standard.

INSTRUCTIONS: To convert audiometric test results from ISO to ANSI, -14 dB from ISO for 500Hz, -10 dB for 1,000Hz, -8.5 dB for 2,000Hz. To average, add the readings for 3 frequencies tested and divide by 3.

Numerical reading must be recorded.

| | Right Ear | Left Ear | | Right Ear | | | Left Ear | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| a) Record distance from individual at which forced whispered voice can first be heard. | 5 Feet | 5 Feet | b) If audiometer is used, record hearing loss in decibels. (sec. to ANSI Z24.5-1951) | | | | | | |
| | | | Average: | | | | Average: | | |

### 5. BLOOD PRESSURE / PULSE RATE — Numerical readings must be recorded. Medical examiner should take at least 2 readings to confirm blood pressure.

| Blood Pressure | Systolic | Diastolic | | Reading | Category | Expiration Date | Recertification |
|---|---|---|---|---|---|---|---|
| | 118 | 80 | | 140-159/90-99 | Stage 1 | 1 year | 1 year if <= 140/90; One-time certificate for 3 months if 141-159/91-99 |
| Driver qualified if <= 140/90. | | | | 160-179/100-109 | Stage 2 | One-time certificate for 3 months | 1 year from date of exam if <= 140/90 |
| Pulse Rate : ☒ Regular ☐ Irregular | | | | >= 180/110 | Stage 3 | Disqualified; 6 months from date of exam if <= 140/90 | 6 months if <= 140/90 |

Record Pulse Rate:  120
Is post exercise required? ☐ Yes ☐ No
Pulse Rate after 2 mins exercise: ____ bpm
Exercise Type ____

*The SAGE Corporation*                    **DRIVER-INSTRUCTOR'S ROAD TEST EXAMINATION**

Name: _LORETTA EURE_    School Location: _# 30 SAN ANTONIO/CHINA GROVE_

License No: _TX 08136486_    Social Security No.: _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_

The SAGE road test shall be given to all Sage Driver-Instructors prior to employment. The test shall be given by a current Driver-Instructor who is competent to evaluate and determine whether the person who takes the test has demonstrated that he or she is capable of operating the vehicle and associated equipment that the motor carrier intends to assign.

Rating of Performance (place a √ mark if successfully completed):

_✓_ The pretrip inspection (as required by Sec. 392.7).
_✓_ Coupling and uncoupling of combination units.
_✓_ Placing the equipment in operation.
_✓_ Use of vehicle's controls and emergency equipment.
_✓_ Operating the vehicle's controls and emergency equipment.
_✓_ Operating the vehicle in traffic and while passing other vehicles.
_✓_ Turning the vehicle.
_✓_ Braking, and slowing the vehicle by means other than braking.
_____ Backing and parking the vehicle.
_____ Other, Explain: _____

Type of equipment used in giving the test: _FO2188    FREIGHTLINER_

Date: _12/13/10_ Examiner's Signature: _____

If the road test is successfully completed, the person who gave it shall complete the following certificate.

Remarks: _DROVE 14 MILES_

Instructions: If the road test is successfully completed, the person who gave it shall complete a certificate of the driver's road test. The original or copy of the certificate shall be retained in the employing motor carrier's driver qualification file of the person examined and a copy given to the person who was examined.

---

**CERTIFICATE OF DRIVER-INSTRUCTOR'S ROAD TEST**

Name: _KELLY MCCOY_    Social Security No.: _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_

License Number: _07897239_    State: _TX_

Type of Power Unit: _FREIGTLINER_

Type of Trailer(s): _UTILITY_

This is to certify that the above-named driver was given a road test under my supervision on, _12/13_ ,20 _10_ consisting of approximately _14_ miles of driving. It is my considered opinion that this driver possesses sufficient driving skill to operate safely the type of commercial motor vehicle listed above.

Signature of Examiner: _Kelly McCoy_    Date: _12-13-10_

Examiner Name: _KELLY MCCOY_    Examiner Title: _INSTRUCTOR_

---

© The SAGE Corporation 2003. All Rights Reserved.                    04/2003

HERE IS LORETTA'S
CARD — WILL MAIL ORIGINAL

*Bill*

---

### CERTIFICATE OF QUALIFICATION

Instructor: Loretta Eure Driver License Number: 08136486 Date of Hire: 12/21/10

*Signature of Driving Instructor*

I certify that the above driver, as defined in §390.5 of the Federal Motor
Carrier Safety Regulations (FMCSR) is regularly driving a vehicle operated
by The SAGE Corporation and is fully qualified under Part 391, FMCSR.

● CDL expires on: 2/17/13 ● Medical Examiner's Certificate expires on: 11/9/11
● This Certificate issued on: 12/21/2010 ● This Certificate expires on:3/31/11

*Issued by*

The SAGE Corporation
Safety Department: Billings, Montana

Signature _____ Safety Administrator

© 1994 The SAGE Corporation, Camp Hill, Pennsylvania          (rev: 04-02-02)

---

Compass 30
JJ

**FAXED**
12-21-10
12-21-10

EXHIBIT

2

*The* SAGE *Corporation*

# Corporate Personnel Policy Manual

## NOTICE TO ALL EMPLOYEES

The provisions of The SAGE Corporation *Corporate Personnel Policy Manual* are not conditions of employment, and the language is not intended to create a contract between The SAGE Corporation and its employees, or to guarantee employment or the terms of employment (express or implied) by placing these matters in writing. The SAGE Corporation Reserves the right to revise the *Manual* and its policies and benefits, in whole or in part, at anytime, with or without notice. Employees may obtain the most current version of this Manual by contacting the Corporate Office. Employment with The SAGE Corporation is for no definite period of time and is terminable at Sage's or its employees' discretion.

November 1, 2005

# TABLE OF CONTENTS

**EMPLOYMENT**

EQUAL EMPLOYMENT OPPORTUNITY . . . . . . . . . . . . . . . . . . . . . -1-
EQUAL EMPLOYMENT
    OPPORTUNITY: AGE DISCRIMINATION . . . . , . . . . . . . -1-
ETHICS IN BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
AVOIDANCE OF CONFLICT OF INTEREST . . . . . . . . . . . . . . . . -4-
SEXUAL HARASSMENT AND FRATERNIZATION . . . . . . . . . . . -5-
PROBATIONARY PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . :. -7-
DISCIPLINE AND SEPARATION . . . . . . . . . . . . . . . . . . . . . . . . -7-
GENERAL PAYROLL PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . -8-
DRESS CODE . . . . . . . . . . . : . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
ANNUAL PERFORMANCE REVIEWS AND INSTRUCTOR
    EVALUATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
EMPLOYMENT TERMINATION AND RESIGNATION . . . . . . . . -10-
CONTROLLED SUBSTANCES AND ALCOHOL:
    USE, TRAINING & TESTING . . . . . . . . . . . . . . . . . . . . . . -11-
CELL PHONE/WCD USE . . . . : . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
COMPUTER, INTERNET AND EMAIL USE . . . . . . . . . . . . . . -16-
MOTOR VEHICLE SAFETY AND LIABILITY . . . . . . . . . . . . . . -17-

**BENEFIT ISSUES**

COMPANY PAID HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
VACATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
ABSENCE WITH PAY DUE TO ILLNESS OR ACCIDENT . . . . . . -20-
MEDICAL INSURANCE PREMIUM ONLY PLAN (POP) . . . . . . . -20-
PROFIT SHARING PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
STAFF PROFESSIONAL DEVELOPMENT, EDUCATION
    AND TRAINING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT
    INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
BEREAVEMENT/FUNERAL LEAVE . . . . . . . . . . . . . . . . . . . . . -24-

**EMPLOYEE RELATIONS**

CODE OF CONDUCT . . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . . -24-
COMPLAINT PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

# President's Welcome

I want to take this opportunity to welcome you as an employee of The SAGE Corporation! We truly value the contribution of each employee. There is no question in my mind that the success of this company is based 100% upon the hard work and dedication of our good employees.

Although we are a small company, it has always been my view that SAGE should be not only an enjoyable place to work, but also a _professional_ place to work. As a result, we have written these policies to ensure that all employees have clear expectations and understand that we all must hold ourselves to the highest standards of professional conduct.

If I were to choose one word to describe my objective for this company, it would be _QUALITY_. Quality employees, quality training, quality services and a quality reputation. I hope that you will be as devoted to this principle as I am.

If there is ever any issue that you want to discuss with me personally, I ask that you <u>call the corporate office at any time and speak with me</u>. This includes any time you see something you think is wrong or violates Company policies. I would prefer to hear from you about a problem than not know there is a problem. I ask that you first try to address issues to your supervisor(s). But, the bottom line is you should feel free to talk with me, and no employee or student should ever be told by a supervisor that they cannot call me or the corporate office.

.t is my sincere hope that you will be a happy and successful employee of SAGE for many years. Thank you for being a part of this company.

Gregg R. Aversa
President and CEO

## EMPLOYMENT ISSUES

### 3.A.1. EQUAL EMPLOYMENT OPPORTUNITY

1 PURPOSE
   To ensure continued compliance with the applicable Federal and State Equal Opportunity laws and executive orders.
2 SCOPE
   This policy and procedure applies to all locations and Employees of The Sage Corporation.
3 POLICY
   It is the continued policy of The Sage Corporation to offer available employment to qualified job applicants regardless of race, color, religion, age, sex, national origin, veterans status, except where age and sex are essential bona fide occupational requirements. Officers, managers, and supervisors of all School locations are instructed to take action to ensure that recruiting, hiring, transfer, promotion, demotion, compensation, training, layoff, recall, employment benefits, and all other actions concerning personnel, shall be taken solely on the basis of merit and fitness.
4 PROCEDURES
   In order to ensure compliance with this policy, all Company locations will take all necessary actions including the following:
   4.1 Employment Advertisement Solicitations
      Advertisements and solicitation for applicants for employment and other materials concerning recruitment and hire should include the phrase "EOE" (Equal Opportunity Employer).
   4.2 Posted Notices
      At all places of employment, post in conspicuous locations easily accessible and visible to employees and applicants for employment, legible notices which include the following wording: "This School will not discriminate against any employee or applicant for employment because of race, color, religion, age, sex, veteran status, disability or national origin. Such action shall include, but not be limited to the following: hiring recruiting, promotion, demotion, transfer, layoff, recall, termination, compensation, training, and employment benefits."
   4.3 Record Retention
      Retain files, until further notice, of all advertisements, publicity, and other statements or solicitations covering employment or personnel matters for two years. Such files must also include copies of all memoranda, communications, books, and records of any sort which relate to nondiscrimination matters, especially reasons for employment rejection. Retain for one year all applications, resumes and letters of inquiry which relate to employment and recruiting.
   4.4 Facilities
      Maintain all facilities, such as eating areas and restrooms, on a nonsegregated basis.
   4.5 Periodic Audit
      The Corporate office shall make a periodic inspection to assure that the Equal Opportunity Policy and Practices of this Company, as outlined above, are being carried out.

### 3.A.2.   EQUAL EMPLOYMENT OPPORTUNITY: AGE DISCRIMINATION

1 PURPOSE
   To ensure continued compliance with Federal and State laws providing for equal opportunity of employment with respect to age of applicants and employees.
2 SCOPE
   This policy and procedure applies to all locations and employees of The Sage Corporation
3 POLICY
   In accordance with the Age and Discrimination Employment Act and applicable to applicants and employees 40 and more years of age, it is the policy of The Sage Corporation:
   3.1 Not to refuse to hire any individual or otherwise discriminate with respect to compensation, terms, conditions, or privileges of employment because of such individual's age.
   3.2 Not to discharge any employee because of such individual's age.

©The SAGE Corporation, 2001. All Rights Reserved.

3.2.7 If any employee, without any action of his/her own, finds himself/herself in a situation which is contrary to or may conflict with the policy set forth herein, he/she shall promptly notify the Company in writing of all details of such situation and take remedial action.

3.3 The foregoing prohibitions apply not only to the employee personally, but also to the employee's spouse and minor children.

3.4 Employees are remunerated for work they perform on behalf of the Company. All projects, documents, publications and material developed in the course of employment, or utilizing Company property, are the exclusive property of the Company. No Company materials, documents, literature or related records may be released by an employee, or retained by an employee after termination of employment, without the express written permission of the President of the Company.

3.5 Employment activities outside of those performed for the Company must only be undertaken with the prior written consent of the Company. The Company will normally be liberal in granting its consent provided the outside employment activities are not in conflict with the Company's business and/or in competition with it.

4 Procedures

4.1 The highest level manager at each facility within the Company is responsible to ensure that all exempt employees within his/her jurisdiction are familiar with the foregoing policy and that appropriate employees have signed a compliance letter acknowledging that he/she has read and understands the policy. Once the compliance form is signed and dated, it shall remain effective until the employee terminates employment with the Company.

4.2 Any conflict of interest or potential conflict of interest disclosed as a result of the above procedure or revealed at any time in connection with any employee should be brought at once to the attention of the President of the Company.

4.3 Each employee agrees, as a condition of employment, that in the event of any violation of this policy, SAGE shall be entitled, where authorized by law, to withhold from payroll reasonable sums for such violation. Each employee authorizes such withholding in advance as a condition of employment. Sage shall, in addition to any such withholding, be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief, as well as an equitable accounting of all profits or benefits arising from such violation, which rights and remedies shall be cumulative and in addition to any other rights or remedies at law or in equity to which SAGE may be entitled.

## 3.A.6. SEXUAL HARASSMENT AND FRATERNIZATION

1 PURPOSE
To prohibit any form of sexual harassment of employees or students, and to prohibit fraternization with students by employees. To foster a safe, comfortable and non-threatening learning and working environment.

2 SCOPE
This policy applies to all employees of the Company. It is the responsibility of all employees to implement this policy

3 PROCEDURE

3.1 Sexual Harassment is defined as any unwelcome and offensive behavior by an employee that is sufficiently severe, persistent and pervasive that it: (a) adversely affects a student's education or creates a hostile or abusive educational environment; or (b) adversely affects another employee's work or creates a hostile or abusive employment environment.

3.1.1 Sexual harassment can consist of sexually-oriented "kidding," physical contact or touching, demands for sexual favors tied to promises of better treatment, or threats concerning employment for refusal, discriminating against an employee for refusing to give in, or granting favors to one who submits.

3.1.2 Other sexually harassing conduct includes offensive sexual flirtation, advances, propositions, verbal abuse of a sexual nature, graphic verbal commentaries about the human body parts or functions, sexually degrading words used to describe an individual, and any offensive display in the workplace of sexually suggestive objects or pictures.

3.2 Fraternization is defined to include any economic, social or family relationship between two people, where one supervises or has control over the other. Any Company employee is always assumed to have supervisory

control over a student or applicant for purposes of this policy.

3.2.1 Fraternization would include, but is not limited to, any intimate work or non-work-related social relationship or association with a student or applicant and an employee of the Company, as well as such a relationship between two employees, where one supervises or has control over the other.

3.2.2 Fraternization also may include the use by either an employee or a student of personal or real property (such as vehicles, electronic equipment, money or housing) belonging to the other. This includes conduct or a relationship that the student and/or employee may consider acceptable, but which violates this policy.

3.3 **Prohibition Against Sexual Harassment and Fraternization**

3.3.1 It is the policy of the Company that sexual harassment of students or employees, and fraternization by employees with students or other employees with whom there is a supervisory context, is absolutely prohibited.

3.3.2 Violation of this policy will not be tolerated and is grounds for discipline, including termination of employment for infractions deemed serious by the Company.

3.4 **Reporting Sexual Harassment**

3.4.1 Employees who believe that this policy is being violated should notify the person engaging in such conduct that you find it offensive, that it is against Company policy, and that you expect them to stop it immediately.

3.4.2 It is important to let you fellow employees know when you consider behavior offensive, as the Company hires people from a wide variety of cultural and ethnic backgrounds, and some people may not realize behavior he/she thinks is fun could be seen by others as offensive.

3.4.3 If the conduct continues after a warning, immediately report the violation to the School Director and the Company's Legal Department in Camp Hill, PA. School Directors that receive information on possible violations of this policy must contact the Company's Legal Department immediately.

3.4.4 If you see an employee sexually harassing others, notify the employee being harassed of the Company policy and the appropriate procedures they can use.

3.4.5 Remember that the Company cannot take action for sexual harassment unless it has been notified of the conduct. No employee will be disciplined or retaliated against for providing notice of harassment.

3.4.6 If you are notified that your conduct is offensive, do not get angry or insulted. People have different values and standards, and may be offended by behavior you think is OK. Tell the employee you did not realize your behavior was offensive. Then stop the behavior.

3.4.7 If you are harassed by a non-employee, report the conduct to your supervisor. While the Company cannot control the behavior of all non-employees, we will try to remedy the situation if we can.

3.5 **Reporting Fraternization**

3.5.1 Employees and applicants are expected to voluntarily disclose fraternization when the relationship comes into existence. All employees are required to report fraternization between staff and students. Failure to do so may lead to disciplinary action.

3.5.2 If employee fraternization comes into existence while employed, a transfer of one employee will be attempted, if available, so as to avoid any appearance of favoritism, preferential treatment or conflict of interest.

3.5.3 If a transfer is not possible, the employees must choose who will resign; absent such a voluntary resolution, the Company reserves the right to require one or both employees to resign.

3.6 **Investigation**

The Legal Department and the School Director will promptly investigate reports of violations of this policy and take appropriate steps to prevent the conduct and resolve the situation. Measures should be taken to protect the confidentiality of the complainant if it is requested and is feasible under the circumstances. The Company will take appropriate action for any violation of this policy; such action may include termination of employment.

©The SAGE Corporation, 2001. All Rights Reserved.

3.13 Employees are not permitted to perform personal work during working hours or use The Sage Corporation materials or equipment for personal work without the permission of management.

3.14 No employee is permitted to remove from work premises records, tools, or other material of any description without the prior approval of management.

3.15 Company telephones and mail facilities shall be available for the communication of Company business. Employees are permitted limited use of Company telephones for local calls concerning personal business during lunch break.

3.16 An employee necessarily absent is required to report same to his/her supervisor prior to the start of his/her shift, when possible, on the first day of absence.

3.17 An employee desiring leave to be absent from work must notify his/her supervisor and obtain permission. An employee absent without having obtained leave or permission from his/her supervisor must satisfactorily substantiate the reason for his/her absence and his/her failure to obtain leave.

3.18 Habitual and/or excessive absenteeism and/or tardiness will not be tolerated.

3.19 Gambling, punch boards, chain letters, pyramid schemes,etc., are strictly forbidden on Company property.

3.20 Sale of tickets, circulating petitions, taking of subscriptions, collections of money for any cause, or solicitation of any kind, unless sanctioned by management, are strictly forbidden on Company property.

3.21 Employees are required to operate vehicles in a lawful, responsible, professional and safe manner.

3.22 Parking is permitted in authorized areas only.

3.23 Fraternization or giving excessive personal attention on a social basis to any actively enrolled student, male or female, by any employee is strictly prohibited.

3.24 Company confidential material is to be locked in a drawer at the end of each day.

3.25 Dress and grooming is to be appropriate to the work situation. Office management and instructors must wear coat and tie.

3.26 Each employee is responsible for his/her own work area and will maintain such area, including all vehicles, in a clean, neat and orderly fashion.

3.27 Employees are to report anything needing repair or replacement to their supervisor.

3.28 All file cabinet drawers are to be closed immediately after use.

3.29 Office traffic patterns are to be kept clear of extension cords and other obstacles.

3.30 Employees are to refrain from stacking personal or Company materials in a disorganized fashion.

3.31 Creating or contributing to unsanitary conditions or illegal environmental contamination is prohibited.

3.32 Employees who sustain a work-incurred injury must report same to supervisor without delay.

3.33 Theft, fraud or, dishonesty in any communication to Company personnel, students or clients of the Company will not be tolerated.

4 PROCEDURES

4.1 Upon entering the employ of the Company, an employee agrees to abide by the Company rules.

4.2 Violation of these and/or other reasonable rules and regulations, which may be invoked from time to time, is grounds for disciplinary action.

4.3 All management personnel are responsible for enforcement of this policy and other reasonable rules and regulations which may be invoked from time to time.

**3.C.2.     COMPLAINT PROCEDURE**

1 PURPOSE

To establish a complaint procedure policy to maintain a good feeling among all employees of the Company. To provide effective lines of communication within the Company

2 SCOPE

This policy applies to all employees of The Sage Corporation.

3 POLICY

©The SAGE Corporation, 2001. All Rights Reserved.

The Sage Corporation encourages all employees to bring to the attention of their supervisor complaints about work-related situations. Employees will be provided an opportunity to present complaints and appeals of decisions to management through a formal complaint procedure.

## 4 PROCEDURES

4.1 Employees should discuss any work problems, suggestions or questions with their supervisor first.

4.2 Where resolution of the problem has not been accomplished with the supervisor, the matter may then be discussed with the appropriate department head. The department head will attempt to give the employee his/her answer within two (2) working days from the time he/she is informed. Additionally, the President of Sage is available to advise and counsel both employee and manager if needed.

4.3 If the employee is still displeased with the decision rendered by the department head, he/she may then submit the problem, in writing, directly to the department head's superior. The superior will discuss the problem with all parties involved and make a decision.

4.4 If the department head's superior is unable to resolve the problem, he/she may submit the matter, in writing, directly to the President of the Company, whose decision shall be final and binding.

4.5 Information concerning an employee complaint will be received in strict confidence. Supervisors, department heads, and other members of management will discuss the complaint only with those necessary individuals who are involved in its processing.

4.6 Management decisions on complaints will not be precedent-setting nor binding on future complaints. Whenever possible, the decisions will be retroactive to the date of the employee's official complaint.

## 5 OPEN DOOR POLICY AND COUNSELING

NORMALLY, AN EMPLOYEE WILL BE EXPECTED TO USE THE COMPLAINT PROCEDURE TO RESOLVE A PROBLEM. HOWEVER, IF THE PROBLEM OR COMPLAINT IS OF A PERSONAL NATURE OR INVOLVES AN IMMEDIATE SUPERVISOR, THE EMPLOYEE MAY MEET FIRST WITH THE SCHOOL DIRECTOR TO DISCUSS IT. THE SCHOOL DIRECTOR WILL DECIDE IF IT SHOULD FIRST BE DISCUSSED WITH THE EMPLOYEE'S SUPERVISOR. IF SO, THE EMPLOYEE WILL BE DIRECTED TO USE THE COMPLAINT PROCEDURE. IF THE COMPLAINT, SUGGESTION OR QUESTION IS OF SUCH A NATURE THAT RESOLUTION OF THE PROBLEM WOULD BE HAMPERED BY THE COMPLAINT PROCEDURE, THE SCHOOL DIRECTOR WILL TAKE THE APPROPRIATE ACTION. ALL EMPLOYEES ARE ENCOURAGED TO CONTACT THE CORPORATE OFFICE, INCLUDING THE PRESIDENT/CEO, ON ANY MATTER THAT IS NOT RESOLVED TO THEIR SATISFACTION AT THE LOCAL SCHOOL LEVEL.



*The* SAGE *Corporation*
SAGE *Technical Services*

# Corporate Policy Manual Acknowledgement

I, *(print name)* Loretta Evone acknowledge that I have read carefully, understand, and will comply with The SAGE Corporation **Corporate Policy Manual** including but not limited to the provisions regarding the following:

> Ethics in Business
> Avoidance of Conflict of Interest
> Sexual Harassment and Fraternization
> Code of Conduct
> Safety and Health Program Policies

I understand that I may be disciplined for any violation of this Manual, and that such discipline may include immediate dismissal as an employee of The Sage Corporation. If I have any questions regarding any provisions of the **Manual** I will consult my supervisor.

I understand that the provisions of The SAGE Corporation **Corporate Policy Manual** are not conditions of employment, and the language is not intended to create a contract between The SAGE Corporation and its employees, or to guarantee the terms of employment (express or implied) by placing these matters in writing. The SAGE Corporation reserves the right to revise the **Manual** and its policies, in whole or in part, at anytime, with or without notice. I understand and agree that my employment with The SAGE Corporation is for no definite period of time and is terminable at SAGE's or my discretion.

_____        12/8/10
Signature                                Date

*The* SAGE *Corporation* © 2003.

## Chris Thropp

From:    "Loretta Eure" <eurel08@yahoo.com>
Date:    Friday, April 01, 2011 12:19 AM
To:      <cthropp@sageschools.com>
Subject: Fw: Legal Matter

$210 - 617 - 0270$

----- Forwarded Message ----
From: Loretta Eure <eurel08@yahoo.com>
To: gaversa@aol.com
Cc: barbara blake <bblake@sageschools.com>
Sent: Thu, March 31, 2011 9:48:31 PM
Subject: Legal Matter

EXHIBIT
4
PENGAD 800-631-6989

Mr. Aversa,

mp;n bsp;
Let me start off sir by intoducing myself. I am Loretta Eure and I am one of your instructors at
the San Antonio campus. The purpose of this letter is to inform you of some things that are going
on at this school that I feel are wrong. I was hired by your Program Director as an instructor. I
know that at the time of my coming onboard for you that there was only one instructor that was
considered fulltime. I shadowed for only 24 hours and then left to sink or swim, even though I
was never trained by Noel Smith as he was intructed to by Ms. Margie. Noel Smith made sure I
wasn't ready, which was ok because I found myself around quite well.

Your Montana staff has arrived in San ntonio, this is where the problems begun. I feel that am
being discriminated against because of two things. One of them being gender, because I am a
female in a supposed a mans world! Secondly because of my sexual orientation. I am a female
that has facial hair, no breasts and wear mens clothing, meaning that I am being discriminated for
being gay. I was told by Carmella that I was going to be on the Sanjel project and now I see that
everyone, even the newest instructor and the part time Instructors have all the hours and I only
have 8. This project was to be good for us and being that we were getting very little hours from
the beginning however Ms Margie managed to keep it fair for all of us. Can't say that about the
rest of your staff. So I am left with no alternative but to lodge a legal complaint with the EEOC,
ACLU, TWC, and will be meeting with an attorney about this matter. I really feel that my
gender or sexual orientation should have no basis. I was hired to do a job that I am qualified to
do and have been doing since I begin my employment with the Sage Corporation. My experience
speaks for itself. I met all of Sage's qualifications and I even currently hold a qualification
card signed by your safety administrator Bill Carr. Also if you check my file there are no
disciplinary action forms or anything negative against me. Sir, don't allow the ignorance of those
people employed by you or your partner Carmella. This woman has made all the staff aware that
she is your partner and that your position is only to oversee the corporate office. I was shocked
to hear from her that she owned all vehicles that were in palce at all Sage schools. I feel she has
lowered your level and raised herself above you. It was my understanding, that you were the
president of this company. This is why I am addressing this matter with you. I will still regard
you as president and I am making you aware of the undermining of one Carmella and my legal
recourse.

I am certain your corporation has legal representation and therefore my leagal counsel will be
contacting yours.

Loretta Eure



**From:** bblakesage@aol.com
**Sent:** Friday, April 01, 2011 12:12 PM
**To:** eurel08@yahoo.com
**Cc:** gaversa@sageschools.com ; cthropp@sageschools.com
**Subject:** Contact request

Loretta,

We are in receipt of your e-mail dated 3/31/11. Mr. Aversa is traveling today and is unfortunately, unavailable to discuss your concerns.

However, Chris Thropp, Vice President/General Counsel and myself would very much like to speak with you today. Please contact Chris at 1-800-761-3931 at your earliest convenience. He will conference me into the call.

Thank you,

Barbara Blake
Western Regional Director
The SAGE Corporation
(307)262-2325



From: Loretta Eure <eurel08@yahoo.com>
To: greg aversa <gaversa@sageschools.com>
Subject: Fw: Resignation
Date: Mon, Apr 4, 2011 10:09 pm
Attachments: Scan_Doc0040.pdf (1360K)

----- Forwarded Message ----
**From:** Loretta Eure <eurel08@yahoo.com>
**To:** GREG AVERSA <gaversa@aol.com>
**Sent:** Mon, April 4, 2011 6:16:31 PM
**Subject:** Resignation

Mr. Aversa,

This e-mail is to inform you that after seeing the schedule changes that have been made by Carmella that, I am not a part of your organization. It saddens me to no end because I felt that I had finally found my home of employment. Margie Brandon made me feel very much a part of the Sage team and I was looking forward to a long employment with your company. Now I see it in a different light. I refuse to be a part of an organization that is racist and bias. As I also see things, Carmella has been given an armor of words and power to use as she sees fit, which I am sure will be very destructive to your company.

This left me no alternative but to seek legal recourse. After sharing my copies of the schedule change, it is very clear and obvious that I am not wanted by your organization for reasons that Carmella has made clear to all concerned. This will be a serious concern to all that will hear my voice. Per my last e-mail, I clearly stated my intent.

Attached please view a copy of the schedule and it is very clear that I was omitted. How blatant is this I ask you?

I have mailed the two keys that Ms. Margie issued to me. One for the front gate and the second to the classroom. These keys were mailed to you specifically at the corporate office.

Mr Aversa, I wish you great success as I saw great potential for your San Antonio campus. You must realize that you lost a great asset of your company when you let Ms. Margie and Maria Solis resign. That was a huge mistake.

Loretta Eure

Print

From: Loretta Eure (eurel08@aol.com)
To: greggsage@aol.com;
Date: Wed, April 6, 2011 10:04:08 PM
Cc:
Subject: Re: Legal Matter



Mr. Aversa:

Let me start off by saying thank you for your kind words as I do appreciate them sir. As I mentioned in
my email I really was disappointed in all that had transpired with carmella at the san antonio campus
because I thought that I had found my home with sage. I would love to have my job back but couldn't
help notice that you mentioned nothing about Ms. Margie and or Maria returning. I took my being
omitted from the schedule as sage was quiting for me. I am glad that this was not the case. I would really
like to get some understanding about the schedule and the number of hours that I would be working.
You see Mr. Aversa I stuck it out from the beginning because I knew that the sanjel project was coming.
I cannot continue to work a few hours a week due to the expenses for the insurance alone. I also have a
family that needs my support, therefore this information is very important to me.
Thank you,

Loretta Eure

From: "greggsage@aol.com" <greggsage@aol.com>
To: eurel08@yahoo.com
Cc: bblake@sageschools.com
Sent: Tue, April 5, 2011 4:29:51 PM
Subject: Re: Legal Matter

Loretta:

I am sorry I had been out of my office from last Thursday evening until late yesterday
afternoon and did not get your email until this afternoon. Your email went to my spam file
which I did not check earlier.

I have to say I am very, very sorry for the occurrences of late last week. Please do not take
what was said or implied by Carmella as a corporate or a personal opinion or policy of mine
or anyone else in our organization. Her comments and statements made to you or anyone
else during her visit to our school in San Antonio were hers and only hers! Your email has
saddened me not only for loosing a valued instructor but the hurt she has caused in you and
others. The only reason you may not have been scheduled for any hours, I am assuming,
was due to directions Carmella may have left for others at the school. Ramona Manthei, the
Director at our Casper school has been assigned temporarily to cover for us in San
Antonio. I talked with her a short time ago and she told me she has tried to reach you by
phone but without success. I asked Margie last evening if you had resigned and she told me
she thought you had not. So I am sorry and disappointed to hear that you may not be
available to continue with us. The reports from Margie on your teaching skills and your
overall performance were very positive and encouraging to Barb Blake and to me.

I have not had time yet to discuss this whole matter with Carmella but will do so just as soon
as I complete this message to you. She does not speak for this Corporation. Yes, she owns

. Print

stock in our company and she did help in setting up our company but that does not give her license to abuse or disscredit anyone.

I am very surprised and shocked by her statements. To the best of my knowledge I am not aware of any such past actions by her in the over 21 years I have known her.

Please accept my heartfelt apologies for all that has transpired and please know any consideration for your return would be greatly appreciated by everyone.

Thank you,

Sincerely,

Gregg R. Aversa
President/CEO
The Sage Corporation
(717)761-3931
greggsage@aol.com

----Original Message----
From: Loretta Eure <eurel08@yahoo.com>
To: greg aversa <gaversa@sageschools.com>
Sent: Mon, Apr 4, 2011 10:05 pm
Subject: Fw: Legal Matter

Sorry sir I had sent these emails to an incorrect address

---- Forwarded Message ----
From: Loretta Eure <eurel08@yahoo.com>
To: gaversa@aol.com
Cc: barbara blake <bblake@sageschools.com>
Sent: Thu, March 31, 2011 9:48:31 PM
Subject: Legal Matter

Mr. Aversa,

&a

mp;a mp;a mp;a mp;a mp;a mp;n bsp;
Let me start off sir by intoducing myself. I am Loretta Eure and I am one of your instructors at the San Antonio campus. The purpose of this letter is to inform you of some things that are going on at this school that I feel are wrong. I was hired by your Program Director as an instructor. I know that at the time of my coming onboard for you that there was only one instructor that was considered fulltime. I shadowed for only 24 hours and then left to sink or swim, even though I was never trained by Noel Smith as he was intructed to by Ms. Margie. Noel Smith made sure I wasn't ready, which was ok because I found myself around quite well.

Your Montana staff has arrived in San ntonio, this is where the problems begun. I feel that am being discriminated against because of two things. One of them being gender, because I am a female in a supposed a mans world! Secondly because of my sexual orientation. I am a female that has facial hair, no breasts and wear mens clothing, meaning that I am being discriminated for being gay. I was told by Carmella that I was going to be on the Sanjel project and now I see that everyone, even the newest instructor and the part time instructors have all the hours and I only have 8. This project was to be good

for us and being that we were getting very little hours from the beginning however Ms Margie managed to keep it fair for all of us. Can't say that about the rest of your staff. So I am left with no alternative but to lodge a legal complaint with the EEOC, ACLU, TWC, and will be meeting with an attorney about this matter. I really feel that my gender or sexual orientation should have no basis. I was hired to do a job that I am qualified to do and have been doing since I begin my employment with the Sage Corporation. My experience speaks for itself. I met all of Sage's qualifications and I even currently hold a qualification card signed by your safety administrator Bill Carr. Also if you check my file there are no disciplinary action forms or anything negative against me. Sir, don't allow the ignorance of those people employed by you or your partner Carmella. This woman has made all the staff aware that she is your partner and that your position is only to oversee the corporate office. I was shocked to hear from her that she owned all vehicles that were in palce at all Sage schools. I feel she has lowered your level and raised herself above you. It was my understanding, that you were the president of this company. This is why I am addressing this matter with you. I will still regard you as president and I am making you aware of the undermining of one Carmella and my legal recourse.

I am certain your corporation has legal representation and therefore my leagal counsel will be contacting yours.


Loretta Eure

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 451-2011-00967 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Loretta I. Eure | (210) 379-1999 | 02-17-1959 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4823 Laura Lane, Kirby, TX 78219 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| SAGE CORPORATION | 500 or More | (210) 826-7043 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7586 Highway 87 East, China Grove, TX 78263 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 03-30-2011 Latest 03-30-2011

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Since on or about March 30, 2011, I was taken off the schedule and have not been allowed to return to work.

I believe that I have been discriminated against because of my sex, female, in that although I am female and have a female name (Loretta), I present and appear as a male. My employer has not allowed me to return to work because I am a female who does not meet the stereotypical view of how a female should look like and act like, in violation of Title VII of the Civil Rights Act of 1964, as amended.

**EXHIBIT**

8

PENGAD 800-631-6989

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Apr 04, 2011 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date — Charging Party Signature | |

# WEEKLY CLASS/DRIVE SCHEDULE

FROM **03/28/11**     Original     TO **03/27/11**

| | | Monday 3/28/2011 | Tuesday 3-29-11 | Wednesday 3/30/2011 | Thursday 3/31/2011 | Friday 4/1/2011 | Saturday 4/2/2011 | Sunday 4/3/2011 |
|---|---|---|---|---|---|---|---|---|
| 4:00 AM to 8:00 AM | Rental Truck | | | SANJEL ALL DAY | | | Take trucks | |
| | Rental Truck | Isador Staff D Noel Training | ALL STAFF all day | BILL NOEL ISADORE SANJEL | Bill Eval | Bill Eval | Bill/Noel Sanjel Sam | |
| CLASS 2 | | NOEL/Margi Sanjel Orient | Staff D ALL STAFF | Wayne All Students | Noel SAGE Stud Day 10 | Noel Sanjel Stud | Noel SAGE Stud Day 10 | |
| 8:00AM to 12:15 PM | Rental Truck | Isadore/Wayne Rick/Marco D3 | NOT TEACHING Loretta mkts | 1 hr Day 9 All of Day 8 | Isadore Steve / Trin D3 | Wayne Rick D5 | 2nd 1/2 | Loretta or Kelly Michael/Rick |
| | Rental Truck | | Wayne Steve/Trin D2 | 9 hour Day | | Isadore Marco D6 | 2 trucks to Sanjel Sam | D6 |
| CLASS 1 | | | Stud D ALL STAFF | Wayne 1:00PM All Students | | | Wayne SAGE Stud Day 10 | |
| 1:00 PM to 6:15 PM | Rental Truck | Isadore/Noel Steve/Trini D1 | Wayne Rick D4 | 2 Trks @ Sanjel | | Kelly Ernest D8 | 2 hrs of 4.2 Day 11 | Isadore Ernest D5 |
| | Rental Truck | only wked → | Loretta Marco D4 | Kelly Sam/Ernest D3 | | Loretta Sam D6 | | Wayne Sam D5 |
| CLASS 1 | | | | | | | | |
| 5:30 PM to 9:45 PM | Rental Truck | Kelly Sam D4 | only 8 hrs | | Loretta or Kelly Michael D4 | | | |
| | Rental Truck | Loretta Ernest D4 | | | | | | |
| INSTRUCTORS | | | STUDENTS | | | | | |
| Noel Wayne Kelly Loretta Isadore | | | start date 3/14/2011 | SANJEL STUD 3/28/2011 | start date | start date 2/28/2011 | start date | SPECIAL TRAINING |
| | | | Rick M. Marco B. Sam T. Ernest P. | Steven Trinidad O. | | Michael M. | | |
| | | Margie 559-1714 | | All other Days were given to other Instructors | | | | |

PENGAD 800-631-6989

EXHIBIT 2

# WEEKLY CLASS/DRIVE SCHEDULE
## SAGE STUDENTS   Revised

FROM   3/28/2011                    TO   04/03/01

| | | Monday 3/28/2011 | Tuesday 3/29/2011 | Wednesday 3/30/2011 | Thursday 3/31/2011 | Friday 4/1/2011 | Saturday 4/2/2011 | Sunday 4/3/2011 |
|---|---|---|---|---|---|---|---|---|
| 4:00 AM to 8:00 AM | Truck #1 | | | NO TRUCKS | | | NO TRUCKS | |
| | Truck #2 | | | | | | | |
| CLASS 1 | classroom 1 | | | WAYNE Day 8+DOT Regs | NOEL DAY 10 | | Wayne DAY 10 | |
| 8:00AM to 12:15 PM | Truck #1 | ISADORE/WAYNE Rick/Marco D3 | | | morning only | WAYNE Rick D5 | Class All Day | KELLY Rick D6 |
| | Truck #2 | | | | | ISADORE Marco D5 | | |
| CLASS 1 | classroom 1 | | | WAYNE Day 8+DOT Regs | | | | |
| 1:00 PM to 5:15 PM | Truck #1 | | WAYNE Rick D4 | | WAYNE Sam/Ernest D3 | KELLY Ernest D6 | Cancelled given to other Instr. | ISADORE Ernest D5 |
| | Truck #2 | | LORETTA Marco 4 | | | LORETTA Sam D6 | | WAYNE Sam D5 |
| CLASS 1 | classroom 1 | | | | | | | |
| 5:30 PM to 9:45 PM | Truck #1 | KELLY Sam D4 | | KELLY Michael D4 | | KELLY Michael D5 | KELLY Michael D6 | |
| | Truck #2 | LORETTA Ernest D4 | | | | | | |

## SAGE STUDENTS

| INSTRUCTORS | | | Class Start 2/28/2011 | Class Start 3/14/2011 | start date | start date | start date | |
|---|---|---|---|---|---|---|---|---|
| Noel Wayne Kelly Loretta Isadore | | Margie 559-1714 | Michael M. | Rick M Marco B. Sam T. Ernest P. | | | | |

# WEEKLY CLASS/DRIVE SCHEDULE

*ORIGINAL*

FROM __04/04/11__  TO __04/10/11__

@012    TWC E HOUS    04/28/2011 11:10 FAX 5810144

04/27/2011 WED 11:03 [TX/RX NO 9933] @012

| | | Monday 4/4/2011 | Tuesday 4/5/2011 | Wednesday 4/6/2011 | Thursday 4/7/2011 | Friday 4/8/2011 | Saturday 4/9/2011 | Sunday 4/10/2011 |
|---|---|---|---|---|---|---|---|---|
| 4:00 AM to 8:00 AM | Rental Truck | | | | | | | |
| | Rental Truck | | Noel TANG | NOEL TANG | NOEL TANG | | | |
| CLASS I | classroom 1 | 7-12:16 Isadore | Isadore | ADMIN | Isadore | | | |
| | | SAGE & Trinidad | SAGE & Trinidad | SANJEL GS | SAGE STUD Day 13 | | | |
| | Rental Truck | Noel Richard | Wayne Joel | Wayne Roger | Loretta Sam/Michael D7 | Noel Michael D6/Earn D7 | Noel Rick/Marco D8 | Loretta Sam/Earn D10 |
| | Rental Truck | Wayne Terrance | Loretta Jesus | Kelly Johnny | | | | |
| CLASS I | | 1-6:16 Isadore | 1-3PM Isadore | ADMIN | | | | |
| | | SAGE & Trinidad | SAGE & Trinidad | SANJEL EXAMS GS | | | | |
| | Rental Truck | Kelly Richard | Wayne Jesus | Isadore Johnny | Isadore Roger | | | |
| | Rental Truck | Wayne Terrance | Loretta Joel | Wayne Roger | Wayne Trinidad D5 | Noel Rick/Marco D7 | Noel Sam/Earn B8 | Loretta Rick/Marco D10 |
| CLASS I | classroom 1 | Kelly Trinidad D4 | Mi? | Isadore Marco D6 | Wayne Roger | | Loretta Michael D9 | |
| | Rental Truck | | | | | | | |

| INSTRUCTORS | STUDENTS | | | | | |
|---|---|---|---|---|---|---|
| | start date 3/14/2011 | start date 3/28/2011 | start date | start date 2/28/2011 | | SPECIAL TRAINING |
| Noel Wayne Kelly Loretta | Rick M. Marco B. Sam T. Ernest P. | 0 Trinidad O. | | Michael M. | | Rich Terrance Joel Jesus Johnny Roger |

Margie 559-1714

# WEEKLY CLASS/DRIVE SCHEDULE

FINAL POSTED SCHEDULE  *Revised*

FROM __04/04/11__     TO __04/10/11__

| | | Monday 4/4/2011 | Tuesday 4/5/2011 | Wednesday 4/6/2011 | Thursday 4/7/2011 | Friday 4/8/2011 | Saturday 4/9/2011 | Sunday 4/10/2011 |
|---|---|---|---|---|---|---|---|---|
| 4:00 AM to 8:00 AM | Truck | | | | | | | Isadore Sam D9 |
| | Truck | | Noel TANG | Noel TANG | Noel TANG | | Wayne Michael D9 | Kelly Earnest D9 |
| Instructor | | | | ADMIN | Isadore | | | |
| Class Room 8am-12:15 | Instructor | Noel Richard | Wayne Sam/Earnest D7 | Trinidad GS Wayne Roger | Isadore Sam/Michael D8 | 7:11:15 Noel Michael/Marco D7 | Noel Rick/Marco D8 | |
| | Truck | | | | | | | |
| | Rental Truck | Wayne Terrance | | Kelly | | | | Isadore Rick/Marco D10 |
| Instructor | | | | ADMIN | | | | |
| Class 1pm-5:15 | Instructor | Kelly Richard | Wayne Trinidad Final | SANJEL EXAMS GS Isadore Roger | Isadore Roger | 12-4pm Noel Michael D8/Earn D8 | | |
| | Truck | | Sanjel Skill Exam | | | | | |
| | Instructor Truck | Wayne Terrance | | Kelly Marco D6 | | | Sam/Earn D10 | |
| Instructor | Instructor | | | | | 4-8pm | | |
| Class 5:30-9:45 | Classroom | | | | | | | |
| | Instructor Truck | Kelly Trinidad D4 | | | Wayne Roger | | | |
| | Rental Truck | | | | | | | |
| | | 4/4/2011 | 4/5/2011 | 4/6/2011 | 4/7/2011 | 4/8/2011 | 4/9/2011 | 4/10/2011 |

| INSTRUCTORS | | STUDENTS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | start date 3/14/2011 | start date 3/28/2011 | start date | start date 2/28/2011 | | | SPECIAL TRAINING |
| Noel Wayne Kelly Loretta | | Rick M. Marco B. Sam T. Ernest P. | Sanjel - 40 Trinidad O. | | Michael M. | | | Rich Terrance Roger Johnny |

# WEEKLY CLASS/DRIVE SCHEDULE

FROM 04/11/11    #2    Revised 4/12/11    TO 04/18/11

| | | Monday 4/11/2011 | Tuesday 4/12/2011 | Wednesday 4/13/2011 | Thursday 4/14/2011 | Friday 4/15/2011 | Saturday 4/17/2011 | Sunday 4/18/2011 |
|---|---|---|---|---|---|---|---|---|
| 4:00 AM to 8:00 AM | White Truck | | | | | | 8:00-NOEL/ISADORE SANJEL | |
| | Red Truck | | | | | SAGE GRAD CERTIFICATES | EVALUATIONS | |
| CLASS I INSTRUCTORS 8:00AM to 12:15 PM | | Noel COSA | | WAYNE COSA | Noel Noel STATE EXAM ? | | | |
| | White Truck | | | | | | | |
| | Red Truck | Kelly Earnest D11 | Wayne Marco D11 | Kelly Rick D9 | | | | |
| CLASS I INSTRUCTORS 1:00 PM to 5:15 PM | | | | NOEL SANJEL SITE 12:00:00 | | | | |
| | White Truck | | | | | | | |
| | Red Truck | Kelly Marco D9 | Wayne Sam-D11 | Isadore Michael D11 | | | | |
| CLASS I INSTRUCTORS 5:30 PM to 9:45 PM | | | | | | | | |
| | White Truck | | | | | | | |
| | Red Truck | | Wayne Rick D9 | | | | | |
| | | 4/11/2011 | 4/12/2011 | 4/13/2011 | 4/14/2011 | 4/15/2011 | 4/17/2011 | 4/18/2011 |

| INSTRUCTORS | STUDENTS | | |
|---|---|---|---|
| | start date 3/14/2011 | start date 2/28/2011 | |
| Noel Wayne Kelly Isadore | Rick M. Marco B. Sam T. Earnest P. | Michael M. | |
| Ramona -307-277-8082 | | | |