IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LORETTA EURE, individually, | § | CV. NO. 5:12-CV-1119-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| THE SAGE CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO STRIKE

Before the Court is a Motion for Summary Judgment filed by

Defendant The Sage Corporation ("Sage" or "Defendant").  ("Mot.," Dkt. # 21.)

The Court held a hearing on Defendant's Motion on November 6, 2014.  At the

hearing, Glenn D. Levy, Esq., represented Plaintiff Loretta Eure ("Eure" or

"Plaintiff"); John T. Hawkins, Esq., represented Defendant.  Upon careful

consideration of the arguments asserted in the supporting and opposing

memoranda, as well as the arguments presented at the hearing, the Court

**GRANTS** Defendant's Motion for Summary Judgment.  In conjunction with this

ruling, the Court also **GRANTS IN PART AND DENIES IN PART** Defendant's

Motion to Strike (Dkt. # 27).

<u>BACKGROUND</u>

Defendant owns and operates truck driving schools, including a school in San Antonio.  (Mot., Ex. 1 ¶ 2.)  In December 2010, Eure, who was assigned female at birth and presents as male, began working as a truck-driving instructor at Defendant's San Antonio location.  ("Resp.," Dkt. # 26, "Eure Decl.," Ex. 1 ¶ 2.)  During her[1] tenure, Eure reported to San Antonio School Director Margie Brandon ("Brandon"), Western Regional Director Barbara Blake ("Blake"), and President Gregg Aversa ("Aversa") as her supervisors.  (Mot., Ex. 1 ¶ 3.)

At the beginning of her employment with Defendant, Eure attests that she received insufficient training because her trainer, Noel Smith ("Smith") only permitted her to shadow him for twenty-four hours.  (Eure Decl. ¶ 3.)  Eure also attests that Smith subjected her to "sarcasm and innuendos," in which Smith complained about having to instruct Eure and expressed his desire to work in Brandon's supervisory role.  ("Eure Dep.," Mot., Ex. 4 at 43:1–6.)  Eure reported these comments to her supervisor, Brandon.  (Id. at 41:10–11, 20–22.)

In March 2011, Carmela Campanian ("Campanian"), a National Project Director for Sage, arrived at the San Antonio campus to conduct specialized training.  (Mot., Ex. 3 ¶ 2.)  Brandon alleges that, early that day,

---

[1] In Eure's papers, Eure refers to herself as "she" and this Court will do the same.

Campanian saw Eure with a student and asked Brandon, "What is that and who hired that?"  (<u>Id.</u> ¶ 3.)  Brandon alleges that Campanian then said, "Please don't tell me that is a Sage instructor" and informed Brandon that Sage did not hire "cross genders."  (<u>Id.</u>)  After Brandon told Campanian that she hired Eure because Eure was qualified and filled the school's need for a bilingual instructor, Brandon alleges that Campanian told her, "We will deal with you seriously for hiring that."  (<u>Id.</u>)  Brandon further alleges that Campanian indicated she would discuss the matter with Sage's President, Gregg Aversa ("Aversa") and discuss appropriate punishment for Brandon.  (<u>Id.</u>)

On that day or the following day, Brandon alleges that she reviewed the instructor schedule that Campanian had reworked.  (<u>Id.</u> ¶ 6.)  Brandon alleges that when she told Campanian that Eure had been omitted from the schedule, Campanian indicated that the omission was purposeful and asked Brandon if she understood the severity of the consequences for hiring a transgender instructor.  (<u>Id.</u>)

That same day, Campanian informed Eure that Eure could not use a particular truck with her student and Eure proceeded with the student's lesson in a different truck.  (Eure Dep. 49:10–21.)  After Eure returned from the lesson, Brandon's assistant, Maria Solis ("Solis"), informed Eure that Campanian had called her to the office.  (<u>Id.</u> at 50:22–24.)

3

When Eure met with Campanian, Eure alleges that Campanian said "I've never had to deal with something like this." (Id. at 51:12–13.)  In response, Eure asked, "What do you mean?  Because I'm gay?" (Id. at 51:13–14.)  Eure alleges that Campanian paused and then said that Eure was insubordinate. (Id. at 51:14–15.)  Eure alleges that Campanian then received a phone call and dismissed Eure from her office. (Id. at 51:23–52:4.)  Eure immediately reported this incident to Brandon. (Id. at 52:20–23.)  Later that evening, Eure called Brandon again to discuss the incident. (Id. at 53:22–54:3.)  At the same time, she attempted to report the incident to Aversa, but she obtained Aversa's contact information through a search engine and mistakenly emailed the incorrect Aversa. (Id. at 54:4–10.)  When the incorrect recipient informed her of the mistake, she redirected the complaint to Aversa on March 31, 2011. (Id.; id. at 56:17–20.)

Because Aversa was out of town, Blake responded to the complaint on behalf of Aversa on April 1, 2011. (Id. at 59:8–16; Mot., Ex. 2, Ex. E at 2.)  Blake asked that Eure call Sage's Vice President and General Counsel Chris Thropp sometime that day to discuss the matter over the phone. (Mot., Ex. 2, Ex. E at 2.)

On April 4, 2011, Eure submitted a charge of discrimination with the EEOC, which alleged discrimination based on sex against Defendant. (Eure Dep. 67:8–23.)  That same day, Aversa returned from his trip and spoke with Eure. (Mot., Ex. 1 ¶ 4; Eure Dep. 59:20.)  Aversa asked Eure to consider returning to

4

work and assured Eure that he planned to investigate the incident further.  (Eure

Dep. 60:2–18.)  On April 5, 2011, Aversa replied to Eure's email, expressing his

apologies for the events that unfolded, his intention to address the matter with

Campanian, and his support for Eure's return to work.  (Mot., Ex. 1, Ex. H.)  He

also stated that "[t]he reports from [Brandon] on your teaching skills and your

overall performance were very positive and encouraging to Barb Blake and to me."

(Id.)  On April 6, 2011, Eure replied that she would need additional information

about the hours that she would be able to work and whether Brandon and Solis

would be returning before she agreed to return to work.  (Mot., Ex. 1, Ex. I.)  Eure

never returned to work.  (Eure Dep. 64:17–19.)

On November 29, 2012, Eure filed a complaint in this Court, naming

Sage as the sole defendant.  She asserts claims of gender discrimination under Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Texas

Commission on Human Rights Act ("TCHRA"), Texas Labor Code § 21.051;

wrongful termination and retaliation under Title VII and § 1981; and negligent

hiring, supervision, training, and retention.  ("Compl.," Dkt. # 1 ¶¶ 14–23.)  Eure

seeks past and future wages and benefits, noneconomic damages, punitive

damages, and attorney's fees.  (Id. at 5–6.)

On July 31, 2014, Defendant filed the instant Motion for Summary

Judgment.  (Dkt. # 21.)  Plaintiff filed her Response to the Motion for Summary

Judgment on September 22, 2014. (Dkt. # 26.) On September 29, 2014,

Defendant filed a Motion to Strike various portions of Eure's declaration, which

was submitted in support of Plaintiff's Response. (Dkt. # 27.) On the same day,

Defendant submitted its Reply to Plaintiff's Response to the Motion for Summary

Judgment. (Dkt. # 28.)

## LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there

is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see also

Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014). A dispute is

only genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). If the moving party meets this burden, the nonmoving party must

come forward with specific facts that establish the existence of a genuine issue for

trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703,

706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621

(5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

I.   Defendant's Motion to Strike

Defendant objects to various portions of Eure's declaration, submitted in support of Plaintiff's Response, on the basis that particular statements (a) constitute inadmissible hearsay and (b) contain speculation and conclusory statements. (Dkt. # 27 at 2–4.) Defendant also argues that the entire affidavit should be stricken as a sham affidavit because it conflicts with Eure's deposition testimony. (Id. at 4–5.)

A.    <u>Sham Affidavit</u>

"It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." <u>S.W.S. Erectors, Inc. v. Infax, Inc.</u>, 72 F.3d 489, 495 (5th Cir. 1996) (citing <u>Thurman v. Sears, Roebuck & Co.</u>, 952 F.2d 128, 137 n.23 (5th Cir. 1992)). This circuit recognizes the "sham-affidavit rule," which prohibits a non-moving party from "manufactur[ing] a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." <u>Guerrero v. Total Renal Care, Inc.</u>, 932 F. Supp. 2d 769, 776 (W.D. Tex. 2013). The "sham-affidavit rule 'is applied sparingly' and may be invoked only where there is 'some inherent inconsistency between an affidavit and a deposition.'" <u>Axxiom Mfg., Inc. v. McCoy Invs., Inc.</u>, 846 F. Supp. 2d 732, 749–50 (S.D. Tex. 2012).

Defendant argues that Eure's declaration attests to the fact that Defendant discriminated against her or had a position against transgender employees, but that Eure testified that the only incidents supporting Defendant's bias was the incident in which Campanian would not allow Eure to use a truck and Campanian's comments that Eure was insubordinate. (Dkt. # 27 at 4–5.) Defendant argues that the deposition testimony directly conflicts with the declaration and, accordingly, the Court should strike Eure's declaration in its

8

entirety.  (Id. at 5.)

The fact that Defendant does not agree with Eure that these incidents amount to a showing of gender discrimination or a policy against transgender employees does not render the statements inconsistent.  The court finds no direct conflict between the affidavit and deposition testimony indicating bad faith, and therefore **DENIES** Defendant's Motion to Strike Eure's declaration in its entirety on the basis that the declaration constitutes a sham affidavit.

B.    Hearsay and Conclusory Statements

Under Federal Rule of Evidence 56(c)(4), a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that that the . . . declarant is competent to testify on the matters stated."[2]  Any statements in a declaration that violate this rule are not considered for summary judgment purposes; any portions of the declarations that are not struck remain part of the summary judgment record.  See Mayfield v. Tex. Dep't of Criminal Justice, 529 F.3d 599, 607 (5th Cir. 2008) (citing Akin v. Q–L Invs., Inc., 959 F.2d 521, 531 (5th Cir. 1992)); Williamson v.

---

[2] Although Eure's declaration is unsworn, it is nevertheless entitled to consideration because it falls within the statutory exception permitting consideration of unsworn oaths.  28 U.S.C. § 1746; Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1305–06 (5th Cir. 1988)) (finding that, to be competent for summary judgment purposes, an affidavit must be sworn or its contents must be stated to be true and correct under penalty of perjury).

<u>U.S. Dep't of Agric.</u>, 815 F.2d 368, 383 (5th Cir. 1987).

        1.      <u>Conclusory Statements</u>

Defendant argues that the following statements in Eure's declaration are conclusory or speculative: (1) "I believe it was Mr. Noel's way of letting me know that my gender was an issue with him"; (2) "I learned my gender was an issue with management"; (3) "I later came to learn that Ms. Campanian was angry that Margie Brandon, the school director, had hired me because I was a gender non-conforming female instructor"; (4) "an environment where an owner and an executive had bigotry and hate as a motivator."  (Dkt. # 27 at 3–4.)

The Court agrees that the statements are of a conclusory nature, since they are Eure's speculative conclusions about the beliefs of others.  Accordingly, the statements are inadmissible, and the Court **GRANTS** Defendant's Motion to Strike on that basis.

        2.      <u>Hearsay</u>

Defendant argues that the following statements in Eure's declaration are hearsay: (1) Eure's recounting of the interaction between Campanian and Brandon, during which Campanian allegedly asked Brandon, upon seeing Eure, "What is that," and told Brandon that she would be punished for hiring "cross genders" and (2) Eure's statement that Brandon was instructed by Campanian to significantly reduce Eure's work schedule.  (Dkt. # 27 at 2.)

The Court agrees that, because Eure was not present for either of these conversations, they constitute inadmissible hearsay.  Accordingly, the Court **GRANTS** Defendant's Motion to Strike on that basis.

II.     Defendant's Motion for Summary Judgment

        In its motion, Defendant contends that Eure's claims fail because: (1) she failed to establish a prima facie case on her claims of gender discrimination, retaliation, and hostile work environment; (2) her constructive discharge claim is insufficient as a matter of law; and (3) her negligent hiring, supervision, training, and retention claim is both preempted and insufficient as matter of law.[3]  (Mot. at 4–20.)

---

[3] The Court agrees with Defendant that, although Eure's complaint contains the cursory statement that "Defendant's employment practices had a disparate and adverse impact on Plaintiff because of her gender (female)" (Compl. ¶ 18), Eure has not alleged a disparate impact claim.  As the Supreme Court has described:

> [D]isparate treatment is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic]. . . . By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.

Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (internal quotation marks omitted) (citations omitted).

        The facts alleged in Eure's complaint do not identify any facially neutral employment practices that disparately impact females.  See McClain v. Lufkin Indus., Inc., 519 F.3d 264, 275 (5th Cir. 2008) ("To establish a prima facie

At the outset, the Court notes that sex discrimination claims are not cognizable under § 1981.  Daigle v. Gulf State Utils. Co., Local Union No. 2286, 794 F.2d 974, 980 (5th Cir. 1986); Bobo v. ITT, Cont'l Baking Co., 662 F.2d 340, 344–45 (5th Cir. 1981).  Therefore, the Court analyzes the claims set forth only under Title VII, the TCHRA, and state common law.

A.   Gender Discrimination and Hostile Work Environment Claims

Title VII[4] makes it "an unlawful practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex."  42 U.S.C. § 20000e–2(a)(1).  The "ultimate question" in every Title VII case is whether the plaintiff has proven that the defendant intentionally discriminated against her because of a protected characteristic.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

---

case of discrimination under a disparate-impact theory, a plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two"); see also Ricci v. DeStefano, 557 U.S. 557, 587 (2009) ("a prima facie case of disparate-impact liability [is] essentially, a threshold showing of a significant statistical disparity, and nothing more" (citations omitted)).  Because Eure's complaint does not set forth sufficient factual allegations to plead a disparate impact claim, see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), the Court interprets Eure's "gender discrimination" claim as a traditional disparate treatment claim.

[4] Although Eure makes claims under both Title VII and the TCHRA, the Court only refers to Title VII because the TCHRA is interpreted accordance with federal law.  In re United Servs. Auto. Ass'n, 307 S.W.3d 299, 308 (Tex. 2010).

It is well-established that "a plaintiff can satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes."[5] Boh Bros., 731 F.3d at 454. The gender stereotyping theory comes out of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a case in which a female senior manager challenged the rejection of her bid for partnership as gender discrimination. Id. at 233. Hopkins presented evidence that, during the review of her candidacy, the hiring partners referred to her as "macho," "a lady using foul language," "a tough-talking somewhat masculine hard-nosed manager," and "overcompensated for being a woman." Id. at 235. The partners also suggested that she could improve her partnership chances by "walk[ing] more femininely, talk[ing] more femininely, dress[ing] more femininely, wear[ing] make-up, hav[ing] her hair styled, and wear[ing] jewelry." Id. The Court found that this evidence was evidence of sex stereotyping, which was sufficient to satisfy Title VII's "because of sex" requirement. Id. at 251. In so

---

[5] The Court notes that Eure's gender discrimination and hostile work environment claims are brought under both Title VII and the TCHRA. Because the TCHRA was modeled after federal civil rights law and is intended to coordinate state law with federal law in employment discrimination cases, the Texas Supreme Court interprets the TCHRA in light of federal law and the cases interpreting that law. In re United Servs. Auto. Ass'n, 307 S.W.3d at 308. Although Texas courts have not directly addressed whether sex stereotyping claims can support a "because of sex" claim under the TCHRA, the Court concludes that they can, since the TCHRA is interpreted in light of federal law unless the Texas Supreme Court has held otherwise.

holding, the Court noted that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for 'in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" Id. at 251 (alterations omitted) (quoting L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)).

Since Price Waterhouse, courts have relied on the sex stereotyping doctrine in finding discrimination based on sex under Title VII.  In so finding, courts have generally required evidence of gendered statements or acts that target a plaintiff's conformance with traditional conceptions of masculinity or femininity. See, e.g., Boh Bros., 731 F.3d at 454 (finding that evidence that the plaintiff's coworkers taunted him with "sex-based epithets" "directed at [his] masculinity," as well as physical acts of simulated anal sex, simulated male-on-male oral sex, and genital exposure was sufficient to prevail on a gender-stereotyping theory); Nichols v. Azteca Res. Enters., Inc., 256 F.3d 864, 874 (9th Cir. 2001) (finding that evidence that the male plaintiff was "attacked for walking and carrying his tray 'like a woman'—i.e., for having feminine mannerisms," that coworkers called the plaintiff names "cast in female terms," and that coworkers and supervisors referred to him as "she" and "her" was sufficient to prevail on a sex stereotyping theory).

In some cases, the plaintiffs bringing successful sex stereotyping claims are transgender people, arguing that the discrimination that they have suffered is because their coworkers perceived their behavior or appearance as not "masculine or feminine enough." However, courts have been reluctant to extend the sex stereotyping theory to cover circumstances where the plaintiff is discriminated against because the plaintiff's status as a transgender man or woman, without any additional evidence related to gender stereotype non-conformity.[6] Etstitty v. Utah Transit Auth., 502 F.3d 1215, 1222 (10th Cir. 2007) ("[D]iscrimination against a transsexual because she is a transsexual is not 'discrimination because of sex.' Therefore, transsexuals are not a protected class under Title VII and [a plaintiff] cannot satisfy her prima facie burden on the basis of her status as a transsexual."); Schwenk v. Hartford, 204 F.3d 1187, 1201–02 (9th Cir. 2000) (finding that the judicial approach of barring all claims against transgender persons, as held in Holloway, was overruled by the logic of Price Waterhouse, but holding that "[w]hat matters, for the purpose of this part of the

---

[6] Although the Ulane, Sommers, Holloway line of case law was, at one time, a complete bar for transgender plaintiffs to seek recovery on any basis, "federal courts have recognized with near-total uniformity" that complete bar was eliminated when the Supreme Court upheld gender stereotyping as a valid approach to show discrimination because of sex. Glenn v. Brumby, 663 F.3d 1312, 1318 n.5 (11th Cir. 2011) (citing Smith v. City of Salem, 378 F.3d 566, 573 (6th Cir. 2004); Schwenk v. Hartford, 204 F.3d 1187, 1201 (9th Cir. 2000); Rosa v. Park W. Bank & Trust Co., 214 F.3d 213, 215 (1st Cir. 2000).

Price Waterhouse analysis, is that in the mind of the perpetrator the discrimination is related to the sex of the victim: here, for example, the perpetrator's actions stem from the fact that he believed that the victim was a man who 'failed to act like one'"); Ulane v. E. Airlines, 742 F.2d 1081, 1085 (7th Cir. 1984) ("[W]e are constrained to hold that Title VII does not protect transsexuals"); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982) ("Because Congress has not shown an intention to protect transsexuals, we hold that discrimination based on one's transsexualism does not fall within the protective purview of [Title VII]"); Schroer v. Billington, 577 F. Supp. 2d 293, 304 (D.D.C. 2008) ("While I agreed with the Sixth Circuit that transsexuality is not a bar to a sex stereotyping claim, I took the position that 'such a claim must actually arise from the employee's appearance or conduct and the employer's stereotypical perceptions.'  In other words, 'a Price Waterhouse claim could not be supported by facts showing that [an adverse employment action] resulted solely from [the plaintiff's] disclosure of her gender dysphoria'") (citations and alterations omitted).  But see Smith v. City of Salem, 378 F.3d 566, 574–75 (6th Cir. 2004) ("[D]iscrimination against a plaintiff who is a transsexual—and therefore fails to act and/or identify with this or her gender—is no different from the discrimination directed against Ann Hopkins in Price Waterhouse, who, in sex-stereotypical terms, did not act like a woman.  Sex stereotyping based on a person's gender non-conforming behavior is impermissible

discrimination, irrespective of the cause of that behavior; a label, such as "transsexual," is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity.").

All of the testimony that Eure has presented related to Campanian's animus couches Campanian's alleged discrimination in terms specifically related to Eure's status as a transgender person, not in terms related to her conformance with gender stereotypes.[7] Eure presents two pieces of evidence to show discrimination based on sex: (1) Brandon's testimony that, upon seeing Eure, Campanian asked Brandon, "What is that and who hired that? . . . Please do not tell me that is a Sage instructor . . . . We will deal with you seriously for hiring that," (Brandon Decl. ¶ 3.), and (2) Brandon's testimony that, upon reviewing the changes Campanian made to the calendar, Brandon told Campanian that Campanian had failed to place Eure on the schedule, at which point "[Campanian] looked at [Brandon] and asked [her] if [she] was serious. . . . She then asked [Brandon] if she understood the severity and the consequences that was [sic] on the horizon for [her] for having the audacity to hire a cross gender" (Brandon Decl. ¶ 6).

This is a difficult case because, although <u>Price Waterhouse</u> provides a

---

[7] The Court notes that, although neither party has made argument on whether Eure's claims were properly made "because of sex," the Court cannot engage in meaningful analysis of the contested arguments, including whether there is direct evidence of discrimination—as Plaintiff's counsel argued at the hearing—without first determining whether the discrimination at issue is covered by Title VII.

vehicle for transgender persons to seek recovery under Title VII, neither the

Supreme Court nor the Fifth Circuit have held that discrimination based on

transgender status is per se gender stereotyping actionable under Title VII.

Without any briefing from the parties on the issue, this Court declines to hold

otherwise.  Because Eure has failed to present evidence showing that the

discrimination was motivated by her failure to act as a stereotypical woman

would,[8] Eure has not presented a cognizable gender stereotyping claim and cannot

succeed in showing that the discrimination or hostile work environment claim that

she presents is "because of sex," as Title VII requires.[9]  Therefore, the Court

**GRANTS** Defendant's Motion for Summary Judgment on the discrimination and

---

[8] The Court notes that similar rationale supported the Second Circuit's conclusion in Dawson v. Bumble & Bumble:

> In sum, in contrast to the plaintiff in Price Waterhouse, who proffered evidence that her promotion to partnership depended upon her changing her behavior to better conform to gender stereotypes, or the plaintiff in Back, who demonstrated a triable issue of fact as to whether her superiors felt that her continued employment violated gender stereotypes, Dawson has produced no substantial evidence from which we may plausibly infer that her alleged failure to conform her appearance to feminine stereotypes resulted in her suffering any adverse employment action at the hands of Bumble & Bumble. Thus, her Title VII claim based upon a gender stereotyping theory must fail.

398 F.3d 211, 222–23 (2d Cir. 2005).

[9] Because Eure has not established that the alleged discrimination was the sort of discrimination prohibited by Title VII, the Court does not reach the parties' arguments about whether she has otherwise established her prima facie case.

hostile work environment claims.

B.    Retaliation

Defendant also contends that summary judgment on Eure's retaliation claim is warranted because Brandon failed to present sufficient evidence on any elements of her prima facie case.  (Mot. at 8–10.)  At the hearing, Plaintiff's counsel indicated that he believes that direct evidence supports the retaliation claim.

Like in discrimination claim, a plaintiff can prove retaliation either through direct or circumstantial evidence.  See Fierros v. Tex. Dep't of Health, 274 F.3d 187, 195 (5th Cir. 2001) (internal quotation marks and internal alteration omitted), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 92 (2003).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir. 2014).  In a direct evidence case, the causal link will amount to evidence that, if believed, proves the fact of intentional retaliation without inference or presumption.  Fierros v. Tex. Dep't of Health, 274 F.3d at 195.

Once the plaintiff presents his prima facie case, the burden shifts to

the defendant to proffer a legitimate non-discriminatory reason for the underlying employment action.  Id. at 317–18.  If a defendant makes this showing, the burden shifts back to the plaintiff to show that the proffered reason is, in fact, a pretext for discrimination.  Id. at 318.

      1.     Protected Activity Under Title VII

      An employee engages "in protected activity if she has 'opposed any practice made an unlawful employment practice under [42 U.S.C. § 2000e–3(a)].'" Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007) (quoting 42 U.S.C. § 2000e–3(a)).  To show that the activity was protected, the employee must have had "at least a reasonable belief that the practices she opposed were unlawful." Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996) (internal quotation marks omitted).

      Although Eure does not specifically identify the factual basis of the protected activity in her complaint, she filed an EEOC charge of discrimination on April 4, 2011, which was a protected activity.  (Eure Dep. 67:8–23.)  Additionally, Eure alleges that she reported the comments made by Smith and Campanian to her supervisors, Brandon and Aversa.  (Eure Dep. 41:10–11, 20–22.)  Because Eure could not have reasonably believed that Smith's comments constituted an unlawful employment practice in and of themselves—since the statements had no relationship to Eure's gender—Eure's decision to report Smith's comments cannot

be a protected activity.

However, Eure could have reasonably believed that Campanian's alleged opposition to hiring transgendered persons and decision to remove Eure from the schedule was in violation of Title VII. Although the contours of the sex stereotyping doctrine that transgender persons can use as a basis for Title VII discrimination claims are complex, the only issue here is whether Eure could have reasonably believed that Campanian's actions violated Title VII. Because there is a potential basis of recovery under Title VII, Eure's belief was reasonable.

Although neither the Supreme Court nor the Fifth Circuit[10] have ruled definitively as to whether informal complaints can constitute opposition, the majority of circuits find that informal complaints come within the opposition clause's requirements. Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors); Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 715 n.2 (11th Cir. 2002) (noting that Title VII protects those "who

---

[10] Although not binding on this Court, the Fifth Circuit has stated in an unpublished opinion that an employee need not submit a formal complaint or charge of discrimination to meet the opposition requirement and that an informal complaint to a supervisor is sufficient. Tureaud v. Grambling State Univ., 294 F. App'x 909, 914–15 (5th Cir. 2008) (finding opposition when the plaintiff sought assistance from fellow employees in rallying support for a job applicant that the plaintiff believed was being discriminated against).

informally voice complaints to their superiors or who use their employers' internal

grievance procedures"); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th

Cir. 2000) (listing various activities that the EEOC identifies as opposing conduct);

Sunner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (listing permissible

forms of opposition as including "making complaints to management"); Armstrong

v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981) (considering informal

complaints protected opposition); Sias v. City Demonstration Agency, 588 F.2d

692, 694 (9th Cir. 1978) ("It should not be necessary for an employee to resort

immediately to the EEOC or similar State agencies in order to bring complaints of

discrimination to the attention of the employer with some measure of protection.

The resolution of such charges without government prodding should be

encouraged.").

      The Court agrees that informal opposition to a discriminatory practice

can constitute protected activity.  Accordingly, there is a fact question as to

whether Eure's report of her conversation with Campanian and of Campanian's

decision to remove Eure from the schedule constituted a protected activity.

      2.   Adverse Employment Action

      Unlike in the Title VII discrimination context, an adverse employment

action in the retaliation context is not limited to ultimate employment decisions,

such as hiring, granting leave, discharge, promotion, and compensation.  McCoy v.

22

City of Shreveport, 492 F.3d 551, 558 (5th Cir. 2007). Rather, the action can be something that "a reasonable employee would have found . . . [to be] materially adverse" or, in other words, would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Aryain, 534 F.3d at 484 (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68).

   Although Eure does not identify the specific basis for her adverse employment action allegation, she does allege that Campanian reduced her hours.[11]

_____

[11] Because Eure's claims do not amount to constructive discharge, Eure cannot rely on her resignation as an adverse employment action.

   A resignation can only constitute an adverse employment action where that resignation amounts to a constructive discharge. Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001). "To prove a constructive discharge, a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." Id. (internal quotation marks omitted) (quoting Faruki v. Parsons, 123 F.3d 315, 319 (5th Cir. 1997)). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." Id. In evaluating whether a reasonable employee would feel compelled to resign, a court must consider whether the plaintiff experienced any demotions; reductions in salary or job responsibilities; job reassignments to menial or degrading work, or to a younger supervisor; badgering, harassment, or humiliation calculated to encourage resignation; offers of early retirement; or continued employment on terms less favorable than the employee's former status. Id. (quoting Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000)).

   Eure's resignation was not a constructive discharge amounting to an adverse employment action. Eure alleges that she resigned because of the "tone" of Campanian's meeting with her, her understanding that Campanian had a problem with transgender employees, and the reduction in work hours that she experienced. Although these events may amount to an unpleasant working environment, they transpired over the period of two days. "In the constructive discharge context, . . . 'part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."

Eure presents Brandon's declaration to show that she was removed from teaching

assignments at the direction of Campanian.  (Brandon Decl. ¶ 6.  <u>Compare</u> Eure

Dep., Ex. 9 at 1 (showing a shift on 4/1/11 and possible shifts on 3/31/11 and

4/3/11), <u>with</u> <u>id.</u>, Ex. 9 at 2 (showing shift on 4/1/11 with a handwritten note

"cancelled given to other Instr." and no shifts on 3/31/11 or 4/3/11).)

       Eure was a part-time instructor at Sage, who was assigned "minimal

hours," somewhere between twenty-six and twenty-eight hours per week.  (<u>Id.</u> at

43:24–44:11.)  The evidence in the record establishes that Sage originally

scheduled Eure for 12.75 hours with the possibility of 8.5 additional hours (the

instructor on the shift assignments at issue was designated as "Kelly or Loretta")

for the week of March 28, 2011.  (<u>Id.</u>, Ex. 9 at 1.)  The revised schedule shows that

Sage scheduled Eure for 12.75 hours and removed the possibility of the 8.5

additional hours (the shifts were given to Kelly).  (<u>Id.</u> at 2.)  Brandon attests that

Campanian purposefully made this change in order to reduce Eure's hours on the

---

Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 481–82 (5th Cir. 2008) (quoting
Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987)).  The
record is clear that Eure did not give Defendant the opportunity to investigate her
claims before she stopped returning to work; rather, she reported the incident to
Brandon and Aversa and never came to work again.  She did this in spite of
Aversa's apologies, both via email and over the phone, for what she said had
occurred and his attempts to convince her to return to work.  This conduct
undermines Eure's obligation to be reasonable.  Accordingly, there was no
constructive discharge amounting to an adverse employment action in this case.

schedule.[12]

Because a reduction in hours—and, consequently, the reduction in associated income—could dissuade a reasonable employee from making or supporting a charge of discrimination, a reduction in hours can be an adverse employment action in the retaliation context.  See, e.g., Badii v. Rick's Cabaret Intern., Inc., No, 3:12-CV-4541-B, 2014 WL 550593, at *17 (N.D. Tex. Feb. 11, 2014) (finding that shift reduction can be an adverse employment action in the retaliation context); McNairy v. Chickasaw Cnty., Miss., No. 1:09-CV-59-SA-JAD, 2010 WL 3813612, at *4 (N.D. Miss. Sept. 22, 2010) (finding that a reduction in hours constituted an adverse employment action for retaliation); Harris v. Fresenius Med. Care, No, H-04-4807, 2006 WL 2065313, at *19 (S.D. Tex. July 24, 2006) (finding that hours reduction could be an adverse employment action for retaliation purposes, but was not because the employer provided a legitimate, non-discriminatory reason for that reduction).  Accordingly, Eure has set forth evidence to satisfy the second prong of the prima facie case.

---

[12] The Court notes that the schedule also has a cross-out through the 4/1/2011 8.5 hour shift, accompanied by writing that reads "cancelled given to other Instr." (Eure Dep., Ex. 9 at 2.)  It is unclear who made this marking, as well as the time at which the cancellation occurred.  However, Defendant's evidence, which Eure does not dispute, indicates that the shift was reassigned when Eure called in sick on April 1, and was not cancelled at the same time that Kelly was given the undecided 8.5 hour shifts.  (Mot., Ex. 2 ¶ 22.)  Therefore, the Court does not consider this evidence of an hours reduction.

3.      Causal Link

"At the prima facie stage, 'the standard for satisfying the causation

element is 'much less stringent' than a 'but for' causation standard.'  Nevertheless,

the plaintiff must produce some evidence of a causal link between the protected

activity and the adverse employment action to establish a prima facie case of

retaliation."  Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003)

(quoting Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191 (5th Cir. 2011)).

Eure has failed to produce such evidence, either in direct or

circumstantial form.  The hours reduction that Eure alleges occurred before she

made any reports to Brandon or Aversa.  Similarly, Eure chose to stop returning to

work before submitting her EEOC discrimination charge.  Compare with

Shackelford v. Deloitte & Touce, LLP, 190 F.3d 398, 409 (5th Cir. 1999) (finding

that termination after submitting an EEOC charge was sufficient to meet the causal

link showing).  Accordingly, there is no causal link between Eure's reduction of

hours and the adverse employment actions.  Therefore, the Court finds that

summary judgment on the retaliation claim is warranted and the Court **GRANTS**

Defendant's Motion for Summary Judgment with respect to the retaliation claim.

C.      Negligent Hiring, Supervision, Training, and Retention Claims

Finally, Defendant contends that summary judgment on Eure's

negligent hiring supervision, training, and retention claims is proper because

26

(1) negligence claims based on acts of discrimination or harassment are preempted by the Texas Commission on Human Rights Act ("TCHRA"); (2) negligence claims against an employer are preempted by the worker's compensation remedy; (3) there is no evidence that a Sage employee committed a tort against Eure; and (4) Eure has failed to show any negligence on the part of Defendant.  (Mot. at 17–19.)

      1.    <u>Preemption</u>

The TCHRA is a Texas statute prohibiting discrimination and retaliation against employees on the basis of race, sex, and other protected characteristics.  Tex. Labor Code § 21.051.  When the facts underlying a plaintiff's negligence claims are entwined with facts that would give rise to a harassment claim under the TCHRA, the TCHRA is the exclusive state-law remedy for the harassment.  <u>Waffle House, Inc. v. Williams</u>, 313 S.W.3d 796, 799 (Tex. 2010).

Although Eure does not identify the specific facts giving rise to her claim based in negligence, the only possible basis for her claims is the same set of facts that form the basis of her discrimination, harassment, and retaliation claims. Because the TCHRA is the exclusive state-law remedy for those claims, Eure's negligence claims fail as a matter of law.

      2.    <u>The Merits</u>

Even if Eure's negligence claims were not preempted by the TCHRA,

her claims would nevertheless fail.  Although the Texas Supreme Court has "not

ruled definitively on the existence, elements, and scope" of negligent hiring claims,

a few broad principles are clear.  First, like a general negligence action, a negligent

hiring action requires a showing of duty, a breach of that duty, and damages

proximately caused by the breach.  Castillo v. Gulf Coast Livestock Mkt., L.L.C.,

392 S.W.3d 299, 306 (Tex. 2012); see also Wansey v. Hole, 379 S.W.3d 246, 248

(Tex. 2012); Kroger Co. v. Elwood, 197 S.W.3d 793, 794 (Tex. 2006).  Second,

the plaintiff must show that she "suffer[ed] some damages from the foreseeable

misconduct of an employee hired pursuant to the defendant's negligent practices,"

which amount to an independently actionable tort.  Wansey, 379 S.W.3d at

247–248.  Third, when the claim is based on failure to screen, as it is in the instant

case, the plaintiff must show that the "employer's failure to investigate, screen, or

supervise its [hires] proximately caused the injuries the plaintiffs allege."  Fifth

Club, Inc. v. Ramirez, 196 S.W.3d 788, 796 (Tex. 2006) (internal quotation marks

omitted) (quoting Doe v. Boys Clubs of Greater Dall., Inc., 907 S.W.2d 472, 477

(Tex. 1995)).  Accordingly, this Court has previously concluded that:

> [A] negligent hiring and management claim in Texas requires a
> plaintiff to establish that: (1) an employee of the defendant committed
> an actionable tort against the plaintiff, (2) the plaintiff suffered
> damages as a result of the employee's foreseeable misconduct, (3) the
> employer was negligent in hiring or supervising the employee, and
> (4) the employee's misconduct would not have occurred but for the
> employer's negligence.

<u>Ayres v. Parker</u>, No. 5:12-CV-621-XR, 2013 WL 4048328, at *18 (W.D. Tex. July 29, 2013).

Although Eure names negligent hiring, supervision, training, and retention as the basis of her claim, she does not identify any actionable tort committed by Campanian (or any other Sage employee).  Having failed to identify any particular tort, she has not met her burden under <u>Wansey</u>.

Even if Eure had identified a particular tort committed by Campanian, the Court cannot find any support in the record showing that Campanian's alleged harassment was foreseeable. Plaintiff presents no evidence that Campanian had received discipline or been subject to termination for gender-based harassment at Sage or any other prior employer.  <u>See Ogunbanjo v. Don McGill of W. Hous., Ltd.</u>, No. 1-13-406-CV, 2014 WL 298037, at *3 (Tex. App.—Houston [1st Dist.] Jan. 28, 2014) (finding that a previous termination, without an evidentiary showing of the basis for that termination, was insufficient to raise a fact issue regarding foreseeability of sexual harassment).  The only evidence in the record addressing Campanian's disciplinary record is her own attestation that she has never had a complaint of harassment or discrimination made against her during her thirty years working in driving schools, as well as her attestation that she previously trained a transgender driver at another school without incident.  (Mot., Ex. 3 ¶ 5.) Accordingly, Eure has failed to show that any alleged harassment by Campanian

was foreseeable to Defendant.

Therefore, Defendant's Motion for Summary Judgment on the negligence claims is **GRANTED.**

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 21).  Accordingly, all claims made against Defendant are **DISMISSED**.  In conjunction with this ruling, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Strike (Dkt. # 27).

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, November 19, 2014.

_____
David Alan Ezra
Senior United States Distict Judge